**2023-1682; 2023-1900**

# United States Court of Appeals for the Federal Circuit

BULLSHINE DISTILLERY LLC,

*Appellant,*

– v. –

SAZERAC BRANDS, LLC,

*Cross-Appellant.*

*On Appeal from the United States Patent and Trademark Office, Patent Trial and Appeal Board in No. 91227653*

## NON-CONFIDENTIAL BRIEF FOR APPELLANT

JOHN R. HORVACK, JR.
FATIMA LAHNIN
DAMIAN K. GUNNINGSMITH
CARMODY TORRANCE SANDAK & HENNESSEY LLP
195 Church Street
New Haven, Connecticut 06510
(203) 777-5501
jhorvack@carmodylaw.com
flahnin@carmodylaw.com
dgunningsmith@carmodylaw.com

*Counsel for Appellant*

JULY 7, 2023

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF INTEREST

**Case Number** 2023-1682

**Short Case Caption** Bullshine Distillery LLC v. Sazerac Brands, LLC

**Filing Party/Entity** Bullshine Distillery LLC

**Instructions:**

1. Complete each section of the form and select none or N/A if appropriate.
2. Please enter only one item per box; attach additional pages as needed, and check the box to indicate such pages are attached.
3. In answering Sections 2 and 3, be specific as to which represented entities the answers apply; lack of specificity may result in non-compliance.
4. Please do not duplicate entries within Section 5.
5. Counsel must file an amended Certificate of Interest within seven days after any information on this form changes. Fed. Cir. R. 47.4(c).

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: 04/11/2023

Signature: /s/ John R. Horvack, Jr.

Name: John R. Horvack, Jr.

**FORM 9. Certificate of Interest** **Form 9 (p. 2)**
**March 2023**

| **1. Represented Entities.** Fed. Cir. R. 47.4(a)(1). | **2. Real Party in Interest.** Fed. Cir. R. 47.4(a)(2). | **3. Parent Corporations and Stockholders.** Fed. Cir. R. 47.4(a)(3). |
|---|---|---|
| Provide the full names of all entities represented by undersigned counsel in this case. | Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.<br><br>☑ None/Not Applicable | Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.<br><br>☑ None/Not Applicable |
| Bullshine Distillery LLC | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

☐ Additional pages attached

**4. Legal Representatives.** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |
| | | |

**5. Related Cases.** Other than the originating case(s) for this case, are there related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

☐ Yes (file separate notice; see below) ☑ No ☐ N/A (amicus/movant)

If yes, concurrently file a separate Notice of Related Case Information that complies with Fed. Cir. R. 47.5(b). **Please do not duplicate information.** This separate Notice must only be filed with the first Certificate of Interest or, subsequently, if information changes during the pendency of the appeal. Fed. Cir. R. 47.5(b).

**6. Organizational Victims and Bankruptcy Cases.** Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

☑ None/Not Applicable ☐ Additional pages attached

| | | |
|---|---|---|
| | | |
| | | |

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .......... i

TABLE OF CONTENTS .......... iv

TABLE OF AUTHORITIES .......... vii

STATEMENT OF RELATED CASES .......... ix

TABLE OF ABBREVIATIONS .......... x

I. JURISDICTIONAL STATEMENT .......... 1

II. STATEMENT OF THE ISSUES .......... 1

III. STATEMENT OF THE CASE .......... 1

IV. STATEMENT OF FACTS .......... 2

V. SUMMARY OF THE ARGUMENT .......... 13

VI. ARGUMENT .......... 15

A. The Board erred by failing to apply the correct legal standard that is applicable to genericness cases—like this one—which do not involve genericide .......... 15

1. Standard of Review .......... 15

2. Trademark law prohibits one merchant from taking a generic word out of the English language and appropriating it for its own exclusive trademark use .......... 15

B. The Board erred, as a matter of law, by failing to conclude that the "fireball" designation is generic for whiskeys and liqueurs given its factual findings .......... 22

1. Standard of Review ..... 22

2. By its own admission, the Opposer first sought to monopolize the "fireball" designation in April 2007 ..... 23

3. The "fireball" designation was generic for whiskey and liqueurs since at least the early 1990's, and therefore, the Opposer could not withdraw it from the public domain and monopolize it in April 2007 ..... 25

a. *Like "Churrasco" and "Zero," the term "Fireball" denotes a "subcategory" or "part of" the genus because it is the name of an alcoholic drink designed to taste like Fireball candy* ..... 26

b. *Like "Chocolate Fudge," "Honey Brown," "Cola" and "Hurricane," the term "Fireball" denotes a flavor that cannot be monopolized by one producer of the claimed goods* ..... 32

C. Assuming arguendo that secondary meaning is a permissible consideration in genericness cases, the Board erred by failing to apply a heightened and exacting standard when assessing such evidence ..... 36

1. Standard of Review ..... 36

2. If a permissible consideration, a highly exacting standard had to be applied when assessing secondary meaning evidence ..... 36

VII. CONCLUSION ..... 38

STATEMENT AS TO CONFIDENTIAL MATERIAL

Pages 5 and 8 have been redacted from this non-confidential version of the Opening Brief of Appellant. The material on page 5 was designated by NBCUniversal Media, LLC as confidential under the protective order. The material omitted on page 5 describes the number of units sold and the total views of a particular film, which is considered proprietary business information. The material on page 8 was designated by Sazerac as confidential under the protective order. Sazerac contends that the quote on Page 8 contains proprietary business information regarding customer perception.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
537 F.2d 4 (2d Cir. 1976) ........................................................................ 16

*A.J. Canfield Co. v. Honickman*,
808 F.2d 291 (3d Cir. 1986) .................................................... 16, 17, 32, 33, 35

*Co-Rect Prod., Inc. v. Marvy! Advert. Photography, Inc.*,
780 F.2d 1324 (8th Cir. 1985) ...................................................................... 18

*Cont'l Airlines, Inc. v. United Air Lines, Inc.*,
1999 WL 1288981 (T.T.A.B. 1999) ................................................................ 19

*Dixi-Cola Lab'ys v. Coca-Cola Co.*,
117 F.2d 352 (4th Cir. 1941) ........................................................................ 32

*Elliott v. Google, Inc.*,
860 F.3d 1151 (9th Cir. 2017) ...................................................................... 21

*E.T. Browne Drug Co. v. Cococare Prod., Inc.*,
538 F.3d 185 (3d Cir. 2008) ........................................................................ 17

*Frito-Lay N.Am., Inc. v. Princeton Vanguard, LLC*,
2017 WL 3948367 (T.T.A.B. 2017) ................................................................ 19

*Genesee Brewing Co. v. Stroh Brewing Co.*,
124 F.3d 137 (2d Cir. 1997) ........................................................................ 32

*Harley Davidson, Inc. v. Grottanelli*,
164 F.3d 806 (2d Cir. 1999) .................................................................. 16, 18, 24

*Henry Heide, Inc. v. George Ziegler Co.*,
354 F.2d 574 (7th Cir. 1965) ................................................................... 18, 32

*Hewlett-Packard Co. v. Packard Press, Inc.*,
281 F.3d 1261 (Fed. Cir. 2002) ..................................................................... 22

*In re Cordua Restaurants, Inc.*,
823 F.3d 594 (Fed. Cir. 2016)........................................................................ 26

*In re Louisiana Fish Fry Prod., Ltd.*,
797 F.3d 1332 (Fed. Cir. 2015)...................................................................... 20

*In re Pennington Seed, Inc.*,
466 F.3d 1053 (Fed. Cir. 2006)................................................................ 17, 20

*Keebler Co. v. Rovira Biscuit Corp.*,
624 F.2d 366 (1st Cir. 1980)........................................................................ 17

*Otokoyama Co. Ltd. v. Wine of Japan Imp., Inc.*,
175 F.3d 266 (2d Cir. 1999)................................................................... 16, 17

*Parasol Flavors, LLC v. SnoWizard, Inc.*,
2010 WL 745004 (E.D. La. Feb. 25, 2010)................................................... 32

*Retail Servs., Inc. v. Freebies Publ'g*,
364 F.3d 535 (4th Cir. 2004) ........................................................................ 18

*Royal Crown Co., Inc. v. The Coca-Cola Co.*,
892 F.3d 1358 (Fed. Cir. 2018).......................................... 15, 20, 21, 27, 36, 37

*Squirrel Brand Holdings L.P. v. Kraft Food Group, Inc.*,
2012 WL 6917103 (E.D. Tex. 2012)............................................................... 32

*Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*,
951 F.2d 684 (5th Cir. 1992) ........................................................................ 18

*Weiss Noodle Co. v. Golden Cracknel & Specialty Co.*,
290 F.2d 845 (C.C.P.A. 1961) ............................................................. 17, 21, 37

*Welding Servs., Inc. v. Forman*,
509 F.3d 1351 (11th Cir. 2007) ...................................................................... 18

**<u>Statutes</u>**

15 U.S.C. § 1071 ............................................................................................ 1

# STATEMENT OF RELATED CASES

Other than the Trademark Trial and Appeal Board ("Board") proceeding from which this appeal is taken, this case has not previously been before this Court or any other court. There are no cases known to undersigned counsel that are pending in this or any other court that will directly affect or be directly affected by this Court's decision in this appeal.

# TABLE OF ABBREVIATIONS

"Board" – The Trademark Trial and Appeal Board

"Bullshine" – Bullshine Distillery LLC

"Opposer" – Sazerac Brands, LLC

"Sazerac" – Sazerac Brands, LLC

"'432 Registration" – U.S. Trademark Registration No. 2,852,432

"'110 Registration" – U.S. Trademark Registration No. 3,550,110

## I. JURISDICTIONAL STATEMENT

This Court has jurisdiction in accordance with 15 U.S.C. § 1071. Appellate jurisdiction is based on a timely appeal from a final decision of the Trademark Trial and Appeal Board dated March 6, 2023. Appx6657-6660.

## II. STATEMENT OF THE ISSUES

1. Whether the Board erred by failing to apply the correct legal standard applicable to this case, which is a non-genericide genericness case?

2. Whether the Board erred by failing to conclude that the "fireball" term is generic as a matter of law given its own factual findings?

3. Even if it were permissible to consider secondary meaning in assessing genericness (which it is not), whether the Board erred by failing to apply a highly exacting standard to such evidence?

## III. STATEMENT OF THE CASE

This appeal arises from a final, appealable decision of the Board issued March 6, 2023 in Opposition No. 91227653 and styled as *Sazerac Brands, LLC v. Bullshine Distillery, LLC*, in which Opposer opposed Bullshine's U.S. Application Serial No. 86/750,668 seeking to register "Bullshine Firebull" for alcoholic beverages except beers. In its Opposition Notice, Opposer alleged that registration of "Bullshine Firebull" would create a likelihood of confusion with U.S. Trademark Registration No. 2,852,432 (the "'432 Registration") for "Fireball" for

use in connection with liqueurs, and U.S. Trademark Registration No. 3,550,110 (the "'110 Registration") for "Fireball" for use in connection with whisky or whiskey. Appx87-96. Bullshine counterclaimed alleging that "Fireball" was generic for the claimed goods in the '432 and '110 Registrations. Appx541-565 at Appx561. Specifically, Bullshine alleged that "fireball" is a generic name for a whiskey or liqueur/schnapps based common alcoholic drink containing a spicy flavoring element such as cinnamon or hot sauce. Appx561.

Following trial briefs and oral argument, the Board ruled that it was a "close question" as to whether "Fireball" was generic at the time Sazerac sought registration in 2001 and 2008. Appx48. But the Board went on to conclude that "[w]hen we consider the evidence from the time of trial—late 2021 through mid 2022—Opposer's FIREBALL cinnamon whiskey had become so much more popular and well known by that time that whisky and liqueur consumers did not **primarily** use or understand use or understand FIREBALL to refer to a subpart or 'key aspect' of the genus, but instead to Opposer's FIREBALL cinnamon whisky." Appx48-49. This Appeal followed.

## IV. STATEMENT OF FACTS

Ferrara Pan Candy Company created Atomic Fireball candy in 1954, which combined a spicy cinnamon flavor with a sweet candy core. Appx3057-3060, Appx3063-3081 at Appx3066. "The spicy flavor…was instantly popular" and

"found an immediate audience" with orders exceeding capacity. Appx3099, Appx3107-3109, Appx3066. Ferrara Pan sells over 15,000,000 candy pieces, each week, and boasts that Atomic Fireball was the taste that "revolutionized" the industry. Appx3112, Appx3099-3101, Appx3107-3109, Appx3066.

As early as the 1990's, the Fireball flavor became increasingly used in alcoholic beverages, and naturally, the beverages were named "Fireball." Appx3067-3068. Since at least 1994, "Fireball" recipes have been available in books and on the internet. Appx3452-3716 at Appx3453, ¶6, Appx3458-3461, Appx6027-6030, Appx6032-6041. Specifically, at least fourteen (14) bartending books contain alcoholic drinks recipes bearing the "Fireball" designation. Appx3452-3716 at Appx3453. ¶6 and Appx3458-3461, Appx6027-6041, Appx6067-6091, Appx6110-6113. These "Fireball" recipes include whiskeys (Southern Comfort, Jack Daniel's), liqueurs (Cinnamon Schnapps, Glayva), and Tabasco sauce. Appx3453, ¶7, Appx3458-3461, Appx6067-6091.

One example of a bartending book is the 2nd Edition of The Official Harvard Student Agencies Bartending Course book was published in November 1994 (the "1994 Harvard Book"). Appx5707-5717. The 1994 Harvard Book included a recipe for "Hot Shot (also called a Fire Ball)." Appx6039. The 1994 Harvard Book's Index includes an entry for "Fire Ball, 82"—and page 82 is located within "The Latest and Greatest Drinks" category of Chapter 3. Appx6032,

Appx6038-6040. From 1994 to the present, over 25,000 copies of the 1994 Harvard Book were sold. Appx5707-5708, Appx5711-5717.

Another example of a bartending book is the 3rd Edition of The Official Harvard Student Agencies Bartending Course book released in December 1999 (the "1999 Harvard Book"). Appx3476-3483. The 1999 Harvard Book included the same recipe as the 1994 Harvard Book, but now with the simplified name "FIREBALL." Appx3481. From 1999 to the present, over 19,000 copies of 1999 Harvard Book were sold. Appx5707-5708, ¶8, Appx5719-5725.

A third example of a bartending book is Bartending 101: The Basics of Mixology published in 2005. Appx3546-3553, Appx5707-5708. ¶11, Appx5727-5728. The Bartending 101 book includes the same "Fireball" recipe as the 1995 and 1999 Harvard Books. Appx3551, Appx5842. The Bartending 101 book was first published on October 1, 2005. Appx5708, ¶11. From 2005 to the present, over 24,000 copies of The Bartending 101 book were sold. Appx5708-5709, Appx6003-6015, Appx6016-6022.

At least eleven (11) additional books contain the "Fireball" name for alcoholic drinks containing whiskey and/or liqueurs. Appx3458-3461, Appx3485-3506, Appx3510-3521, Appx3546-3553, Appx3557-3559, Appx3571-3579, Appx3586-3592, Appx6068-6091.

In addition to books, forty-seven (47) website pages use the "Fireball" name to identify a type of alcoholic drink. Appx3458-3461, Appx3468-3474, Appx3508, Appx3523-3527, Appx3544, Appx3555, Appx3561-3569, Appx3581-3584, Appx3594-3716. For example, THE WEBTENDER includes three "Fireball" drinks. Appx3468-3474. The first was added on April 7, 1997. Appx3468. The second was added on July 29, 1997, and the page states: "Tastes like a fireball candy." Appx3470. The third designated Fireball #2 was added October 15, 1997, and the recipe includes a whiskey (Southern Comfort), a liqueur (Cinnamon Schnapps), and Tabasco sauce. Appx3472-3474, Appx3130-3135.

The ubiquitous generic use and understanding of the term "Fireball" for cinnamon flavored alcoholic drinks is underscored by THE GUEST—a feature film from 2014. THE GUEST opened in the United States on September 17, 2014, in nineteen (19) theaters. Appx6024-6025. THE GUEST was in fifty-three (53) theaters in the U.S. and Canada at its widest point of theatrical distribution, and to date, the film has grossed $332,890 in theatres. Appx6024. From 2014 to the present, Number units of THE GUEST were sold on DVD and Blu-Ray formats. Appx5407-5409. From 2014 to the present, THE GUEST was purchased (EST) or rented (VOD) for home viewing a total of Number times. Appx5410.

THE GUEST includes a bar scene, during which the main character David (played by Dan Stevens) engages in the following dialogue with a waiter:

WAITER: What can I get you?

DAVID: You know how to make a fireball?

WAITER: Cinnamon schnapps and tabasco sauce.

DAVID: That's my drink of choice. Let me get one of those.

Appx6189-6196 at 21:40-21:50. The "Fireball" recipe recited in the 2014 film THE GUEST is the same recipe found in the 1994 and 1999 Harvard Books and THE WEBTENDER website from 1997 (Appx3463-3465, Appx3476-3481), demonstrating generic use of the term "Fireball" for over two decades.

In the 1980s, Joseph E. Seagram & Sons, Inc. ("Seagram") created a Dr. McGillicuddy line of flavored products, which included "Fireball Flavoured Corn Whisky Shooter[s]." Appx20. In 1999, Sazerac purchased rights to Seagram's Dr. McGillicuddy flavored products, including "DR. MCGILLICUDDY ***FIREBALL Flavoured*** Corn Whisky Shooter." Appx20, Appx4666-4667, Appx3119. In a February 2001 press release, Sazerac stated: "The Sazerac Company will introduce Fireball, a cinnamon whisky and the newest member of the Dr. McGillicuddy's family, in Spring 2001. Fireball joins Dr. Mint and Dr. Vanilla as the newest libation by Dr. A. P. McGillicuddy." Appx3119. Sazerac also stated that the "unique flavors are driving the market and Dr. McGillicuddy's Fireball is carving a new niche." Appx3119. Tellingly, Sazerac's product label identified "Dr.

McGillicuddy" as the "Brand" and "Fireball Flavoured Corn Whisky" described the product. Appx3122.

On March 10, 2000, Sazerac filed an intent to use application—not for "Fireball"—but for "Dr. McGillicuddy's Fireball." Appx3124-3128. On August 15, 2000, the Trademark Office issued a rejection, in part, because "a Fireball is a whiskey based alcoholic drink." Appx3130-3132. The Examiner relied on one of the "Fireball" drink recipes. Appx3134-3135. In response, on February 15, 2001, Sazerac did not deny that "a Fireball was a whiskey based alcoholic drink," and instead filed a disclaimer that "no claim is made to the exclusive right to use 'FIREBALL' apart from the mark as shown." Appx3137-3138.

By letter dated April 2, 2001, Marie Brizard asserted rights in "Fireball" and alleged "Dr. McGillicuddy's Fireball" infringed those rights. Appx3140. On April 18, 2001, Sazerac responded by filing a declaratory judgment complaint, seeking, *inter alia*, a declaration that Marie Brizard had *no* rights in the term FIREBALL. Appx3142-3149. A counterclaim alleging infringement was asserted against Sazerac. Appx3151-3157. On July 17, 2001, Sazerac responded to the infringement counterclaim, by asserting: "The FIREBALL ***name*** is the ***generic term*** for a ***type*** of cinnamon flavored alcoholic beverage and thus is ***not*** protectible as a trademark under federal or state law." Appx3155, Appx3160 (emphasis

added). On August 19, 2002, Marie Brizard and Sazerac settled their dispute. Appx2416-2417.

After the dispute settled, Sazerac continued to use "Dr. McGillicuddy's Fireball" in commerce until 2007, when it dropped "Dr. McGillicuddy's" and began using "Fireball." Appx5210-5211; Appx1538; Appx2439; Appx3180. But the formula and flavor never changed, Appx2439, and Sazerac admitted that

Quote describing consumer motivations.

Appx2510. Claiming a first use date of April 2007, Sazerac filed trademark applications for "Fireball" for whiskey on May 11, 2008, and for a "Fireball" design for whiskey on June 16, 2009. Appx3184-3198.

Because of the popularity of the "fireball" flavor, a variety of foods are flavored to taste like Fireball candy: (1) Ice Cream (Appx3363-3368 at Appx3366, Appx3374-3375, Appx3381-3382); (2) Snow Cones (Appx3385, Appx3390, Appx3393, Appx3396); (3) Beef jerky (Appx3399, Appx3403) ("Cinnamon meets teriyaki & cayenne pepper in layers much like atomic fireball candy"); (4) Popcorn (Appx3406) ("One bite of our Fireball popcorn and you'll know where it got its name! Chock full of spicy sweet cinnamon and crushed candy red hots"); and (5) Lollipops (Appx3408-3411). Notably, the International Dairy Foods Association performed a survey asking respondents to identify the most daring and creative

flavors for ice cream, and "Fireball (Red Hot Cinnamon)" was identified as one of those flavors. Appx3422.

Companies also sell "Fireball" flavor concentrates for use in alcoholic beverages. For example, Apex Flavors, Inc. sold a "Fireball Type Flavor" for use in whiskey, spirits, beer, cider and wine. Appx3226-3227, Appx3717-3721. The "Fireball" concentrate was approved by the Alcohol and Tobacco Tax and Trade Bureau ("TTB") as a flavor for use in alcoholic beverages. Appx3226-3232, Appx3717-3721. Apex boasted the "Fireball" flavor is "used by over 400 Breweries, Distilleries and Wineries in North America." Appx3226-3227. Similarly, Northwestern Extract Co. sells "Cinnamon Fireball," which is also approved for use in alcohol beverages. Appx3232-3234, Appx3238, Appx3719.

On social media, Sazerac conceded its product is "based on" the Fireball candy, Appx3241-3243, and it "tastes like the candy but its whisky." Appx3250, Appx3252. ("Fireball cinnamon whisky – yes they make it – just like the candy you were given as a kid")). Sazerac's corporate designee admitted that Fireball whiskey and the Atomic Fireball candy have the same flavoring. Appx2443. The online encyclopedia, Wikipedia, states Sazerac's product has a foundation of "Canadian whisky, and the taste otherwise resembles the candy with a similar name, Ferrara Candy Company's 'Atomic Fireball' candy." Appx3254. Trade publications confirm the point:

- "This nostalgic drink will remind you of flavors from your childhood with adult twist. After your first sip you'll understand how this drink got its name." Appx3259, Appx3262.

- "The drink, which tastes exactly like the Atomic Fireball candy" Appx3265.

- "It tasted exactly like Atomic Fireball Cinnamon Candy – those little red-hot balls with the hard-to-open plastic wrappers." Appx3268.

- "The younger kids, it reminds them of the Atomic hot balls candy" Appx3271.

- "You barely taste the alcohol, it tastes like [Atomic Fireball] candy." Appx3275.

- "The current darlings of the trashy-liquor category are Fireball Cinnamon Whisky, which tastes just like Atomic Fireball candy…" Appx3279.

- "It's the cinnamon flavored, Atomic Fireball candy like, syrupy-sweet liquor . . . ." Appx3283.

- "Its foundation is Canadian whisky, and the taste otherwise resembles the candy with a similar name, Ferrara Candy Company's 'Atomic Fireball' . . . ." Appx3287.

- "Fireball Cinnamon Whisky, which tastes remarkably similar to the molar-dulling Ferrara jawbreakers of our youth . . . ." Appx3291.

- "It tastes like the Atomic Fireball candy kids dared each other to suck on the longest." Appx3294.

- "While Fireball has proven to be more than just a flavor of the month" Appx3297.

- "Like Atomic Fireball candy, for which this spicy hot spirit is named…." Appx3299.

Consumers likewise understand the product is named “Fireball” because it tastes like Fireball candy:

- A consumer sent Sazerac a note, indicating that the whiskey tasted like the Atomic Fireball. Appx2576.
- “the taste otherwise resembles, no, is ***identical***, to the atomic fireball jawbreaker candy you had as a kid.” Appx3307.
- “Fireball Cinnamon Whisky, just like those Atomic Fireball candies….” Appx3310.
- “Taste like an atomic fireball” Appx3313.
- “literally taste like the candy… #atomicfireball” Appx3316.
- “With the childhood flavor of the atomic fireball candy” Appx3319.
- “imagine melting an Atomic Fireball candy, and taking shots with it… That’s exactly what it taste like.” Appx3322.
- “The taste otherwise resembles the candy with a similar name, Ferrara Candy Company’s ‘Atomic Fireball’ candy.” Appx3325, Appx3327-3360.

An independent expert, Ms. Kimmerle, performed a flavor analysis that likewise showed: (1) Fireball Whiskey and Atomic Fireball Candy share the same level or intensity of heat and use cinnamaldehyde flavor the chemical compound that gives hot cinnamon candy flavor its taste; (2) Fireball Whiskey and Atomic Fireball Candy flavors create deeper burn sensation which comes from capsaicin, the compound found in spicy peppers; (3) Fireball Whisky causes similar heat sensation and mouthfeel as Atomic Fireball candy; (4) Fireball Whisky and

Fireball Shot recipe have a candy-like cinnamon spicy flavor; and (5) the term "Fireball" is used to describe a candy-like spicy cinnamon flavor that is like the flavor of Atomic Fireball candy. Appx3079-3080.

On September 8, 2015, Bullshine filed an application to register the mark BULLSHINE FIREBULL based on an intent to use the mark in commerce in connection with "[a]lcoholic beverages except beers" in International Class 33. Appx67-71. On December 30, 2015, the United States Patent and Trademark Office filed a Notice of Publication for the mark. Appx85. On May 3, 2016, Sazerac filed a Notice of Opposition, alleging likelihood of confusion. Appx87-96. On June 12, 2016, Bullshine filed an Answer to Notice of Opposition with Counterclaims. *See* Appx536-565. In its operative third amended answer and counterclaims, Bullshine sought cancellation of Sazerac's "Fireball" registrations, on the grounds that the term was generic. Appx536.

The parties filed cross-motions for summary judgment. Appx1505, Appx3028. After the Board ruled on the cross-motions for summary judgment, the parties stipulated to resolving the remaining claims and counterclaims via accelerated case resolution. Appx3. Bullshine presented a voluminous evidentiary record to the Board, which established that well before April 2007 and continuing unabated to the present, the relevant public primarily used and understood the "Fireball" designation to be a generic term for whiskeys and liqueurs.

Yet, on March 6, 2023, the Board denied Bullshine's genericness counterclaims, Appx51, and Bullshine filed a timely notice of appeal to the Federal Circuit. Appx6657-6660.

## V. SUMMARY OF THE ARGUMENT

The Board committed legal error in three ways. First, the Board erred by failing to apply the correct legal standard applicable to this case, which is a non-genericide genericness case. For such cases, the law prohibits any one merchant from taking a generic word out of the English language and appropriating it for its own trademark use. Indeed, no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive other manufacturers from using the generic term for competing products. Instead, evidence that a generic term has become associated with one producer proves only what courts call "de facto" secondary meaning. Despite this being the established law in this Circuit for over six (6) decades, the Board credited the Opposer's creation of "de facto" secondary meaning and erred by finding the "fireball" term to be not generic as a result.

Second, the Board erred by failing to conclude that the "fireball" term is generic as a matter of law given its own factual findings. Specifically, the Board found that the "fireball" designation was generic for whiskeys and liqueurs in two

related ways before the time of Opposer's first trademark use. The Board first found that "fireball" was a name for "alcoholic cocktails or shots"—"many of which include[d] whiskey or cinnamon schnapps." Appx11. The Board also found that "fireball" reflected a "spicy, cinnamon and candy-like taste"—a fact "Opposer [did] not seriously dispute." Appx48. Based on one or both of these related factual findings, the Board erred by failing to conclude the "fireball" designation was generic because the law prohibits any one vendor from removing a generic name from the public domain.

Third, even if it were permissible to consider secondary meaning in assessing genericness (which it is not), the Board erred by failing to apply a highly exacting standard to such evidence. Outside the confines of genericness, this Court has long held that the burden of showing acquired distinctiveness increases with the term's level of distinctiveness. For highly descriptive terms, the law requires substantial evidence of acquired distinctiveness. Because genericness is the epitome of descriptiveness, an even more exacting standard had to be applied if secondary meaning is a valid consideration. But the Board unquestionably failed to apply a heighten, exacting standard. Indeed, the Board wrongly credited indirect evidence of acquired meaning (advertising dollars and sales success), even though the Opposer's own expert survey showed that even for the population targeted by

Opposer's marketing efforts, less than 50% of that improperly limited population recognized the term "fireball" as a brand.

# VI. ARGUMENT

## A. <u>The Board erred by failing to apply the correct legal standard that is applicable to genericness cases—like this one—which do not involve genericide</u>.

### 1. <u>Standard of Review</u>

Whether the Board applied the correct legal standard to the facts of a particular case is a question of law that the Court reviews de novo and without deference. *Royal Crown Co., Inc. v. The Coca-Cola Co.*, 892 F.3d 1358, 1364 (Fed. Cir. 2018).

### 2. <u>Trademark law prohibits one merchant from taking a generic word out of the English language and appropriating it for its own exclusive trademark use.</u>

The Board's decision has wrongly allowed one distiller (the Opposer) to take a generic designation for whiskeys and liqueurs out of the public domain and monopolize it for its goods. That outcome occurred only because the Board failed to apply the correct legal standard established by this Court decades ago. This Court must, therefore, reverse the Board's non-genericness conclusion.

"A generic term is 'the common descriptive name of a class of goods or services.'" *Royal Crown*, 892 F.3d at 1366 (internal citation omitted). A generic term is the "ultimate in descriptiveness" and cannot acquire distinctiveness. *Id.*

Generic terms are "by definition incapable of indicating source" and therefore, "can never attain trademark status." *Id.* Generic designations are "never protectable because even complete 'success . . . in securing public identification . . . cannot deprive competing manufacturers of the product of the right to call an article by its name.'" *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 297 (3d Cir. 1986) (quoting *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976)).

Simply: "No manufacturer can take out of the language a word, even a slang term, that has generic meaning as to a category of products and appropriate it for its own trademark use." *Harley Davidson, Inc. v. Grottanelli*, 164 F.3d 806, 810 (2d Cir. 1999). "This rule protects the interest of the consuming public in understanding the nature of goods offered for sale, as well as a fair marketplace among competitors by insuring that every provider may refer to his goods as what they are." *Otokoyama Co. Ltd. v. Wine of Japan Imp., Inc.*, 175 F.3d 266, 270 (2d Cir. 1999). Indeed, "[n]o matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name." *Abercrombie & Fitch*, 537 F.2d at 9. Therefore, evidence that a generic term has

become associated with one producer "proves only what courts call 'de facto' secondary meaning." *A.J. Canfield Co.*, 808 F.2d at 297.

This Court's predecessor court established these legal principles more than six (6) decades ago in *Weiss Noodle Co.* and this Court has consistently reaffirmed such principles:

> While it is always distressing to contemplate a situation in which money has been invested in a promotion in the mistaken belief that trademark rights of value are being created, merchants act at their peril in attempting, by advertising, to convert common descriptive names, which belong to the public, to their own exclusive use. Even though they succeed in the creation of de facto secondary meaning, due to lack of competition or other happenstance, the law respecting registration will not give it any effect.

*In re Pennington Seed, Inc.*, 466 F.3d 1053, 1059 (Fed. Cir. 2006) (*quoting Weiss Noodle Co. v. Golden Cracknel & Specialty Co.*, 290 F.2d 845, 848 (C.C.P.A. 1961)).

Other Circuits have adopted and apply the same legal standard. *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 374 (1st Cir. 1980) ("No amount of purported proof that a generic term has acquired a secondary meaning associating it with a particular producer can transform that term into a registrable trademark."); *Otokoyama Co.*, 175 F.3d at 270 (the rule protects the consuming public by insuring every provider may refer to his goods as to what they are); *E.T. Browne Drug Co. v. Cococare Prod., Inc.*, 538 F.3d 185, 191 (3d Cir. 2008) ("The Lanham Act . . . provides no protection for generic terms because a first-user of a term 'cannot deprive competing manufacturers of the product of the right to call an

article by its name.'"); *Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 547 (4th Cir. 2004) ("Evidence of an acquired secondary meaning, however, has no relevance unless the mark in question has been found not to be generic."); *Texas Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 691 (5th Cir. 1992) (If generic in 1930, that decision would estop litigation 60 years later because "generic terms can never attain trademark protection."); *Henry Heide, Inc. v. George Ziegler Co.*, 354 F.2d 574, 576 (7th Cir. 1965) (a generic term may not be exclusively appropriated as a trademark regardless of the length of time used by a single distributor and despite whatever promotion effort may have been expended); *Co-Rect Prod., Inc. v. Marvy! Advert. Photography, Inc.*, 780 F.2d 1324, 1331 (8th Cir. 1985) ("[I]f the mark were generic, it may be said that secondary meaning could not transform it into a subject for trademark protection."); *Welding Servs., Inc. v. Forman*, 509 F.3d 1351, 1358 (11th Cir. 2007) ("Even if the name becomes in some degree associated with the source, a generic mark cannot achieve true secondary meaning.").

The correct legal analysis, thus, focuses on whether the term was generic for the goods at issue "prior to the proprietor's trademark use and registration." *Harley Davidson*, 164 F.3d at 811 (emphasis added). If generic at that time, the law "forbid[s]" any merchant from attempting to monopolize the term through the creation of "de facto" secondary meaning. *Id.* at 812. The Board has faithfully

followed this correct standard in precedential decisions in the past. *See Frito-Lay N.Am., Inc. v. Princeton Vanguard, LLC*, 124 U.S.P.Q.2d 1184, 2017 WL 3948367, at *21 (T.T.A.B. 2017); *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 53 U.S.P.Q.2d 1385, 1999 WL 1288981, at *12 (T.T.A.B. 1999).

In this case, however, the Board refused to do so. The Board, instead, created its own approach to genericness, which wrongly credited the Opposer's creation of "de facto" secondary meaning. First, the Board found that "fireball" was the name of an alcoholic cocktail or shot in bartending books and webpages, and that many of the recipes included whiskey and/or cinnamon schnapps (a liqueur). Appx11-16. Second, the Board found that the "fireball" designation denoted a "spicy, cinnamon and candy-like taste" and the Board underscored that this was a fact that "Opposer [did] not seriously dispute." Appx48.

Both findings were supported by overwhelming evidence before the Board. For example, in a federal lawsuit, the Opposer asserted in 2001: "The FIREBALL name is the generic term for a type of cinnamon flavored alcoholic beverage and thus is not protectable as a trademark under Federal or State law." Appx3153, Appx3160. As to this admission, the Board found: "This assertion directly and obviously supports Applicant's genericness counterclaim." Appx38.

Despite this, the Board went on to analyze the Opposer's use of the "fireball" designation over time, both generically and as a purported trademark.

Appx20-32. Indeed, the Board sought to minimize the Opposer's pleading admission of genericness, by reasoning that it had occurred over 21 years ago, and about a decade before the Opposer's product "started its meteoric rise." Appx38. Ultimately, based on Opposer's advertising and commercial success, the Board concluded that the public's understanding of the "fireball" term had evolved over time and was not generic. Appx48-51.[1]

That analysis is legally wrong and reflects the very same mistake that the Board made in *Royal Crown*, which required reversal by this Court. *See Royal Crown*, 892 F.3d at 1370 ("the Board's position …ignore[s] the fact that '[g]eneric terms cannot be rescued by proof of distinctiveness or secondary meaning no matter how voluminous the proffered evidence may be.'"); *see also In re Louisiana Fish Fry Prod., Ltd.*, 797 F.3d 1332, 1338 (Fed. Cir. 2015) (Newman, J., concurring) ("When a term is the common descriptive or generic name of the goods, 'evidence of secondary meaning cannot change the result.'"); *In re Pennington Seed*, 466 F.3d at 1059 ("merchants act at their peril in attempting, by advertising, to convert common descriptive names, which belong to the public, to their own exclusive use. Even though they succeed in the creation of de facto

---

[1] The Board notably relegated the legal principle that "[a] generic term that enjoys de facto secondary meaning is still unregistrable" to a footnote, Appx47, and then went on to immediately ignore the legal principle when "Balancing the Evidence and Reaching a Conclusion on Genericness." Appx48-51.

secondary meaning, due to lack of competition or other happenstance, the law respecting registration will not give it any effect."); *Weiss Noodle*, 290 F.2d at 848 (no matter what the market situation may have been as to indication of origin or secondary meaning, a common descriptive name cannot become a trademark exclusively owned by one vendor).[2]

In summary, the Board's decision—by crediting de facto secondary meaning—violated the legal principle that "[g]eneric terms cannot be rescued by proof of distinctiveness or secondary meaning no matter how voluminous the proffered evidence may be." *Royal Crown*, 892 F.3d at 1370. Because the Board failed to apply the correct legal standard to the facts of this case, this Court must reverse the Board's conclusion that the "fireball" designation is not generic for whiskeys and liqueurs.

---

[2] The Board's failure to apply the correct legal standard is all that matters on appeal. Nevertheless, it is noteworthy that the source of the Board's error appears to be confusing this genericness case with a genericide case. The Board declared that it must "examine the evidence up through the time of trial," Appx34, but that is only required in genericide cases. In a genericide case, the question is whether the public appropriated a valid trademark by using it as a generic name for certain goods or services irrespective of source. *Elliott v. Google, Inc.*, 860 F.3d 1151, 1156 (9th Cir. 2017). Assessing that issue requires careful consideration of whether, at some point before trial, the trademark took a "fateful step" on a path to genericness. *Id.* This case, of course, involves the exact opposite scenario where the designation is generic in the first instance, and one manufacturer seeks to take it from the public domain and monopolize it for its own trademark use.

### B. **<u>The Board erred, as a matter of law, by failing to conclude that the "fireball" designation is generic for whiskeys and liqueurs given its factual findings</u>.**

1. <u>Standard of Review</u>

This Court reviews the Board's legal determinations de novo and without deference. *Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002). The Board made factual findings that the "fireball" designation was generic before the Opposer's attempted monopolization, both because "fireball" reflects a subcategory of the claimed goods, Appx10-11, and further because it denotes a flavor for the claimed goods. Appx48.

As to the former, the Board found that "fireball" was the name of an alcoholic cocktail or shot in bartending books and webpages since the 1990's, and that many of the recipes included whiskey and/or cinnamon schnapps (a liqueur). Appx11-16. The Board also found the Opposer's admission, in 2001, that "fireball was "the generic term for a type of cinnamon flavored alcoholic beverage" "directly and obviously supports Applicant's genericness counterclaim." Appx38. Moreover, as to the latter, the Board found "fireball" denoted a "spicy, cinnamon and candy-like taste" and that was a fact "Opposer [did] not seriously dispute." Appx48. Therefore, this Court can and should conclude that the "fireball" designation is generic in view of these factual findings because no other conclusion can be reached under a proper application of the law.

2. <u>By its own admission, the Opposer first sought to monopolize the "fireball" designation in April 2007.</u>

Under the correct legal standard, genericness of the "fireball" designation had to be tested in April 2007, when the Opposer first sought to claim it as a trademark. The undisputed record showed: The Opposer purchased rights to Seagram's Dr. McGillicuddy flavored products, including "DR. MCGILLICUDDY ***FIREBALL Flavoured*** Corn Whisky Shooter" in 1999. Appx20, Appx4666-4667, Appx3119. This included "Dr. MCGILLICUDDY FIREBALL Flavoured Corn Whisky Shooter." Appx20, Appx4666-4667, Appx3122. Thus, "fireball" described the product's flavor.

Next in March 2000, the Opposer filed an intent to use trademark application with the USPTO for "Dr. McGillicuddy's Fireball." Appx3124-3128; Appx5215. The applied-for mark used the possessive "Dr. McGillicuddy's." Significantly, use of the possessive form reflects that the product was one version of a fireball flavored whiskey (*i.e.*, Dr. McGillicuddy's), and thus acknowledges that other versions existed.

In August 2000, the USPTO issued a rejection, reasoning that "a 'fireball' is a whiskey based alcoholic drink." Appx3130-3132. The Examiner's rejection cited and relied upon the "Fireball #2" drink recipe from THE WEBTENDER, which the document reflects was "**Added**: 15.Oct.1997" to the WEBTENDER website.

Appx3116, Appx3130-3135, Appx3160. Therefore, "a Fireball" was a type of "whiskey based alcoholic drink."

In response, on February 15, 2001, the Opposer did not contest that "a Fireball was a whiskey based alcoholic drink." Appx3137-3138. Instead, the Opposer filed a disclaimer that conceded: "No claim is made to the exclusive right to use 'FIREBALL' apart from the mark as shown." Appx3138. Therefore, as of February 15, 2001, the Opposer had concededly not yet attempted to monopolize the generic "fireball" designation.

In March 2001, the Opposer began selling "Dr. McGillicuddy's Fireball" in the United States. Appx5213. Consistent with its trademark application, the Opposer used the possessive "Dr. McGillicuddy's"—conveying to the consuming public that it was selling one type of fireball flavored whiskey and thus acknowledging others exist. Appx3119. Moreover, the commercial product name included "fireball" as the noun, with "Dr. McGillicuddy's" as the tradename adjective." This too confirms "fireball" was generic because it needed a tradename adjective. *See Harley Davidson*, 164 F.3d at 809 ("Honda Hog" proves "hog" was generic because it needed a tradename adjective).

Also, in 2001, the Opposer was accused of infringing a competitor's alleged rights in "fireball." In response, on July 17, 2001, the Opposer asserted: "The FIREBALL name is <u>the</u> <u>generic</u> <u>term</u> for <u>a</u> <u>type</u> of cinnamon flavored alcoholic

beverage and thus is not protectible as a trademark under federal or state law." Appx3155, Appx3160 (emphasis added).

After March 2001, the Opposer continuously marketed and sold McGillicuddy's Fireball in the United States, until April 2007, when it changed the name to "Fireball" alone.[3] Appx5210-5211; Appx1538; Appx2439; Appx3180. Thereafter, in May 2008 and June 2009, the Opposer filed trademark applications for "fireball." Appx3184-3198. Significantly, each trademark application filed by the Opposer claimed a first use date of April 2007. (*Id.*) Therefore, the undisputed record establishes that the Opposer, by its own admission, first began its attempt to monopolize the "fireball" designation for the goods at issue in April 2007. Before that time, the Opposer only sold "Dr. McGillicudy's Fireball" with the "fireball" designation disclaimed.

3. The "fireball" designation was generic for whiskey and liqueurs since at least the early 1990's, and therefore, the Opposer could not withdraw it from the public domain and monopolize it in April 2007.

[3] While Opposer was assigned the '432 Registration in August 2002, it is undisputed that Opposer did not receive any rights in the goods associated with the '432 Registration and, in fact, continued to only sell its product, Dr. McGillicuddy's Fireball (with "Fireball" disclaimed), until April 2007. Indeed, Sazerac's corporate designee confirmed during trial testimony that despite acquiring the trademark application for "Fireball" from Mohawk in August 2002, Sazerac only sold the whisky product purchased from Seagram using "Dr. McGillicuddy's Fireball" until 2007. Appx5238-5239.

For two related reasons, the evidence demonstrated, and the Board correctly found, that the "fireball" designation was generically used for whiskeys and liqueurs as of April 2007.

First, the Board recognized that a term can be generic for three independent reasons, and two were at issue in this case. Appx36. Specifically, while not synonymous with the class of goods (*i.e.*, whiskey or liqueurs), the "fireball" designation reflected a "subcategory" or "part of" the genus (*i.e.*, alcoholic drinks designed to taste like Fireball candy), and relatedly, the term denoted a key aspect of the genus (*i.e.*, the "fireball" flavor). Appx11, Appx48. The law supports both genericness findings.

*a. Like "Churrasco" and "Zero," the term "Fireball" denotes a "subcategory" or "part of" the genus because it is the name of an alcoholic drink designed to taste like Fireball candy.*

This Court has been clear: "[A] term is generic if the relevant public understands the term to refer to *part of the claimed genus* of goods or services, *even if* the public does not understand the term to refer to the broad genus *as a whole*." *In re Cordua Restaurants, Inc.*, 823 F.3d 594, 605 (Fed. Cir. 2016) (emphasis added). In *In re Cordua*, the term "Churrasco" was found to be generic for restaurant services. *Id.* at 604. The reason was not because Churrasco referred to the broad genus of restaurant services, but instead because it referred to a type of grilled meat and, thus, represented one subcategory of restaurant services. *Id.* To

be generic, the term only needs to refer to a "particular sub-group or type of restaurant rather than to all restaurants." *Id.* at 605. This Court reaffirmed these principles in *Royal Crown*, holding that if the public understood the term ZERO to refer to a sub-group of beverages with low-calories, "that would be enough to render the term generic." *Royal Crown*, 892 F.3d at 1368.

With respect to this issue, the Board found that "fireball" was used in a "non-trademark manner in connection with alcoholic beverages, many with a sweet/spicy cinnamon flavor." Appx10. The Board pointed to recipes for "fireball" cocktails or shots, where "many of which included whiskey or cinnamon schnapps" (*i.e.*, a liqueur). Appx11-16. The earliest "fireball" recipe cited by the Board was April 7, 1997—a decade before the Opposer's attempted monopolization in April 2007. Appx12. Moreover, the Board found that the Opposer affirmatively asserted, in 2001, that "[t]he FIREBALL name is the generic name for a type of cinnamon flavored alcoholic beverage and thus is not protectable as a trademark under Federal or State law" and that "[t]his assertion directly and obviously supports Applicant's genericness counterclaim." Appx38. Based on these findings, the "fireball" designation is generic based upon a proper application of the law.

Indeed, no other conclusion could be reached in view of the full evidentiary record before the Board, which demonstrated a "fireball" (no different than a

"Manhattan" or "Martini") was the generic name for a type of alcoholic drink since at least the early 1990's. First, Ms. Kimmerlee testified that popular candies (like Fireballs and LemonDrops) were transformed into alcoholic drinks. Appx3067. "Fireball along with Lemon Drop, Chocolate, Bubble Gum, Cookie Dough and Cotton Candy all began as singular confections and their names then became synonymous with their flavor." Appx3080. "Fireball" specifically became a popular shot in the 1990's made with cinnamon schnapps (a liqueur) mixed with whisky or golden rum. Appx3067. The Opposer presented no contrary evidence.

Second, bartending books confirmed "fireball" was the name of an alcoholic drink consisting of whiskey and/or liqueur since the early 1990's. For example, the 1994 Harvard Book—which was used to teach a bartending course at Harvard University—was published on November 15, 1994, with a chapter, "The Latest and Greatest Drinks." Appx6032, Appx5707, Appx6038-6040. That Chapter included an entry for "Hot Shot (also called a Fire Ball)." Appx6039. The 1994 Harvard Book was lodged with the Library of Congress in January 1995. Appx6043-6047. Moreover, the record proved that, from 1995 to 2001, the publisher sold 25,670 units of this book. Appx5707-5708, Appx5711-5717.

The record also showed that the next edition of The Official Harvard Student Agencies Bartending Course – The 1999 Harvard Book – was released on December 15, 1999. Appx5424, ¶8. The 1999 Harvard Book proved that "Fireball"

continued to be used generically to refer to a type of alcoholic drink (now without reference to "Hot Shot"). Appx3476-3483 at 3481. It was also lodged with the Library of Congress in December 1999, and from 1999 to 2005, the publisher sold 19,823 units of this book. Appx6052-6054, Appx5424, ¶¶ 8 &9, Appx5719-5725.

While still used to teach a bartending course at Harvard University, the book's Fourth Edition was renamed: "Bartending 101, The Basics of Mixology" and continued the generic use of "Fireball" to designate a type of alcoholic drink. Appx5842, Appx5988. The book was first on sale on October 20, 2005, Appx5424, ¶11, and like previous editions, was lodged with the Library of Congress in November 2005. Appx6063-6066. From 2005 to 2021, the publisher sold 24,700 units, along with 524 electronic copies. Appx5424-5425, Appx6004-6015, Appx6017-6022.

In summary, based on the Harvard books alone, the record showed the term "fireball" was the generic name for a type of alcoholic drink continuously from November 15, 1994 to the present, and further, that from January 1, 1995 until 2021, the publisher had sold over 70,000 units of these books. Therefore, from this perspective, the Board's decision has wrongly allowed one manufacturer to take the generic name of a type of drink out of widely used and distributed Bartending Books and monopolize it for its own trademark use. That is fundamentally wrong on all levels – just as it would be if one manufacturer attempted to monopolize

"Martini" for gin or vodka or "Manhattan" for whiskey or bourbon.

Moreover, beyond the three Harvard books, the record included eleven (11) other bartending books: (1) The Bartender's Black Book (4th Ed. 1998); (2) How to Setup and Operate a Successful Nightclub (2001); (3) Retro Cocktails (2002); (4) Bartender's Best Friend (2003); (5) Bartending for Dummies (2003); (6) The Original Pocket Guide to Cocktails and Drinks (2004); (7) The Bartender's Black Book (8th Ed. 2006); (8) Cocktails Galore (2006); (9) The Complete Idiot's Guide to Bartending (2010); (10) 488 Bacardi Rum Based Cocktails (2015); and (11) The Bartender's Black Book (10th Ed. 2019). Appx3453, Appx3458-3461, Appx3485-3506, Appx3510-3521, Appx3557-3559, Appx3571-3579, Appx3586-3592, Appx6027-6030, Appx6068-6092, Appx6111-6113. Each confirmed that for consumers of whiskey and liqueurs, "fireball" was the name of an alcoholic drink made with whiskey and/or liqueurs. (*Id.*)

In addition to bartending books, the record included internet bartending guides that likewise confirmed that "fireball" was the generic name for an alcoholic drink that included whiskey and/or liqueurs. Three such "fireball" recipes were published in 1997 on the WEBTENDER website—a decade before the Opposer's attempted monopolization in April 2007. Appx3468-3474. All three "fireball" recipes included cinnamon schnapps, a liqueur, and one recipe included Southern Comfort, a whiskey. (*Id.*) One recipe states: "Tastes like a fireball

candy." Appx3470. And, the Examiner used one WEBTENDER recipe to reject the Opposer's application for "Dr. McGillicuddy's Fireball," because "a 'fireball' is a whiskey based alcoholic drink." Appx3130-3135, Appx3472. In response, the Opposer did not contest that "a Fireball is a whiskey based alcoholic drink," and instead, filed a disclaimer that "no claim is made to the exclusive right to use 'FIREBALL' apart from the mark as shown." Appx3137-3138.

In addition, the record included other internet bartending entries for "fireball" published before April 2007, including: (1) www.bardrinks.com (Jan. 2002); (2) www.drinksmixer.com (April 2003); (3) www.barmandrinks.com (Oct. 2006); and (4) www.barmandrinks.com (Feb. 2007). Appx3508, Appx3523, Appx3561, Appx3563. Moreover, even after April 2007, "fireball" continued to be used and understood as the name of a type of alcoholic drink. For example, the record included bartending books and websites published after April 2007. Appx3458-3461, Appx3565-3716.

Lastly, in 2014, a "fireball" drink was featured in the popular feature film, *The GUEST.* One scene included the following exchange:

> WAITER: What can I get you?
>
> DAVID: You know how to make <u>*a fireball*</u>?
>
> WAITER: Cinnamon schnapps and tabasco sauce.
>
> DAVID: That's my drink of choice. Let me get <u>*one*</u> of those.

Appx6189-6196 at 21:40-21:50 (emphasis added).

*The GUEST* won three film awards, played in 53 theaters in the United States, and has had 664,106 home views. Appx6024-6025.

The evidence thus showed that the "fireball" designation was continuously and primarily used and understood as the name of a type of alcoholic drink, which is made whiskeys and/or liqueurs, since the early 1990's. Because the law prohibits any one merchant from removing such a generic term from the public domain, this Court should conclude that the Board erred by failing to find the "fireball" designation was generic for whiskeys and liqueurs.

*b. Like "Chocolate Fudge," "Honey Brown," "Cola" and "Hurricane," the term "Fireball" denotes a flavor that cannot be monopolized by one producer of the claimed goods.*

Genericness principles apply to prevent monopolization of "key" product characteristics, such as flavor. *A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 305 (3d Cir. 1986) ("Chocolate Fudge" generic for diet soda); *Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d at 145-46 (2d Cir. 1997) ("Honey Brown" generic for ale beers); *Henry Heide, Inc. v. George Ziegler Co.*, 354 F.2d 574, 576 (7th Cir. 1965) ("Jujubes"—a fruit—generic for candy); *Dixi-Cola Lab'ys v. Coca-Cola Co.*, 117 F.2d 352, 355-58 (4th Cir. 1941) ("Cola" generic for sodas); *Squirrel Brand Holdings L.P. v. Kraft Food Group, Inc.*, No. 12CV00501, 2012 WL 6917103 (E.D. Tex. 2012) ("Crème Brulee" generic for almonds); *Parasol*

*Flavors, LLC v. SnoWizard, Inc.*, No. CIV.A. 09-3394, 2010 WL 745004, *6 (E.D. La. Feb. 25, 2010) ("Hurricane," "Praline," "King Cake," "Buttered Popcorn," "Ice Cream," "Dill Pickle" and "Butter cream" generic for snowcones). As the Third Circuit has explained: "[I]f a term is necessary to describe a *product characteristic* that a competitor has a right to copy, a producer may not effectively preempt competition by claiming that term as its own." *A.J. Canfield*, 808 F.2d at 305 (emphasis added).

However, that is the precise wrong that has occurred here. All distillers of whiskeys and liqueurs have the absolute right to make and sell goods that are flavored to taste like Fireball candy. The Board specifically found that the "fireball" designation denotes such a flavor and the Opposer did not seriously contest that fact. Appx48. The Board also found that the Opposer admitted its product was flavored to taste like Fireball Candy. Specifically, the Board found that the Opposer's admitted under oath: "The cinnamon flavor of Fireball whisky and the Fireball candy cinnamon flavor, they're the same flavoring." Appx28.

Moreover, the record is replete with the Opposer's public admissions that its product is "based on" the Fireball candy, and further, the consuming public's recognition of that fact. For example, the Opposer posted an online tribute when the inventor of Atomic Fireball candies died, as follows: "Mr. Ferrara invented the Atomic Fireball candies which our whisky is based on. Take a shot in his name

today. Cheers, Mr. Ferrara!" Appx3241. The Opposer has also promoted: "Fireball cinnamon whisky – yes they make it – just like the candy you were given as a kid" and "It tastes like the candy but its whisky." Appx3252, Appx3250. Wikipedia and trade publications have likewise acknowledged "fireball" is the flavor of Opposer's whiskey: (1) "the taste otherwise resembles the candy with a similar name, Ferrara Candy Company's 'Atomic Fireball' candy"; (2) "It tasted exactly like Atomic Fireball Cinnamon Candy"; (3) "The drink, which tastes exactly like the Atomic Fireball candy"; (4) "You barely taste the alcohol, it tastes like (Atomic Fireball) candy"; and (5) "The current darlings of the trashy-liquor category are Fireball Cinnamon Whiskey, which tastes just like Atomic Fireball candy." Appx3254, Appx3265, Appx3268, Appx3275, Appx3279. Additionally, in briefing before the Board, Opposer expressly conceded that "third parties have made [flavor] comparisons between its product and Atomic Fireball candy." Appx6229.

Moreover, the record included unrebutted testimony from Ms. Kimmerlee that (1) "fireball denotes a spicy, cinnamon and candy-like taste"; (2) the popularity of Atomic Fireball Candy led to "Fireball" becoming synonymous with the sweet, spicy cinnamon flavor of the candy broadly in the food and drink industry before it was used by Sazerac; (3) as early as the early 1990s, the fireball flavor became increasingly used in alcoholic beverages; and (4) spirit bottlers quickly took advantage of the gaining trend and began flavoring their beverage

products and altering product names to accommodate the rise in consumer demand of candy themed shots and beverages. Appx48, Appx3067. In addition, Ms. Kimmerlee performed and presented an uncontested flavor analysis that proved, as the Opposer ultimately admitted, the Opposer's commercial product is flavored to taste like Fireball candy. Appx3076-3080. Indeed, the Opposer does not contest that "the term 'fireball' in Fireball Whisky is used to describe the generic candy-like spicy cinnamon flavor with which it is and has been synonymous for decades due to the popularity of Atomic Fireball candy." Appx3080.

Nevertheless, as it stands, only the Opposer can sell whiskey and liqueurs with the "fireball" designation because of the Board's decision. That decision has wrongly preempted competition for such goods. The Applicant—like all competitors of the Opposer—have the right to flavor whiskey and/or liqueurs to taste like Atomic Fireball candy and the term "fireball" is necessary to describe such a product properly. *A.J. Canfield*, 808 F.2d at 305 ("[I]f a term is necessary to describe a product characteristic that a competitor has a right to copy, a producer may not effectively preempt competition by claiming that term as its own."). There is no way to convey that the product is flavored to taste like the Fireball candy, except with the "fireball" designation. Therefore, the Opposer may not use trademark law to effectively preempt competition by claiming that term as its own.

For these reasons, the Board's finding that "fireball" denotes "spicy,

cinnamon and candy-like taste"—which was "a fact established elsewhere in the record that the Opposer does not seriously dispute" necessarily means, as a matter of the law, that the "fireball" designation is generic for whiskey and liqueurs. Because no other conclusion can be reached under a proper application of the law, this Court should reverse the Board and find that the "fireball" designation is generic for whiskeys and liqueurs.

### C. Assuming arguendo that secondary meaning is a permissible consideration in genericness cases, the Board erred by failing to apply a heightened and exacting standard when assessing such evidence.

#### 1. Standard of Review

Whether the Board applied the correct legal standard to the facts of a particular case is a question of law that the Court reviews de novo and without deference. *Royal Crown*, 892 F.3d at 1364.

#### 2. If a permissible consideration, a highly exacting standard had to be applied when assessing secondary meaning evidence.

The Applicant has found no case where a court has allowed one merchant to remove a generic designation from the public domain and monopolize it from own trademark use because the merchant created de facto secondary meaning. The Board failed to cite any such authority for its contrary ruling, and the law, as detailed above, is decidedly against that outcome. *See, e.g.*, *Royal Crown*, 892 F.3d at 1370 ("[g]eneric terms cannot be rescued by proof of distinctiveness or

secondary meaning.”). However, if the Court concludes otherwise, the Board nevertheless erred by failing to apply the correct legal standard when assessing the secondary meaning evidence.

Outside the confines of genericness, this Court has “long held” that the burden of showing acquired distinctiveness increases with the level of descriptiveness. *Royal Crown*, 892 F.3d at 1368. “[A] more descriptive term requires more evidence of secondary meaning.” *Id.* at 1365. Indeed, for “highly descriptive” terms—such as “Fish Fry Products,” an “elevated burden” of substantial evidence must be met to establish acquired distinctiveness and the Board must assess such evidence through “an exacting lens.” *Id.* at 1389.

In addition, for over six (6) decades, the law in this Circuit has been that a generic term is the “ultimate in descriptiveness” and cannot acquire distinctiveness. *Royal Crown*, 892 F.2d at 1366; *see also Weiss Noodle*, 290 F.2d at 847-48. If the Board did not err by ignoring that legal principle, the Board certainly erred by failing to apply an appropriately elevated and exacting legal standard when assessing secondary evidence. Specifically, the Board wrongly credited indirect evidence (*i.e.*, sales and advertising figures) to prove secondary meaning, when the Opposer presented a survey that refuted any such conclusion.

First, the Board correctly rejected the methodology employed by Ms. Butler’s survey for numerous reasons. Appx43-47. One such reason is that the

survey's universe was limited to individuals "who, in the past six months, have purchased a shot of alcohol or report that in the next six months they are likely to purchase a shot of alcohol." Appx45. The Board found this limited universe improperly skewed the results in Opposer's favor because Opposer's marketing efforts were directed to such individuals (*i.e.*, heavy consumers of alcohol). Appx45-46. But notably, despite the skewed survey, the results showed that only 48.9% of those polled believed "Fireball" was a brand name, and thus, the majority did not. Appx44. Therefore, despite Opposer's extensive marketing efforts seeking to create "de facto" secondary meaning, the Opposer's own survey proved that it failed to create "de facto" secondary meaning even as to the population targeted by its extensive advertising efforts.

In summary, by failing to apply an elevated and exacting standard when assessing secondary evidence, the Board wrongly credited sales and advertising figures to prove secondary meaning, when the Opposer's own survey proved the opposite conclusion was correct.

## VII. CONCLUSION

For the foregoing reasons, this Court should reverse the Board's conclusion of non-genericness because: (1) the Board applied an incorrect legal standard for genericness; (2) under the correct legal standard, the Board had to conclude that the "fireball" designation was generic given its factual findings; and (3) the Board

applied the incorrect legal standard for assessing secondary meaning if that is an appropriate consideration in genericness cases (which it is not).

Respectfully submitted,

Dated: July 7, 2023

/s/ John R. Horvack, Jr.
John R. Horvack, Jr.
Fatima Lahnin
Damian K. Gunningsmith
Carmody Torrance Sandak
& Hennessey LLP
195 Church Street, 18th Floor
New Haven, CT 06509
Tel.: (203)-777-5501
Fax: (203) 784-3199

*Attorneys for Appellant*

# Addendum

## TABLE OF CONTENTS


| **Date** | **Description** | **Appx** |
|---|---|---|
| | Trademark Trial and Appeal Board Standard Protective Order | i-x |
| 03/06/2023 | Board Decision Denying Counterclaims and Dismissing Opposition | 1-66 |

# TRADEMARK TRIAL AND APPEAL BOARD
# STANDARD PROTECTIVE ORDER

Pursuant to Trademark Rule 2.116(g), this standard protective order ("Order") is adopted by the Board and automatically imposed in all Board proceedings. It is not necessary for the parties and/or their attorneys to sign copies of the Order for it to take effect or for the parties to be bound by its terms during the course of the proceeding. However, it may be desirable to obtain such signatures to assure the parties that they have created a contract which will survive this Board proceeding and that they may have a remedy for breach of that contract which occurs after the conclusion of this Board case. Notwithstanding, any determination of whether the Order establishes contractual rights or is enforceable outside of this Board proceeding is for the appropriate judicial forum to decide should such matter come before it.

Information disclosed by any party or non-party witness during this proceeding may be designated (1) **Confidential** or (2) **Confidential – For Attorneys' Eyes Only (Trade Secret/ Commercially Sensitive)** by a party or witness. To preserve the confidentiality of the information so disclosed, the parties are hereby bound by the terms of this Order, in its standard form or as modified by agreement of the parties approved by the Board, and by any additional provisions approved by the Board. As used in this Order, the term "information" covers documentary material, electronically stored information ("ESI"), testimony,[1] and any other information provided during the course of this Board proceeding.

Parties may use this Order as the entirety of their agreement or may use it as a template from which they may fashion a modified agreement, subject to Board approval.

This Order shall govern any information produced in this Board proceeding and designated pursuant to this Order, including all designated discovery depositions, all designated testimony depositions and declarations and affidavits, all designated deposition exhibits and testimony exhibits, interrogatory answers, admissions, documents and other discovery and testimony materials, whether produced informally, as part of mandatory disclosures, or in response to interrogatories, requests for admissions, requests for production of documents or other methods of discovery.

This Order shall also govern any designated information produced or provided in this Board proceeding pursuant to required disclosures under any applicable federal procedural rule or Board rule and any supplementary disclosures thereto.

[1] Testimony as used in this Order, includes testimony provided during a discovery deposition or a testimony deposition or by declaration or affidavit, either orally or upon written questions.

This Order shall apply to the parties and to any nonparty from whom discovery or testimony may be sought in connection with this proceeding and who desires the protection of this Order.

## TERMS OF ORDER

**1) Classes of Protected Information.**

The Rules of Practice in Trademark Cases provide that all inter partes proceeding files, as well as the involved registration and application files, are open to public inspection. The terms of this Order are not to be used to undermine public access to such files. When appropriate, however, a party or witness, on its own or through its attorney, may seek to protect the confidentiality of information by employing one of the following designations.

**Confidential** -Material to be shielded by the Board from public access.

**Confidential – Attorneys' Eyes Only (Trade Secret/Commercially Sensitive)** -Material to be shielded by the Board from public access, restricted from any access by the parties, and available for review by **outside counsel** for the parties and, subject to the provisions of paragraphs 4 and 5, by independent experts or consultants for the parties.

Material designated as **Confidential - Attorneys' Eyes Only (Trade Secret/Commercially Sensitive)** may include the following types of information: (1) sensitive technical information, including current research, development and manufacturing information; (2) sensitive business information, including highly sensitive financial or marketing information; (3) competitive technical information, including technical analyses or comparisons of competitor's products or services; (4) competitive business information, including non-public financial and marketing analyses, media scheduling, comparisons of competitor's products or services, and strategic product/service expansion plans; (5) personal health or medical information; (6) an individual's personal credit, banking or other financial information; or (7) any other commercially sensitive information the disclosure of which to non-qualified persons subject to this Order the producing party reasonably and in good faith believes would likely cause harm.

**2) Information Not to Be Designated as Protected.**

Information may not be designated as subject to any form of protection if it (a) is, or becomes, public knowledge, as shown by publicly available writings, other than through violation of the terms of this Order; (b) is acquired by a non-designating party

or non-party witness from a third party lawfully possessing such information and having no obligation to the owner of the information; (c) was lawfully possessed by a non-designating party or non-party witness prior to the opening of discovery in this proceeding, and for which there is written evidence of the lawful possession; (d) is disclosed by a non-designating party or non-party witness legally compelled to disclose the information; or (e) is disclosed by a non-designating party with the approval of the designating party.

**3) Access to Protected Information.**

The provisions of this Order regarding access to protected information are subject to modification by written agreement of the parties or their attorneys and approval by the Board.

Administrative Trademark Judges, Board attorneys, and other employees of the Board are bound to honor the parties' designations of information as protected, except as otherwise required by law, but are not required to sign forms acknowledging the terms and existence of this Order. Court reporters, stenographers, video technicians or others who may be employed by the parties or their attorneys to perform services incidental to this proceeding will be bound only to the extent that the parties or their attorneys make it a condition of employment or obtain agreements from such individuals, in accordance with the provisions of paragraph 4.

- **Parties** are defined as including individuals, officers of corporations, partners of partnerships, members of limited liability companies/corporations, and management employees of any type of business organization.
- **Attorneys** for parties are defined as including **in-house counsel** and **outside counsel**, including support staff operating under counsel's direction, such as paralegals or legal assistants, secretaries, and any other employees or independent contractors operating under counsel's instruction.
- **Independent experts or consultants** include individuals retained by a party for purposes related to prosecution or defense of the proceeding but who are not current or former employees, officers, members, directors, or partners of any party, affiliates of any party, or the attorneys of any party or its affiliates, or competitors to any party, or employees or consultants of such competitors with respect to the subject matter of the proceeding.
- **Non-party witnesses** include any individuals to be deposed during discovery or trial, whether willingly or under subpoena issued by a court of competent jurisdiction over the witness.

**Parties** and their **attorneys** shall have access to information designated as **confidential**, subject to any agreed exceptions.

**Outside counsel, but not in-house counsel,** shall have access to information designated as **Confidential – Attorneys' Eyes Only (Trade Secret/Commercially sensitive)**.

**Independent experts or consultants**, **non-party witnesses**, and **any other individual** not otherwise specifically covered by the terms of this order may be afforded access to **confidential** information in accordance with the terms that follow in paragraph 4. Further, **independent experts or consultants** may have access to **Confidential – Attorneys' Eyes Only (Trade Secret/Commercially Sensitive)** information if such access is agreed to by the parties or ordered by the Board, in accordance with the terms that follow in paragraphs 4 and 5.

**4) Disclosure to Any Individual.**

Prior to disclosure of protected information by any party or its attorney to any individual not already provided access to such information by the terms of this Order, the individual shall be informed of the existence of this Order and provided with a copy to read. The individual will then be required to certify in writing that the order has been read and understood and that the terms shall be binding on the individual. No individual shall receive any protected information until the party or attorney proposing to disclose the information has received the signed certification from the individual. A form for such certification is attached to this Order. See Exhibit A. The party or attorney receiving the completed form shall retain the original.

**5) Disclosure to Independent Experts or Consultants.**

In addition to meeting the requirements of paragraph 4, any party or attorney proposing to share disclosed information that has been designated **Confidential-Attorneys' Eyes Only (Trade Secret/Commercially Sensitive)** with an independent expert or consultant must also notify the party who designated the information as such. Notification must be personally served or forwarded by certified mail, return receipt requested, or by email, and shall provide notice of the name, address, occupation and professional background of the expert or independent consultant.

The party or its attorney receiving the notice shall have ten (10) business days to object to disclosure to the expert or independent consultant. If objection is made, then the parties must negotiate in good faith the issue before raising the issue before the Board. If the parties are unable to settle the dispute, then it shall be the obligation of the party or attorney proposing disclosure to bring the matter before the Board with an explanation of the need for disclosure and a report on the efforts the parties have made to settle their dispute. The party objecting to disclosure will be expected to respond with its arguments against disclosure or its objections will be deemed waived.

**6) Responses to Written Discovery.**

Responses to interrogatories under Federal Rule 33 and requests for admissions under Federal Rule 36 (whether in a paper or electronic form) and which the responding party reasonably believes to contain protected information shall be prominently stamped or marked with the appropriate designation from paragraph 1. Any inadvertent disclosure without appropriate designation shall be remedied as soon as the disclosing party learns of its error, by informing all adverse parties, in writing, of the error. The parties should inform the Board only if necessary because there was a filing of protected information not in accordance with the provisions of paragraph 12.

**7) Production of Documents.**

If a party responds to requests for production under Federal Rule 34 by making copies and forwarding the copies to the inquiring party, including ESI, then the copies shall be prominently stamped or marked, as necessary, with the appropriate designation from paragraph 1. If the responding party makes documents available for inspection and copying by the inquiring party, all documents shall be considered protected as "Confidential," as defined in Section 1 of this order, during the course of inspection.[2] After the inquiring party informs the responding party what documents are to be copied, the responding party will be responsible for prominently stamping or marking the copies with the appropriate designation from paragraph 1.

**8) Depositions.**

Protected documents produced during an oral discovery deposition or a discovery deposition upon written questions, or offered into evidence during an oral testimony deposition, a testimony deposition upon written questions, or testimony submitted by affidavit or declaration, shall be noted appropriately as such by the producing or offering party at the outset of any discussion of the document or information contained in the document. In addition, the documents must be prominently stamped or marked with the appropriate designation.

[2] To the extent any of the documents provided for inspection may be deemed Confidential-For Attorneys' Eyes Only and the inquiring party is not represented by counsel, it is the responsibility of the responding party to remove such documents prior to inspection and copy and forward such documents, if responsive, to the inquiring party with the marked designation Confidential-For Attorneys' Eyes Only, including any appropriate redactions, if necessary. Alternatively, a party responding to document requests from an inquiring party that is representing itself pro se in a Board proceeding may forego the "inspection" option and instead copy and produce responsive documents clearly marked with the appropriate designation of confidentiality from paragraph 1, as necessary and appropriate.

If testimony includes protected information, the interested party shall, to the extent practical under the circumstances, make note on the record of the protected nature of the information.

The transcript of any deposition (whether for discovery or testimony purposes) and all exhibits or attachments shall be considered "Confidential," as defined in Section 1 of this order, for 30 days following the date of service of the transcript by the party that took the deposition. During that 30-day period, either party may designate the portions of the transcript, and any specific exhibits or attachments that are to be treated as protected, by electing the appropriate designation from paragraph 1. Appropriate stampings or markings should be made during this time, if not already done so. If no such designations are made, then the entire transcript and exhibits will be considered unprotected.

**9) Filing Notices of Reliance.**

When a party or its attorney files a notice of reliance during the party's testimony period, the party or attorney is bound to honor designations made by the adverse party or attorney, or non-party witness, who disclosed the information, so as to maintain the protected status of the information.

**10) Briefs.**

When filing briefs, memoranda, affidavits and/or declarations in support of a motion, or briefs at final hearing, the portions of these filings that discuss protected information, whether information of the filing party, or any adverse party, or any non-party witness, should be redacted. The rule of reasonableness for redaction is discussed in paragraph 12 of this Order.

**11) Handling of Protected Information.**

Disclosure of information protected under the terms of this Order is intended only to facilitate the prosecution or defense of this Board proceeding. The recipient of any protected information disclosed in accordance with the terms of this Order is obligated to maintain the confidentiality of the information and shall exercise reasonable care in handling, storing, using, disseminating, retaining, returning, and destroying the information.

**12) Redaction; Filing Material with the Board.**

When a party or attorney must file protected information with the Board, or a motion or final brief that discusses such information, the protected information or portion of the motion/brief discussing the same should be redacted from the remainder. Redactions are subject to a rule of reasonableness.

Redaction can entail merely covering or omitting a portion of a page of material when it is copied or printed in anticipation of filing but can also entail the more

extreme measure of simply filing the entire page under seal as one that contains primarily confidential material. If only a sentence or short paragraph of a page of material is confidential, covering that material when the page is copied, or omitting the material, would be appropriate.

In contrast, if most of the material on the page is confidential, then filing the entire page under seal would be more reasonable, even if some small quantity of non-confidential material is then withheld from the public record. Likewise, when a multi-page document is in issue, reasonableness would dictate that redaction of the portions or pages containing confidential material be effected when only some small number of pages contain such material. In contrast, if almost every page of the document contains some confidential material, it may be more reasonable to simply submit the entire document under seal. **Occasions when a whole document or motion/brief must be submitted under seal should be very rare**.

Protected information, and pleadings, briefs or memoranda that reproduce, discuss or paraphrase such information, shall be filed with the Board under seal. If filed by mail, the envelopes or containers shall be prominently stamped or marked with a legend in substantially the following form:

**CONFIDENTIAL**

This envelope contains documents or information that are subject to a protective order or agreement. The confidentiality of the material is to be maintained and the envelope is not to be opened, or the contents revealed to any individual, except by order of the Board.

If filed electronically by employing the Board's Electronic System for Trademark Trial and Appeals ("ESTTA"), the filing party should comply with the redaction guidelines set forth above and click the "confidential filing" option prior to transmitting the documents electronically. In all situations, a redacted copy must also be filed for public view.

**13) Acceptance of Information; Inadvertent Disclosure.**

Acceptance by a party or its attorney of information disclosed under designation as protected shall not constitute an admission that the information is, in fact, entitled to protection. Inadvertent disclosure of information which the disclosing party intended to designate as protected shall not constitute waiver of any right to claim the information as protected upon discovery of the error. In the event a party inadvertently files a document containing protected information, such party should immediately inform the Board and the Board will mark such document as confidential and will require the party to resubmit a redacted, publicly available copy of such document.

If, through inadvertence, a producing party provides any "CONFIDENTIAL" or "CONFIDENTIAL - ATTORNEYS' EYES ONLY" discovery material during a Board proceeding without marking the information as "CONFIDENTIAL" or "CONFIDENTIAL - ATTORNEYS' EYES ONLY," the producing party may subsequently inform the receiving party in writing of the "CONFIDENTIAL" or "CONFIDENTIAL - ATTORNEYS' EYES ONLY" nature of the disclosed information, and the receiving party shall treat the disclosed information in accordance with this Order after receipt of such written notice and make reasonable efforts to retrieve any such material that has been disclosed to persons not authorized to receive the material under the terms hereof. A party objecting to any such "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" designation shall follow the procedures set forth in paragraph 14 below. Prior disclosure of material later designated as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" shall not constitute a violation of this Order.

If a disclosing party through inadvertence produces or provides discovery material that it believes is subject to a claim of attorney-client privilege, work product immunity, or any other privilege, the disclosing party may give written notice to the receiving party that the discovery material is deemed privileged and that return of the material is requested. Upon such written notice, the receiving party shall immediately gather the original and all copies of the material of which the receiving party is aware and shall immediately return the original and all such copies to the disclosing party.

**14) Challenges to Designations of Information as Protected.**

If the parties or their attorneys disagree as to whether certain information should be protected, they are obligated to negotiate in good faith regarding the designation by the disclosing party. If the parties are unable to resolve their differences, the party challenging the designation may make a motion before the Board seeking a determination of the status of the information.

A challenge to the designation of information as protected must be made substantially contemporaneous with the designation, or as soon as practicable after the basis for challenge is known. When a challenge is made long after a designation of information as protected, the challenging party will be expected to show why it could not have made the challenge at an earlier time. The party designating information as protected will, when its designation is timely challenged, bear the ultimate burden of proving that the information should be protected.

**15) Consequences of Unchallenged Overdesigations.**

In the event the Board determines that a party has improperly overdesignated information as protected, and a party has not contested the overdesignation, the Board, on its own initiative, may (1) disregard the overdesignation for those matters

which are improperly designated; (2) issue an order to show cause why the submission should not be made open to public view; (3) require a party to reduce redactions by redesignating as non-confidential the overdesignated information and resubmit a properly designated redacted copy for public view; or (4) not consider the improperly designated matter in rendering its decision. In the case of an order to show cause, or request for resubmission of a filing with proper redaction (i.e., proper designation of confidential matter for public access), if no response is received, the Board will redesignate the confidentially filed material as non-confidential and make it available for public view.

**16) Board's Jurisdiction; Handling of Materials after Termination.**

The Board's jurisdiction over the parties and their attorneys ends when this proceeding is terminated. A proceeding is terminated only after a final order is entered and either all appellate proceedings have been resolved or the time for filing an appeal has passed without filing of any appeal.

The parties may agree that archival copies of evidence, memoranda, discovery deposition transcripts, testimony deposition transcripts, affidavits, declarations, and briefs may be retained solely by outside counsel, subject to compliance with agreed safeguards. Otherwise, within 30 days after the final termination of this proceeding, each party and their attorneys, as well as any other persons subject to the terms of this agreement, shall return to each disclosing party (1) all materials and documents, including ESI, containing protected information, (2) all copies, summaries, and abstracts thereof, and (3) all other materials, memoranda or documents embodying data concerning said material, including all copies provided pursuant to paragraphs 4 and 5 of this Order. In the alternative, the disclosing party or its attorney may make a written request that such materials be destroyed rather than returned. Additionally, parties to this agreement are precluded from disclosing orally or in writing any protected information provided during the course of a Board proceeding once this Board proceeding is terminated.

**17) Other Rights of the Parties and Attorneys.**

This Order shall not preclude the parties or their attorneys from making any applicable claims of privilege during discovery or at trial. Nor shall this Order preclude the filing of any motion with the Board for relief from a particular provision of this Order or for additional protections not provided by this Order.

**By Agreement of the Following:**

______________________
[insert signature date]

___________________________
[print or type name and title of
individual signing for defendant]

_________________________
[print or type name and law firm of
attorney for defendant]

_________________________
[print or type name and title of
individual signing for plaintiff]

_________________________
[print or type name and law firm of
attorney for plaintiff]

This Opinion is Not a Precedent of the TTAB

Hearing: September 21, 2022 Mailed: March 6, 2023

UNITED STATES PATENT AND TRADEMARK OFFICE

Trademark Trial and Appeal Board

*Sazerac Brands, LLC*
*v.*
*Bullshine Distillery LLC*

Opposition No. 91227653

Kristen McCallion and Vivian Cheng of Fish & Richardson P.C.
for Sazerac Brands, LLC.

John R. Horvack, Jr., Fatima Lahnin and Damian K. Gunningsmith of Carmody Torrance Sandak & Hennessey LLP
for Bullshine Distillery LLC.

Before Lykos, Adlin and English, Administrative Trademark Judges.

Opinion by Adlin, Administrative Trademark Judge:

Applicant Bullshine Distillery LLC seeks a Principal Register registration of BULLSHINE FIREBULL, in standard characters, for "alcoholic beverages except beers," in International Class 33.[1] In its notice of opposition, Opposer Sazerac Brands,

[1] Application Serial No. 86750668, filed September 8, 2015 under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b), based on an alleged intent to use the mark in commerce.

LLC alleges prior use[2] and registration of FIREBALL (standard characters)[3] and [4] for "whiskey," and FIREBALL (typed form) for "liqueurs,"[5] all on the Principal Register in International Class 33.[6] As grounds for opposition, Opposer alleges that use of Applicant's mark would be likely to cause confusion with Opposer's marks.

---

[2] More specifically, Opposer alleges prior use "through" its parent company and predecessor-in-interest.

[3] Registration No. 3550110, issued December 23, 2008 (the "'110 Registration"); renewed. In this registration, Opposer spelled the identified goods as "whisky." As Opposer explains, the term's spelling is "location dependent." Specifically, "'whiskey' is the American and Irish spelling, whereas Canada and Scotland omit the letter 'e' and spell the word as 'whisky.'" Opposer's "FIREBALL whisky is made from Canadian whisky," so Opposer "refers to its product as whisky." 60 TTABVUE 29 (Henry Dec. I ¶ 8 & n.1).

Citations to the record are to TTABVUE, the Board's online docketing system. Specifically, the number preceding "TTABVUE" corresponds to the docket entry number(s), and any number(s) following "TTABVUE" refer to the page number(s) of the docket entry where the cited materials appear.

[4] Registration No. 3734227, issued January 5, 2010 (the "'227 Registration"); renewed. This registration describes the mark as follows: "The mark consists of Fiery headed, long tailed creature spewing flames under the curved text 'FIREBALL'."

[5] Registration No. 2852432, issued June 15, 2004 (the "'432 Registration"); renewed. There is no substantive difference between "standard character" marks and marks in "typed" form. *In re Viterra Inc.*, 671 F.3d 1358, 101 USPQ2d 1905, 1909 n.2 (Fed. Cir. 2012) ("until 2003, 'standard character' marks formerly were known as 'typed' marks, but the preferred nomenclature was changed in 2003 to conform to the Madrid Protocol … we do not see anything in the 2003 amendments that substantively alters our interpretation of the scope of such marks").

[6] Opposer also pled ownership of Registration No. 4564436 for FUEL YOUR FIRE (standard characters) for "distilled spirits and liqueurs, prepared alcoholic cocktails," but the parties stipulated to Opposer's "withdrawal" of this basis for its likelihood of confusion claim. 57 TTABVUE 2.

In its operative third amended answer and counterclaims, Applicant denies the salient allegations in the notice of opposition and asserts "affirmative defenses" which are in fact merely amplifications of its denials. Applicant also counterclaims to cancel Opposer's pleaded '432 and '110 Registrations (for the FIREBALL word marks) on the ground that "fireball" is a "generic name for a [whiskey or liqueur/schnapps-based] common alcoholic drink" containing "a spicy flavoring element such as cinnamon or hot sauce." 24 TTABVUE 27-28 (Third Amended Answer and Counterclaims ¶¶ 109-116). In addition, Applicant counterclaims for cancellation of each of Opposer's pleaded registrations on the ground of fraud, alleging that Opposer knew that FIREBALL is generic for its identified goods but failed to disclose this to the USPTO, and filed false declarations alleging that others do not have the right to use Opposer's pleaded marks in commerce, when in fact they do.[7] *Id.* at 12-26 (Third Amended Answer and Counterclaims ¶¶ 33-103). In its answer, Opposer denies the salient allegations in Applicant's counterclaims.

## I. The ACR Record and Evidentiary Objections

After the Board ruled on their cross-motions for summary judgment ("Cross MSJs"), 71 TTABVUE, the parties stipulated to resolving their remaining claims and counterclaims via accelerated case resolution ("ACR"). 77 TTABVUE ("ACR Stip."). Specifically, the parties elected to "resolve this proceeding based on the evidence and testimony submitted with the [Cross MSJs], ACR briefs, and supplementation

---

[7] The parties stipulated to dismissal of Applicant's abandonment counterclaim against the '436 Registration, 57 TTABVUE 2, and the Board granted summary judgment dismissing Applicant's abandonment counterclaim against the '432 Registration. 71 TTABVUE 3, 18-19 and fn.10. The '436 and '432 Registrations both identify "liqueurs" rather than "whisky."

thereto." *Id.* at 2 (ACR Stip. ¶ 1). They further agreed that evidence submitted with the Cross MSJs "is authentic for purposes of admission into the evidence and deemed properly of record …," subject to evidentiary objections other than "lack of personal knowledge." *Id.* at 3 (ACR Stip. ¶ 2). Each party's expert report "is admissible trial evidence," but subject to objections under "Federal Rules of Evidence 702, 703 and 704, competency, accuracy, relevance, unreliability, materiality, and/or weight to be afforded." *Id.* at 6 (ACR Stip. ¶ 8). Finally, the parties agreed that "[t]he Board may resolve any genuine disputes of material fact … that it may find to exist …." *Id.* at 3 (ACR Stip. ¶ 3).

Thus, the record consists of: the pleadings; by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the file of Applicant's involved application; the evidence submitted in support of the Cross MSJs; and supplementation to the Cross MSJ evidence. More specifically, Opposer introduced the following:

> First Declaration of Rebecca Henry, Opposer's parent Sazerac Company's Senior Marketing Director of spirit brands, including the FIREBALL brand, and the exhibits thereto ("Henry Dec. I"). 60 TTABVUE 28-456.
>
> First Declaration of Kristen McCallion, a Principal with Opposer's law firm, and the exhibits thereto ("McCallion Dec. I"). *Id.,* at 457-726. The exhibits to this declaration include, among others:
>
>> portions of the Deposition of Kendal Sheets, Applicant's co-owner and co-founder (and an attorney) ("Sheets Tr."), *id.* at 461-489;
>>
>> portions of the Deposition of Wayne Kramer, Applicant's other co-owner and co-founder, and its CEO ("Kramer Tr."), *id.* at 491-555;

portions of the Deposition of Elizabeth Kimmerle, Applicant's expert witness ("Kimmerle Tr."), *id.* at 557-618; and

expert report of Sarah Butler, Opposer's expert witness ("Butler Report"), *id.* at 641-659.

Second Declaration of Ms. Henry, and the exhibits thereto ("Henry Dec. II"). 67 TTABVUE 28-219.

Second Declaration of Ms. McCallion, and the exhibits thereto ("McCallion Dec. II"). *Id.* at 220-338. The exhibits to this declaration include, among others:

portions of the Kimmerle Tr, , *id.* at 223-250;

portions of the Kramer Tr., *id.* at 252-259;

portions of the Sheets Tr., *id.* at 261-270; and

portions of the deposition of Ms. Henry ("Henry Tr."), *id.* at 272-295.

Third Declaration of Ms. Henry, and the exhibits thereto ("Henry Dec. III"). 80 TTABVUE 2-118.

Third Declaration of Ms. McCallion, and the exhibits thereto ("McCallion Dec. III"). 81 TTABVUE 2-127.

Fourth Declaration of Ms. McCallion, and the exhibits thereto ("McCallion Dec. IV"). 105 TTABVUE 2-127.

Applicant introduced:

Internet printouts, official records, files of unpleaded and uninvolved applications and registrations, correspondence, pleadings from trademark litigation involving Opposer's FIREBALL mark, Opposer's discovery responses and printed publications. 63 TTABVUE.

Ms. Kimmerle's expert report ("Kimmerle Report"). *Id.* at 36-70.

portions of the Kramer Tr. *Id.* at 397-405.

> portions of the Sheets Tr. *Id.* at 407-424.
>
> Declaration of Mr. Kramer and the exhibits thereto ("Kramer Dec."). *Id.* at 425-689.
>
> Declaration of Mr. Sheets and the exhibits thereto ("Sheets Dec."). *Id.* at 690-727.
>
> Cross-examination of Ms. Henry, and the exhibits thereto ("Henry Cross"). 92 TTABVUE 5-104.
>
> Declaration of the Custodian of Records for NBCUniversal Media, LLC, and the exhibits thereto ("NBC Dec."). 94 TTABVUE.
>
> Declaration of Wendy Szymanski, Associate General Counsel for Macmillan Publishers, Inc., and the exhibits thereto ("Szymanski Dec."). 97 TTABVUE.
>
> Declaration of Jeanne R. Berney, Chief Operating Officer of Berney Films, LLC d/b/a Picturehouse ("Berney Dec."). 99 TTABVUE.
>
> Supplemental Declaration of Mr. Kramer, and the exhibits thereto ("Kramer Supp. Dec."). 100 TTABVUE.

While acknowledging that "the Board is capable of weighing the relevance and strength or weakness of the testimony and evidence," 83 TTABVUE 34, Opposer nevertheless objects to much of Applicant's evidence on various grounds, with a particular focus on Applicant's expert witness Ms. Kimmerle. *Id.* at 34-51. We address Opposer's objections to Ms. Kimmerle's testimony below, as part of our evaluation of her opinions, findings and qualifications.

Opposer's objections to Mr. Kramer's testimony and other evidence concerning how Opposer's FIREBALL product and other "fireball" mixtures taste are mostly beside the point. As Opposer itself points out, the issue here is "the **public's**

understanding of the word FIREBALL," which may include whether the public perceives there to be a "fireball" taste or flavor. 83 TTABVUE 45 (emphasis added). The parties' own perceptions, and those of their witnesses, are not our focus except to the extent they may reflect public perception.

Moreover, while Internet printouts unsupported by testimony and other hearsay evidence may not be relied upon for the truth of the matters asserted, what these materials show on their face is often directly relevant to public perception. *Harry Winston, Inc. & Harry Winston S.A. v. Bruce Winston Corp.*, 111 USPQ2d 1419, 1428 (TTAB 2014) ("such materials are frequently competent to show, on their face, matters of relevance to trademark claims (such as public perceptions), regardless of whether the statements are true or false. Accordingly, they will not be excluded outright, but considered for what they show on their face."). *See also In re Ayoub Inc.*, 118 USPQ2d 1392, 1399 n.62 (TTAB 2016); *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USQ2d 1458, 1467 n.30 (TTAB 2014).

As for Opposer's other objections, most go not to the admissibility of, but instead the weight to be accorded to, some of the testimony and evidence. Suffice it to say, "we simply accord the evidence whatever probative value it deserves, if any at all … Ultimately, the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence in this specific case, including any inherent limitations." *Hunt Control Sys. Inc. v. Koninkijke Philips Elecs. N.V.*, 98 USPQ2d 1558, 1564 (TTAB 2011). *See also Grote Indus., Inc. v. Truck-Lite Co., LLC*, 126 USPQ2d 1197, 1200 (TTAB 2018) ("We also remind the parties that our proceedings

are tried before judges not likely to be easily confused or prejudiced. Objections to trial testimony on bases more relevant to jury trials are particularly unnecessary in this forum.") (citing *U.S. Playing Card Co. v. Harbro LLC*, 81 USPQ2d 1537, 1540 (TTAB 2006)); *RxD Media, LLC v. IP Application Dev. LLC*, 125 USPQ2d 1801, 1804 (TTAB 2018); *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1478 (TTAB 2017) (quoting *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017)). We have kept Opposer's objections in mind in considering and determining the probative value of Applicant's evidence.

## II. Relevant Facts

The term "fireball" has been used to describe cocktails and candy, as well as their taste or flavor. It has also been used as a trademark to identify alcoholic beverages and candy. Perhaps not surprisingly, public perception and use of the term has evolved, and is largely context-dependent.

### A. Non-trademark and Descriptive Meanings, and Early Trademark Uses of "Fireball" for Candy

"Fireball" is consistently defined in dictionaries as a "ball of fire," "ball of flame" or "bright meteor." 60 TTABVUE 83-95 (Henry Dec. Ex. G).

The term took on new significance in 1954, when Ferrara Pan Candy Co. developed and began offering a spicy and sweet cinnamon candy product called the ATOMIC FIRE BALL. 60 TTABVUE 30-34, 39, 72-78, 80-82, 85. The company registered the ATOMIC FIRE BALL mark (Reg. No. 1316009), as well as variations thereof, including ATOMIC FIREBALL (Reg. No. 3631230) and CHEWY ATOMIC

FIREBALL (Reg. No. 3635241), all on the Principal Register for "candy." 60 TTABVUE 721-26.

As recently as 2019, Apex Flavors, Inc. offered a "fireball type flavor," with "fireball type" presumably intended to convey that the flavor is similar to that of ATOMIC FIREBALL candy or Opposer's FIREBALL whisky/liqueur. Significantly, the flavor was "developed for use in whiskey and other spirits," as shown below:




63 TTABVUE 691, 696-700 (Sheets Dec. ¶¶ 10-12 and Exs. 1, 2); *id.* at 199 (highlighting added). In 2019, Northwestern Extract Co. offered a "Cinnamon Fireball" flavor. *Id.* at 207, 211. *Id.* at 692, 702-09 (Sheets Dec. ¶¶ 13-15 and Exs. 3, 4).

Also in 2019, the "fona.com" website listed the "most daring/creative" ice cream flavors, one of which was "Fireball/Red Hot Cinnamon." 63 TTABVUE 693, 722-27 (Sheets Dec. ¶ 22 and Ex. 9); *id.* at 339, 348, 395. In 2016 Perry's Ice Cream's website

promoted the company's "Fireball" ice cream, stating "[w]e've blended hot cinnamon ice cream with cinnamon flavored swirls and sprinkled it with cinnamonnette candies …." *Id.* at 354. In 2019 Southern Snow offered a "Fireball"-flavored shaved ice concentrate. *Id.* at 363; *see also id.* at 366, 369. "Beef Jerky Outlet's Fireball Flavored Beef Jerky" was promoted online in 2019, and was claimed to have "cinnamon flavor." *Id.* at 372. In 2019 the "avalonmeatcandy.com" website offered "Fireball" flavored beef jerky, stating "cinnamon meets teriyaki and cayenne pepper **in layers much like atomic fireball candy**. Interesting and lots of fun." *Id.* at 376 (emphasis added). In 2019 the "popcorn carnival.com" website offered "Fireball" popcorn stating "one bite of our fireball popcorn and you'll know where it got its name! Chock full of spicy sweet cinnamon and crushed candy red hots, our Fireball popcorn is featured in Food Network Magazine's June 2015 issue." *Id.* at 379.[8] In 2018, the "carawaytea.com" website offered "Cinnamon Fireball" tea, describing it as "a hot cinnamon black tea with a slightly sweet flavor." *Id.* at 392.

At the same time ATOMIC FIREBALL was being used as a trademark for candy, and "fireball" was being used to describe the candy's flavor or similar flavors in other food and beverage products, "fireball" was also being used in a non-trademark manner in connection with alcoholic beverages, many with a sweet/spicy cinnamon flavor. For example, one undated recipe for a "Fireball" cocktail requires as ingredients bourbon, cinnamon schnapps and Tabasco sauce, and states: "This

[8] Opposer introduced a 2020 printout from the same website showing that the popcorn's name was changed to "Fireball Cinnamon Whiskey." 67 TTABVUE 297 (McCallion Dec. II Ex. U).

nostalgic drink will remind you of flavors from your childhood with an adult twist. After your first sip you'll understand how this drink got its name":




*Id.* at 235 (highlighting added). The recipe even suggests that the drink may be garnished "with extra fireball candy." *Id.*

There are a number of additional recipes for "fireball" alcoholic cocktails or shots,[9] many of which include whiskey or cinnamon schnapps (or variations thereof) and Tabasco sauce, as shown below:

[9] Ms. Henry testified that "FIREBALL whisky is primarily drank as a shot." 67 TTABVUE 31 (Henry Dec. II ¶ 15).

***Hot Shot (also called a Fire Ball)***
¾ oz. cinnamon schnapps
¾ oz. Tabasco sauce
Serve straight up in a shot glass.

**Fireball**
Mix 1 oz. of cinnamon Schnapps with a dash of Tabasco sauce.

http://www.bardrinks.com/drinks/drink.asp?id=8261565
13 captures
11 Jan 2002 - 19 May 2008

Fireball



| Qty. | Ingredients |
|---|---|
| 1 oz. | Cinnamon Schnapps |
| - | Tabasco |

**Fireball**
1 oz. cinnamon schnapps
dash Tabasco sauce

Serve straight up in a shot glass.

Fireball (The Webtender) https://www.webtender.com/db/drink/18

THE WEBTENDER
An On-Line Bartender

**Fireball**

**Ingredients:**

- 1 oz Cinnamon schnapps
- 1 dash Tabasco sauce

**Mixing instructions:**

Pour the cinnamon schnapps in shot glass and add the dash of Tabasco Sauce. Then shoot.

**Drink Information:**
**Category:** Shot
**Alcohol:** Alcoholic
**Serve in:** Shot glass
**Rating:** 7.0 - 23 votes [vote]
**Contributor:** Thane J. Hafen
**Added:** 07.Apr.1997

**Options:**

- Find similar drinks
- Print drink
- Add to favourites
- Show your favourites

**Fireball**
» Contributed by: n/a

Printable Version
Add to "My Handbook"
Email This Drink
Rate this Drink -

(No Votes)

**Drink Ingredients**
1. 1 oz Southern Comfort
2. 3 oz Cinnamon Schnapps
3. 1 dash Tabasco Sauce
4. 1 Cherry(s)

**Drink Directions**
Mix the schnapps, southern comfort and tabasco sauce. Pour into cocktail glass. Garnish with a cherry.

# Fireball Shot Recipe

The Fireball is a red shot made from Hot Damn cinnamon schnapps and Tabasco sauce, and served in a chilled shot glass.

## Ingredients

- 1-1/2 oz Cinnamon Schnapps (Hot Damn)
- 1 dash Tabasco Sauce
- Glass: Shot Glass

## Directions

- Shake cinnamon schnapps and Tabasco sauce with ice in a cocktail shaker.
- Strain into a chilled shot glass.



Like Tweet Share 74

Rating: 40.73 (15 reviews)

© CompleteCocktails.com

Categories: Red Drinks, Shot Glass, Spicy Drinks

Good: Average: Bad: Rate

http://www.drinksecret.com/recipe/fireball-1.html Go APR MAY OCT
2 captures 27
27 May 2005 - 3 Oct 2005 2004 2005 2006

Drink Recipes : A B C D E F G H I J K L M

drinksecret.com

**Drink Recipes**
Blended & Frozen Drinks
Cocktails
Halloween Theme Drinks
Hot Drinks
Liqueurs
Mixed Drinks
Non-Alcoholic Drinks
Punches
Shots / Shooters
Specialty Drinks
X-Rated Drinks
**Information**
Search Drink Recipes
Drinking Games
**Recommended Sites**
Bar Supplies
Home Decor Products
Cooking Supply

Drink Recipes :: Cocktails :: Fireball #1 Drink Recipe

**Fireball #1 Drink Recipe**

**Drink Ingredients:**
1 oz. Southern Comfort
1 Cherry
3 oz. Cinnamon Schnapps
1 dash Tabasco Sauce

**Instruction:**
Mix the Schnapps, Southern Comfort, and Tabasco. Pour into cocktail glass. A cherry may be added.

**Glass Type:**



Fireball #4 (Shooter) https://web.a

http://www.barnonedrinks.com:80/drinks/f/fireball-4-6627.html
12 captures
21 Jan 2008 - 8 Jul 2017

**Fireball #4**

**Fireball #4**

**Drink Type:** Shooter - F

**Ingredients**

1 oz. Cinnamon Schnapps - (more)
1/4 oz. Tabasco Sauce - (more)

**Instructions**

Shake with ice and strain into a shot glass.

http://www.barmandrinks.com:80/cocktails-drinks/fireball5-drink.html Go JAN FEB

1 capture

9 Feb 2007

09

2006 2007

Fireball #5

Barman drinks

BarmanDrinks.com

Cocktails

Cocktails Mixed Drink Recipes > **Fireball #5 Drink**

**Drink Categories**

Beer And Ale
Blended And Frozen
Cocktails
Hot
Liqueurs And Extracts
Non Alcoholic
Other
Punches

**Barman Tips**

Bartender Guide
Barman Terminology
Bar Measurements

**Site Menu**

Submit Drink Recipe
Bookmark This Site
Contact Us
Privacy Policy
Homepage

**Fireball #5 Recipe**

Home > Cocktails Drinks > **Fireball #5**

Browse Mixed Drink Recipes Alphabetically:

**Cocktails :** # A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

Popular recipes like Fireball #5 Recipe

Dandy Cocktail recipe
Strawberry Splash recipe
Irish Twist recipe
Peppermint Patty recipe
Mariposa recipe
The Milky Way recipe
Scurvy Pirate recipe
Volcano recipe

**Cocktails Recipes. Mixed Drinks**

**Fireball #5 Recipe**

Ingredients
1.5 oz. Cinnamon Schnapps
Top With Tabasco Sauce
**Mixing Instruction**
Shake and Strain Shnapps w/ ice into shooter glass float tobasco

Drink Category
Cocktails

Glass Type
Shooter

Fireball - Liqueur Shot Drink Recipe https://web.archive.org/web/201

http://www.drinkoftheweek.com/drink_recipes/fireball/ Go AUG SEP

12 captures

14 Sep 2012 - 11 Oct 2017

14

2011 2013

**Fireball**

The Barkeep
Thursday, July 29, 2010

**Ingredients**

- 2 oz cinnamon schnapps
- Tabasco

**Instructions**

Pour the cinnamon schnapps into a shot glass and add a dash of Tabasco.

**Tags:** Cinnamon Schnapps, Hot sauce, Tabasco

← Brown Derby Cocktail

**Fireball**

1½ oz. cinnamon schnapps
1 dash Tabasco sauce

Pour cinnamon schnapps into a shot glass. Add Tabasco sauce.

BarDrinks Drink Page - Fireball #2 https://web.archive.org/web/20031114054432/http://www.bardrinks.com...

http://www.bardrinks.com:80/drinks/drink.asp?id=92931702 Go OCT NOV DEC

9 captures

14 Nov 2003 - 22 May 2008

14

2002 2003 2005

About this capture

Fireball #2

| Qty. | Ingredients |
|---|---|
| - | Goldschlager |
| - | Tabasco |




Glass type: Shot

Directions: pour in shot glass and drink

Source: Remon

**Jawbreaker aka Fireball Cocktail Recipe**

Category: Shots

**Ingredients :**

- 1 oz red cinnamon schnapps
- 3 - 5 drops tabasco sauce
- 1 oz red cinnamon schnapps
- 3 - 5 drops tabasco sauce

**Use a "In glass" for Jawbreaker aka Fireball drink recipe**

Pour Red Cinnamon Schnapps into a shot glass then add Tabasco Sauce.
Serve in "Shot Glass " Garnish: No










One of these recipes is called "Atomic Fireball #2 Recipe," and another is called "Southern Comfort Fireball":

Opposition No. 91227653


http://drinknation.com/drink/atomic-fireball-2
13 captures
14 Feb 2010 - 11 Sep 2017
SEARCH DRINKS
Advanced search
Valentine's Day is coming, which means Valentine's Drinks!
No votes yet!
BROWSE DRINKS
By:
Name Ingredient
Theme Class
Collection Multi-browse!
GAMES
BARTENDING
drink stuff
Your bar
Your favourites
Your account
Advanced Search
Best Drinks
Newest Drinks
Drink of the Week
Ingredient Glossary
Random recipe
Submit recipe
other stuff
New here?

**Atomic Fireball #2 Drink Recipe**

Ingredients

- 1 1/2 oz. Goldschläger
- 3 1/2 oz. 7-up
- 1/4 oz. Grenadine
- 6 cubes Ice
- 10 drops Tabasco Sauce

Glass to Use: Highball glass

Drink Colour: Multi-coloured (layered)

Mixing Instructions: Shake ingredients in a cocktail shaker with ice. Strain into glass.


TABASCO

**SOUTHERN COMFORT FIREBALL**

Ground Wet Seed    Yields: 1 serving

INGREDIENTS

Ingredients    WeightMeasure
TABASCO® brand Ground Wet Seed — 1/4 tsp. (0.5% use)

PREPARATION

Mix together Southern Comfort®, schnapps and TABASCO® Ground Wet Seed.

Pour into cocktail glass.

Garnish with black cherry.

63 TTABVUE 438, 441, 462, 471, 481, 492, 496, 498, 500, 517, 524, 528, 536, 538, 540, 550, 555, 557, 643, 667, 674, 680 (highlighting added). A number of these recipes were published earlier than 2008. *Id.*

There is also a recipe for a "Fireball Mead" containing cinnamon oil:


**Fireball Mead**
Recipe by Chuck Boyce

**Ingredients**
**for 5 U.S. gallons (19 liters)**

| | |
|---|---|
| 18.0 lb | (8.16 kg) lightly flavored honey such as clover |
| 2 tsp | (10 mL) Fermax yeast nutrient |
| 2 tsp | (10 mL) yeast energizer (optional) |
| | Lalvin 71B-1122 Narbonne Dry Wine Yeast (2 packs) |

**Ingredients added after primary fermentation**

| | |
|---|---|
| 0.5 oz | (15 mL) cinnamon oil or more to taste |
| 5 tsp | (25 mL) potassium sorbate |

**Original Target Gravity:** 1.135
**Final Target Gravity:** Keep it sweet—at least 1.030, as high as 1.060!

**Notes:** For higher gravity, give it at least a year to blend. Thanks to the Boston Beer Company for donating the honey used for this mead!

**Directions**
Activate yeast in warm water. Pasteurize honey and water at 150° F (65.5° C) for 30 minutes. Cool and transfer to carboy. Add enough water to make 5.5 gallons. Add yeast and remaining ingredients. Add 0.5 tsp or more of cinnamon oil to the secondary or at bottling, adjusting for your own taste. Once fermentation has ceased and the final target gravity is reached add 5 tsp (25 mL) of potassium sorbate to stabilize the mead and to stop fermentation from restarting. Once mead has cleared, bottle.

63 TTABVUE 189 (highlighting added). And Listermann Brewing Company offered "Chuck's Fireball Mead" which was described as "mead with cinnamon and cinnamon candy added." 63 TTABVUE 692, 711-714 (Sheets Dec. ¶ 17 and Ex. 5).

"Fireball" recipes are not always consistent, however. Some do not include whiskey, and others may not even have a spicy/sweet cinnamon flavor, as shown below:

**Fireball Shooter**

This drink is a hot one – you might need the next drink to put the fire out.

3/4 ounce cinnamon schnapps
3/4 ounce Bacardi 151-proof rum

Pour both ingredients into a mixing glass two-thirds full of ice cubes. Stir well. Strain into a chilled Pony glass.

**Fireball Shooter recipe**

***Description***

A delicious recipe for Fireball Shooter, with cinnamon schnapps, Bacardi® 151 rum and Tabasco® sauce.

***Ingredients***

1 shot cinnamon schnapps
1 shot Bacardi® 151 rum
2 dashes Tabasco® sauce

***Instructions***

Mix the schnapps, rum and tabasco in a shooter glass. Stir briefly.

***Serving***

Shot Glass

**Fireball Shooter**

1 shot cinnamon schnapps
1 shot Bacardi® 151 rum
2 dashes Tabasco® sauce

FireBall Shooter (The Webtender)

THE WEBTENDER
An On-Line Bartender

TWO MEDIUM 2-TOPPING PIZZAS $6.99 EACH
PROMO CODE 2MD699
ORDER NOW

**FireBall Shooter**

**Ingredients:**

- 1 shot Cinnamon schnapps
- 1 shot Bacardi 151 proof rum (Red Label)
- 2 dashes Tabasco sauce (McIlhenny's)

**Mixing instructions:**

Mix the Schnapps, Rum and Tabasco in a Shooter Glass. Stir briefly.

**Creator/contributor's comments:**

Drink the shooter and chase it with a beer. Tastes like a fireball candy.

**Drink Information:**
Category: Shot
Alcohol: Alcoholic
Serve in: Shot glass
Rating: 7.3 - 9 votes
Contributor: Eric Neifeld
Added: 29 Jul 1997

**Options:**
- Find similar drinks
- E-mail drink
- Print drink
- Add to favourites
- Show your favourites

Opposition No. 91227653

**Fireball # 1**

Home > Drinks - Fireball #1

**Fireball # 1**

Drink Type: Cocktail

Ingredients

1 1/2 oz. Brandy (more Brandy drinks)
1 1/2 oz. Sambuca (more Sambuca drinks)

Instructions

Build in a lowball glass.

Top Rated Coffee

Enter Code: "HEYBOXED"

**Fireball # 2**

Home > Drinks - Fireball #2

**Fireball # 2**

Drink Type: Cocktail

Ingredients

1 1/2 oz. Kahlua (more Kahlua drinks)
1 1/2 oz. Ouzo (more Ouzo drinks)

Instructions

Build in a lowball glass.

**Fireball # 5**

Home > Drinks - Fireball #5

**Fireball # 5**

Drink Type: Shooter

Ingredients

1/3 oz. Jose Cuervo (more Jose Cuervo drinks)
1/3 oz. Rumple Minze (more Rumple Minze drinks)
1/3 oz. Cranberry Juice (more Cranberry Juice drinks)

Instructions

Shake with ice and strain into a shot glass.

Cocktails Mixed Drink Recipes > Fireball #6 Drink

**Fireball #6 Recipe**

Home > Cocktails Drinks > Fireball #6

Browse Mixed Drink Recipes Alphabetically:

Cocktails : # A B C D E F G H I J K L M N O P Q R S T U V W X Y Z

Popular recipes like Fireball #6 Recipe

Frozen Daiquiri recipe
French 75 recipe
Black Banana recipe
Big Bird recipe
Joe Punch recipe
Negroni recipe
Whist Cocktail recipe
Jersey Gentleman recipe

Cocktails Recipes. Mixed Drinks

**Fireball #6 Recipe**

Drink Category
Cocktails

Glass Type
Shooter

Ingredients
1 oz. Kahlua
1 oz. Ouzo

Mixing Instruction
Mix all ingredients in a shotglass.

http://www.barnonedrinks.com:80/drinks/f/fireball-1

5 captures
19 Feb 2008 - 6 Sep 2015

**Fireball #1**

**Fireball #1**

Drink Type: Cocktail - F

Ingredients

1 1/2 oz. Brandy - (more)
1 1/2 oz. Sambuca - (more)

Instructions

Build in a lowball glass.

**Fireball #3**

**Ingredients:**

- 1 part Sambuca
- 1 part Tequila
- 5-10 drops Tabasco Sauce

Shots & Shooters

Printable version

**Peppermint Fireball recipe**

INGREDIENTS

Scale ingredients to 1 servings Go

1/2 oz Appleton Estate® 151 proof Jamaican rum
1/2 oz Smirnoff® vodka
1/2 oz Scotch whisky
1 drop peppermint extract

DIRECTIONS

Mix the rum, vodka and whiskey together in a cocktail shaker. Add the peppermint extract/essence to taste. Strain into a 2-oz shot glass, and serve.

Serve in:
Shot Glass

**FIREBALL 2**

Fill glass with ice.
1/2 oz Vodka
1/2 oz Cinnamon Schnapps
1/2 oz Cherry Brandy
4-5 drops Tabasco Sauce
Stir.
Strain into shot glass.







63 TTABVUE 443, 478, 511, 563 (some highlighting in originals, some added); 67 TTABVUE 299-304 (some highlighting in originals, some added); 100 TTABVUE 47.

Furthermore, Opposer points out that many shot and cocktail recipes call for its FIREBALL whisky, specifically and by name, i.e. by Opposer's FIREBALL mark. 67 TTABVUE 31, 64, 71, 85, 108, 117 (Henry Dec. II ¶ 15 and Exs. AL-1, AN). However, most of those recipes name the shot or cocktail itself something other than "Fireball." *Id.*

### B. Opposer's Predecessor Develops FIREBALL Cinnamon Flavored Whisky in Canada and Opposer Begins Offering the Product in the United States

In the 1980s, Joseph E. Seagram & Sons, Inc. offered in Canada a line of DR. MCGILLICUDDY'S schnapps and "whisky shooters." One of the line's two whisky shooters was "cinnamon flavored" and known as "DR. MCGILLICUDDY'S FIREBALL":




60 TTABVUE 29 (Henry Dec. I ¶ 8). "Around 1999, [Opposer] acquired Seagram's worldwide rights to the DR. MCGILLICUDDY'S brand, including the DR. MCGILLICUDDY'S FIREBALL … flavored whisky shooters, and their trademarks, artwork/label designs, and formulas," and began selling DR. MCGILLICUDDY'S FIREBALL cinnamon- flavored whisky in the United States. *Id.* at 30 (Henry Dec. I ¶¶ 9-10).

### C. At That Time (Over 20 Years Ago), Opposer Effectively Conceded that FIREBALL is Not Inherently Distinctive for Whiskey or Whiskey-Based Liqueurs

In 2000, Opposer filed application Serial No. 75941554 to register DR. MCGILLICUDDY'S FIREBALL for "whiskey-based liqueurs." The USPTO issued an

Office Action requiring a disclaimer of "FIREBALL" as "merely descriptive because a 'fireball' is a whiskey based alcoholic drink." The evidentiary basis for the requirement was this recipe for a "Fireball #2" cocktail:



The Webtender: Fireball #2 http://www.webtender.com/db/drink/3035

THE WEBTENDER

An On-Line Bartender

9.9%

**Fireball #2**

Drink Information:

**Ingredients:**

- 1 oz Southern Comfort
- 3 oz Cinnamon schnapps
- 1 dash Tabasco sauce
- 1 Cherry (optional)

Options:

**Mixing instructions:**

Mix the Schnapps, Southern Comfort, and Tabasco. Pour into cocktail glass. A cherry may be added.

Home · Search · Forum · Bookstore · Web Index · Feedback · Advertise

Copyright © 1995-2000 The Webtender.
About | Disclaimer | Privacy policy

63 TTABVUE 103-07 (highlighting added). As shown, the recipe calls for Southern Comfort, cinnamon schnapps and Tabasco sauce. Without challenging the requirement, Opposer entered the disclaimer. *Id.* at 110-11.[10]

The following year, Marie Brizard Wines & Spirits, U.S.A. sent Opposer a cease and desist letter claiming prior use of FIREBALL for "liqueurs" and challenging Opposer's use of DR. MCGILLICUDDY'S FIREBALL. *Id.* at 113. Opposer responded by filing a declaratory judgment action in federal court seeking a declaration that its use of DR. MCGILLICUDDY'S FIREBALL was not infringing. *Id.* at 115-122. More

[10] Opposer later sought to have the resulting registration "corrected," by deleting the disclaimer, but the USPTO refused the request. 60 TTABVUE 64-69.

specifically, Opposer pled that "Brizard is not entitled to trademark protection in the descriptive name FIREBALL." *Id.* at 120.

Marie Brizard then counterclaimed for infringement, in response to which Opposer went even further, asserting, as its Second Affirmative Defense, that **"[t]he FIREBALL name is the generic term for a type of cinnamon flavored alcoholic beverage and thus is not protectable as a trademark under Federal or State law."** *Id.* at 128 (emphasis added); *see also id.* at 133 (Opposer's Response to Request for Admission ("RFA") 28). While the details are designated "Confidential," the declaratory judgment/infringement action apparently settled, because, as Opposer describes it, "[i]n 2002, [Opposer] purchased [Marie Brizard's] rights in the FIREBALL trademark, including its application for FIREBALL with 'liqueurs' that [Marie Brizard] had filed based on a date of first use in commerce of September 1988, which the USPTO issued to [Opposer] as" the '432 Registration. 83 TTABVUE 7; 59 TTABVUE 32 (Henry Dec. I ¶ 19); 62 TTABVUE 187-90.

Around the same time Opposer was effectively conceding in its trademark application and asserting in litigation that FIREBALL is not inherently distinctive, it was using FIREBALL as a mark for its cinnamon whisky product, and using "cinnamon whisky" to identify the product's category, as shown in the following 2001 press release:

SINCE 1850
SAZERAC
NEW ORLEANS

COMPANY NEWS

HISTORY
PRODUCTS
NEWS
JOBS
PEYCHAUD'S BITTERS

**Fireball - The Newest Taste Sensation and Member of the Dr. McGillicuddy's Family**

New Orleans, LA (February 2, 2001) - The Sazerac Company will introduce Fireball, a cinnamon whisky and the newest member of the Dr. McGillicuddy's family, in Spring 2001. Fireball joins Dr. Mint and Dr. Vanilla as the newest libation by Dr. A.P. McGillicuddy.

Fireball is currently the fastest growing Dr. McGillicuddy's brand in Canada, the birthplace of the McGillicuddy's family. Unique flavors are driving the market and Dr. McGillicuddy's Fireball is carving out a new niche.

"Dr. McGillicuddy's Fireball is unique and surprisingly smooth, unlike anything else on the market," says Rebecca Green, Dr. McGillicuddy's Brand Manager. "It is not only the first cinnamon whisky, but a perfect taste sensation combining a popular liqueur flavor, cinnamon, with the smoothness of Canadian whisky."

Fireball's "Original Formula" guarantees that Dr. McGillicuddy's is faithful to the original creation of A.P. McGillicuddy. The original formula starts with the unmistakable taste of cinnamon and ends with a feisty kick of whisky. Dr. McGillicuddy's Fireball is great as a shot, on the rocks, with cola or cranberry juice or in one's own creation. The members of the Dr. McGillicuddy's family, which includes Mentholmint Schnapps, Vanilla Schnapps and Fireball, are identified in the wonderful tradition of celebrating life with good friends and good spirits.

Dr. McGillicuddy's Fireball is imported from Canada by the Sazerac Company, Inc., one of the leading international distillers, importers and distributors of distilled spirits. Dr. McGillicuddy's Fireball is 66 proof (33% alcohol by volume) and made from 100% Canadian whisky. Dr. McGillicuddy's Fireball is available in a full range of sizes including liters, 750 ml, 750 ml

ps://web.archive.org/web/20011023192600/http:/sazerac.com/news4.html[1/2/2020 11:20:31 AM]

**BD-009247**

63 TTABVUE 92 (highlighting added). On the other hand, in the same press release, Opposer states that "Mentholmint Schnapps, Vanilla Schnapps and Fireball" are "members of the Dr. McGillicuddy's family," which could be perceived as equating "Fireball" with the apparently non-distinctive terms "Mentholmint Schnapps" and "Vanilla Schnapps." *Cf.* 67 TTABVUE 282 (McCallion Dec. II Ex. T) (Henry Tr. 121) ("Menthol mint and vanilla are flavors.").

Suffice it to say that, based on the record in its entirety, during the early 2000s Opposer did not consistently treat or use "fireball" as a mark.

### D. Opposer Quite Successfully Rebrands FIREBALL Cinnamon-Flavored Whisky

"Around 2005, [Opposer] explored transitioning the brand from DR. MCGILLICUDDY'S FIREBALL to just FIREBALL." *Id.* at 32 (Henry Dec. I ¶ 20). In 2007, Opposer updated the product's packaging, as shown below:




*Id.* at 33 (Henry Dec. I ¶ 21). As reflected in the depictions above, "[t]he imagery of a flaming ball of fire also carried over to the newly designed FIREBALL product label as a reference to the fact that the word 'fireball' means, literally, a ball of fire." *Id.* at 33 (Henry Dec. I ¶ 22).

Although Opposer enjoyed only modest success in its first several years of offering DR. MCGILLICUDDY'S FIREBALL cinnamon-flavored whisky in the United States, 59 TTABVUE 31 (Henry Dec. I ¶ 13), after the rebranding, FIREBALL cinnamon whisky's popularity skyrocketed in the United States. In fact, in 2012 Opposer's FIREBALL whisky was rated the "#1 shooter in growth according to Nielsen." 60 TTABVUE 37 (Henry Dec. I ¶ 38). "In 2014, FIREBALL whisky became the #1 shot by volume in the U.S," *id.*, although FIREBALL whisky's share "of the entire United

States market for shots" was perhaps not as significant as might have been expected given its ranking. 59 TTABVUE 38 (Henry Dec. I ¶ 38). How these "ratings" were formulated is unexplained.

In any event, Opposer's FIREBALL whisky has become even more successful in recent years. In fact, "[a]s of October 2019, FIREBALL whisky was ranked the #1 selling whisky nationwide, as it had also been in 2017 and 2018, after holding the #2 position in 2015 and 2016." 60 TTABVUE 38 and 59 TTABVUE 188-89 (Henry Dec. I ¶ 38 and Ex. O). Again, the method behind these "rankings" and the evidence supporting them are unexplained.

The product has received substantial unsolicited media attention. *Id.* at 38, 150-254 (Henry Dec. I ¶ 39 and Exs. Q-1 and Q-2); 67 TTABVUE 30-31, 63-152 (Henry Dec. II ¶¶ 12-14 and Exs. AL-1, AL-2 and AM). For example, a 2016 BUSINESS INSIDER article about FIREBALL whisky is titled "This liquor brand grew sales from $1.9 million to $160 million in under 5 years — and it's now more popular than Grey Goose or Jim Beam." 60 TTABVUE 39, 241-42 (Henry Dec. I ¶ 40 and Ex. Q-2). Opposer estimates that the product's unsolicited media attention has "reached" a large number of people, but how it arrived at this estimate is unexplained, and it is unclear whether the estimate is limited to the United States. 59 TTABVUE 50-51 (Henry Dec. I ¶ 70).

Opposer's gross sales from 2011-2019 are significant. 59 TTABVUE 52 (Henry Dec. I ¶ 71). Its marketing expenses from 2011-2019 are as well. *Id.* at 45-46 (Henry Dec. I ¶ 61). However, Opposer has not provided context for its sales and advertising

figures which would allow us to compare them to those of Opposer's competitors.[11] Nonetheless, Applicant agrees that Opposer's FIREBALL brand has been successful because it "sold a lot." 60 TTABVUE 501-02 (Kramer Tr. 127-28).

Opposer attributes its marketing success, in part, to its "brand ambassador program." 60 TTABVUE 40 (Henry Dec. I ¶ 45). Opposer's brand ambassadors "are charged with identifying, establishing, and cultivating super fans, influencers, and brand advocates throughout their respective markets. [Opposer's] FIREBALL ambassadors visit places where FIREBALL whisky is sold and engage consumers in fun drinking activities and other events at which FIREBALL whisky is highlighted." *Id.* (Henry Dec. I ¶¶ 45-46). *See also id.* at 159 ("The company would offer free shots of Fireball to the entire bar. The bar would then take the shot as a group, which left an impression on customers."). Opposer also provides "branded novelty items," signs and other promotional materials to bars:



[11] The "Nielsen Answers" rankings Opposer provided, 59 TTABVUE 188-89, are unauthenticated hearsay, unexplained and insufficient to allow us to draw firm conclusions about whiskey "spirit share distribution," even if that term was adequately explained.

*Id.* at 41 (Henry Dec. I ¶ 47). Opposer's "Official Bartender Loyalty Program" has apparently been successful because in 2015 and 2016 FIREBALL won a "Most Recommended Brand Award" in the "Overall Spirit" and "Shot/Shooter" categories. 59 TTABVUE 42 (Henry Dec. I ¶ 49); 60 TTABVUE 146-49 (Henry Dec. I Ex. P).

Opposer's celebrity endorsers include Chris Pratt, Ed Sheeran, Miranda Lambert, and the bands Florida Georgia Line (whose song "Round Here" mentions FIREBALL) and Kings of Leon. Opposer's "Fireball Whisky" Facebook page has almost one million followers, and was estimated to have "reached" many more than that. *Id.* at 43, 151-52 (Henry Dec. I ¶¶ 53-54 and Ex. Q-1); 80 TTABVUE 16 (Henry Dec. III ¶ 18). "What is Fireball?" was the correct "answer" (in the form of a question) to this clue on the television show Jeopardy: "I carry a flask full of this cinnamon whisky that 'Tastes Like Heaven' & 'Burns Like Hell.'" 80 TTABVUE 12 (Henry Dec. III ¶ 18).

### E. Opposer Challenges Third-Party Uses of FIREBALL for Alcoholic Beverages, and Sometimes Other Products

Opposer has successfully challenged third-party applications to register FIREBALL for beer and spirits. 67 TTABVUE 29, 35-37 (Henry Dec. II ¶ 7 and Exs. AE and AF). It also prevailed in a UDRP case, resulting in the transfer of the domain name "fireballcannabis.com" to Opposer. *Id.* at 29, 39-42 (Henry Dec. II ¶ 8 and Exs. AG).

Opposer recently enforced its rights against several of the third-party users of FIREBALL cited by Applicant in this case, but apparently did not do so until Applicant relied on these third-party uses in support of its Cross-MSJ. *Id.* at 29-30, 46-61 (Henry Dec. II ¶ 10 and Exs. AI, AJ and AK) (revealing successful enforcement

against Beef Jerky Outlet, Northwestern Extract and Apex Flavors). Opposer also successfully enforced its rights in its FIREBALL mark against Jack Daniel's, which used FIREBALL in connection with its competing cinnamon whiskey product. 79 TTABVUE 18, 161-67 (Henry Dec. III ¶ 31 and Ex. BH); *see also id.* at 126-59; 80 TTABVUE 17-18, 114-16 (Henry Dec. III ¶¶ 29-30 and Exs. BF and BG).

Opposer has not prevented all third-party uses of "fireball," however. For example, in 2014, in the midst of FIREBALL Cinnamon Whisky's explosive growth, the theatrical film "The Guest" included descriptive or generic use of FIREBALL for an alcoholic drink. Specifically, in the film a waiter asks the main character for his order, and the main character responds "You know how to make a fireball?" The waiter answers "cinnamon schnapps and Tabasco sauce," to which the main character responds "that's my drink of choice. Let me get one of those." 96 TTABVUE.

### F. Opposer Admits, Sometimes Begrudgingly, that FIREBALL Whisky Tastes Like ATOMIC FIREBALL Candy

Ms. Henry concedes not just that "[p]eople often compare the flavor of FIREBALL whisky to [ATOMIC FIREBALL] candy as well as to BIG RED chewing gum and RED HOTS candy, which have a sharp cinnamon taste," 60 TTABVUE 55 (Henry Dec. I ¶ 84), but also that "[t]he cinnamon flavor of Fireball whisky and the Fireball candy cinnamon flavor, they're the same flavoring." 67 TTABVUE 293 (Henry Tr. 165). Moreover, when the founder of Ferrara Pan Candy Co. died, Opposer posted on its "Fireball Whisky" Facebook page that it had a "heavy heart" and that FIREBALL whisky is "based on" the ATOMIC FIREBALL, as shown below:




63 TTABVUE 214 (highlighting added); *see also id.* at 216, 223, 225 (essentially identical and substantively similar tweets).

Opposer's statements are consistent with perceptions reported in the media and product listings:

> Fireball, which is described as tasting like cinnamon gum …. 60 TTABVUE 159
>
> Consumers say Fireball, a heavily sweetened spirit with a spicy cinnamon kick, 'tastes like Big Red in liquid form.' *Id.* at 165.
>
> It tastes like a syrupy incarnation of Wrigley's Big Red gum. It's sweet, with a spicy burn. *Id.* at 171.

> The drink, which tastes exactly like the Atomic Fireball candy …. *Id.* at 174.
>
> … it used social media to spread the word about the flavored whiskey, which tastes like the liquefied Big Red gum. *Id.* at 175.
>
> The primary ingredient is Canadian whiskey and the pop, which resembles the flavor of a product made by the Ferra [sic] Candy Company "Atomic Fireball" candy, comes from the added cinnamon flavor. *Id.* at 178.
>
> It tasted exactly like atomic fireball cinnamon candy – those little red-hot balls with the hard-to-open plastic wrappers … Fireball Whisky is just pure liquid cinnamon burn, and it's pure fun. 63 TTABVUE 241.
>
> The younger kids, it reminds them of the Atomic hot balls candy …. *Id.* at 244.
>
> You barely taste the alcohol, it tastes like (Atomic Fireball) candy …. *Id.* at 248.
>
> The current darlings of the trashy-liquor category are Fireball Cinnamon Whiskey, which tastes just like Atomic Fireball candy with a million times the sugar …. *Id.* at 252.
>
> It's the cinnamon flavored, Atomic Fireball candy like, syrupy-sweet liquor that "Tastes like Heaven. Burns like Hell." And, its sales are just that – on fire. *Id.* at 256.
>
> Its foundation is Canadian whisky, and the taste otherwise resembles the candy with a similar name, Ferrara Candy Company's "Atomic Fireball" candy. *Id.* at 260.
>
> Fireball Cinnamon Whisky, which tastes remarkably similar to the molar-dulling Ferrara jawbreakers of our youth …. *Id.* at 264.
>
> It tastes like the Atomic Fireball candy kids dared each other to suck on the longest. *Id.* at 267.

> Like Atomic Fireball candy, for which this spicy hot spirit is named, Fireball Cinnamon Liqueur is a treat to be savored. *Id.* at 272.
>
> … the taste otherwise resembles, no, **is identical, to the atomic fireball jawbreaker candy** you had as a kid. Remember the "hot balls" you would put in your mouth and see how long you could keep them in there? Well, turned out that hot ball was intense cinnamon and someone decided to make a whiskey the tastes exactly like one of those balls, but in liquid form. *Id.* at 280 (emphasis added).
>
> With the childhood flavor of the atomic fireball candy, this gives Fireball Cinnamon Whisky a smooth and delicious finish. *Id.* at 292.
>
> … the taste otherwise resembles the candy with a similar name, Ferrara Candy Company's "Atomic Fireball" candy. *Id.* at 298.
>
> "When I was a kid, the most popular dare on the playground was who could suck on a fireball jawbreaker the longest … That childhood cinnamon flavor is what Fireball Whiskey is all about. 67 TTABVUE 155 (Henry Dec. II Ex. AN).

The Wikipedia entry for "Fireball Cinnamon Whisky" states "the taste otherwise resembles the candy with a similar name, Ferrara Candy Company's 'Atomic Fireball' candy." 60 TTABVUE 227.

Opposer's website is consistent with these assessments. It states: "If you haven't tried it yet, just imagine what it feels like to stand face-to-face with a fire-breathing dragon who just ate a whisky barrel filled with spicy cinnamon." *Id.* at 339. Opposer's website is reported to have also stated, alternatively, that "if you haven't tried it yet, just imagine what it's like to get a Chuck Norris roundhouse kick to the face if his legs were on fire and tasted like cinnamon." 67 TTABVUE 83 (Henry Dec. II Ex. AL-

1). Opposer markets FIREBALL whisky under the slogan/tagline "Tastes Like Heaven, Burns Like Hell":




60 TTABVUE 40 (Henry Dec. I ¶ 42).

**III. Entitlement to a Statutory Cause of Action**

Entitlement to a statutory cause of action is a requirement in every inter partes case. *Australian Therapeutic Supplies Pty. Ltd. v. Naked TM, LLC*, 965 F.3d 1370, 2020 USPQ2d 10837, at *3 (Fed. Cir. 2020), *cert. denied*, 142 S.Ct. 82 (2021) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 125-26 (2014)). A party in the position of plaintiff may oppose registration of a mark when doing so is within the zone of interests protected by the statute and it has a reasonable belief in damage that would be proximately caused by registration of the mark. *Corcamore, LLC v. SFM, LLC*, 978 F.3d 1298, 2020 USPQ2d 11277, at * 6-7 (Fed. Cir. 2020), *cert. denied*, 141 S.Ct. 2671 (2021) (holding that the test in *Lexmark* is met by demonstrating a real interest in opposing or cancelling a registration of a mark, which satisfies the zone-of-interests requirement, and a reasonable belief in damage by the registration of a mark, which demonstrates damage proximately caused by registration of the mark).

Here, Opposer's pleaded registrations, 60 TTABVUE 34, 96-102 (Henry Dec. I ¶ 24 and Ex. H), establish that it is entitled to oppose registration of Applicant's mark on the ground of likelihood of confusion. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943,

55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (registration establishes "standing"). Applicant's entitlement to assert its counterclaims is inherent, as it is the defendant in the opposition. *Finanz St. Honore, B.V. v. Johnson & Johnson*, 85 USPQ2d 1478, 1479 (TTAB 2007); *Carefirst of Md., Inc. v. FirstHealth of the Carolinas Inc.*, 77 USPQ2d 1492, 1502 (TTAB 2005) ("Applicant, by virtue of its position as defendant in the opposition, has standing to seek cancellation of the pleaded registration."). In any event, the parties stipulated to each other's entitlement to bring a statutory cause of action. 77 TTABVUE 6-7 (ACR Stip. ¶ 11).

## IV. Applicant's Counterclaims

We address Applicant's counterclaims first, because if successful they would impact our analysis of Opposer's likelihood of confusion claim.

### A. Genericness Counterclaims

"Generic terms are common names that the relevant purchasing public understands primarily as describing the genus of goods or services being sold. They are by definition incapable of indicating a particular source of the goods or services," and may not be registered. *In re Dial-A-Mattress Operating Corp.*, 240 F.3d 1341, 57 USPQ2d 1807, 1810 (Fed. Cir. 2011) (citations omitted). *See also USPTO v Booking.com B.V.*, 140 S. Ct. 2298, 2020 USPQ2d 10729, at *2 (2020) ("A generic name—the name of a class of products or services—is ineligible for federal trademark registration."); *Royal Crown Co. v. Coca-Cola Co.*, 892 F.3d 1358, 127 USPQ2d 1041, 1045-46 (Fed. Cir. 2018).

"The critical issue in genericness cases is whether members of the relevant public primarily use or understand the term sought to be protected to refer to the genus of

goods or services in question." *Royal Crown*, 127 USPQ2d at 1046 (quoting *H. Marvin Ginn Corp. v. Int'l Ass'n of Fire Chiefs, Inc.*, 782 F.2d 987, 228 USPQ 528, 530 (Fed. Cir. 1986)). Thus, "[t]he primary significance of the registered mark to the relevant public rather than purchaser motivation shall be the test for determining whether the registered mark has become the generic name of goods or services on or in connection with which it has been used." 15 U.S.C. § 1064(3). *See also In re Am. Fertility Soc'y.*, 188 F.3d 1341, 51 USPQ2d 1832 (Fed. Cir. 1999); *Magic Wand Inc. v. RDB, Inc.*, 940 F.2d 638, 19 USPQ2d 1551 (Fed. Cir. 1991).

We must make a two-step inquiry to determine whether FIREBALL is generic: First, what is the genus (category or class) of goods at issue? Second, is the term sought to be registered understood by the relevant public primarily to refer to that genus of goods? *Marvin Ginn*, 228 USPQ at 530.

Applicant/Counterclaimant "bears the burden of proving that the term is generic … by a preponderance of the evidence." *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 128 USPQ2d 1370, 1374 (Fed. Cir. 2018). In deciding whether Applicant has met this burden, "we examine the evidence up through the time of trial," *Alcatraz Media Inc. v. Chesapeake Marine Tours, Inc.*, 107 USPQ2d 1750, 1763 (TTAB 2013), *aff'd mem.*, 565 F.App'x 900 (Fed. Cir. 2014), including the evidence "at the time each registration is sought," here 2001 for the '432 Registration and 2008 for the '110 Registration. *In re Consumer Protection Firm PLLC*, 2021 USPQ2d 238 at *22 (TTAB 2021).

Applicant posits two closely related theories that FIREBALL is generic, as follows:

> First, the evidence shows that the relevant public primarily uses and understands the term to refer to a "subcategory" or "part" of the claimed genus of goods. Specifically, "Fireball" was the name of a subcategory of alcoholic drinks containing whiskey and liqueurs that sought to replicate the taste of Fireball candy.
>
> Second, the evidence also shows that the relevant public primarily uses and understands the term to refer to a "key aspect" of the goods at issue—namely, the flavor. Because flavor is a key product characteristic, it is only used to differentiate products—not sources of products.

101 TTABVUE 17. Before addressing these theories, we must identify the genus and the relevant public.

### B. The Genus

Despite some arguing about it, the parties agree that the genus is "whisky" (the goods identified in the '110 Registration) and "liqueurs" (the goods identified in the '432 Registration). 107 TTABVUE 3, 15, 22-23; 101 TTABVUE 21-22. We agree with them. In fact, Opposer's FIREBALL whisky is both a "whisky" and a "liqueur." 60 TTABVUE 34-37 (Henry Dec. I ¶¶ 25-36); 59 TTABVUE 35 (Henry Dec. I ¶ 32). It is settled that "a proper genericness inquiry focuses on the description of [goods] set forth in the certificate of registration." *In re Cordua Rests., Inc.,* 823 F.3d 594, 118 USPQ2d 1632, 1636 (Fed. Cir. 2016) (quoting *Magic Wand*, 19 USPQ2d at 1552).

### C. The Relevant Public

The "relevant public" consists of consumers of whisky and liqueurs. *See Magic Wand*, 19 USPQ2d at 1553-54. Thus, as explained below, Opposer's expert's focus on

certain consumers of shots/shooters specifically was misplaced. The identifications of goods, and more to the point the parties' agreed-upon genus, is not so limited. In fact, the genus encompasses, by way of example: (1) those who occasionally sip a desert liqueur in a fancy restaurant; (2) connoisseur collectors of rare, aged bourbons and ryes; and (3) college-aged partiers who "do shots" while closing down bars on Friday and Saturday nights, among other relevant consumers.

### D. Do Whisky or Liqueur Consumers Primarily Use or Understand FIREBALL to Refer to Whisky or Liqueurs, or a Key Aspect Thereof?

Applicant does not allege that relevant consumers use or understand FIREBALL to refer to "whisky" or "liqueurs" generally. Rather, both of Applicant's proffered theories of genericness are more specific – the first theory is that FIREBALL is generic for a "subcategory" or "part" of the genus (alcoholic drinks containing whiskey and liqueurs that attempt "to replicate the taste of Fireball candy"), and the second theory is that FIREBALL is generic for a "key aspect" of the genus (the "fireball" flavor). 101 TTABVUE 17. *See Royal Crown*, 127 USPQ2d at 1041 (term is generic if it refers to a "key aspect" or part of a genus); *In re Cordua Rests.*, 118 USPQ2d at 1638. *See also In re DNI Holdings Ltd.*, 77 USPQ2d 1435, 1438 (TTAB 2005) ("the class or category of services described in the application still clearly includes that of providing information regarding sports and betting"). We thus focus here on whether consumers use or understand FIREBALL to refer to a "subcategory," "part" or "key aspect" of the genus, specifically whisky or liqueur with a spicy/sweet cinnamon or ATOMIC FIREBALL-type flavor. 101 TTABVUE 17.

Evidence of the relevant public's understanding of FIREBALL may be obtained from any competent source, including testimony, surveys, dictionaries, trade journals, newspapers, and other publications. *In re Northland Aluminum Prods., Inc.*, 777 F.2d 1556, 227 USPQ 961, 963 (Fed. Cir. 1985). "[E]vidence of competitors' use of particular words as the name of their goods or services is, of course, persuasive evidence that those words would be perceived by purchasers as a generic designation for the goods and services." *Cont'l Airlines, Inc. v. United Air Lines, Inc.*, 53 USPQ2d 1385, 1395 (TTAB 1999). Similarly, "examples of … commentators using the term to refer to a category of [goods] is persuasive evidence that the term would be perceived by the relevant public … as a generic designation of those [goods]." *In re Serial Podcast, LLC*, 126 USPQ2d 1061, 1069 (TTAB 2018). *See also Northland*, 227 USPQ at 963 (relying on publications' uses of the term to find BUNDT generic for a type of ring cake mix); *In re Noon Hour Food Prods. Inc.*, 88 USPQ2d 1172 (TTAB 2008) (relying on publications' uses of the term to find BOND-OST generic for a type of cheese).

Here, the evidence of genericness, especially the evidence from around the time registration was sought, is significant. The contrary evidence that FIREBALL is perceived as a mark for Opposer's cinnamon-flavored whisky is also significant.

**1. Opposer's Concessions in 2000 and 2001 that FIREBALL is Not Inherently Distinctive**

We start with Opposer's concessions that FIREBALL is not inherently distinctive. Opposer disclaimed FIREBALL in its application Serial No. 75941554, thus conceding that the term was merely descriptive of "whiskey-based liqueurs." *Alcatraz*

*Media*, 107 USPQ2d at 1762 (TTAB 2013); *Bass Pro Trademarks LLC v. Sportsman's Warehouse Inc.* 89 USPQ2d 1844, 1851 (TTAB 2008). The concession that FIREBALL is merely descriptive is not a concession that the term is generic or unregistrable, however.[12] *See In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 116 USPQ2d 1262, 1264 (Fed. Cir. 2015).

The situation is different with respect to Opposer's litigation position in the Marie Brizard case. There, Opposer's second affirmative defense to Marie Brizard's infringement counterclaim was unequivocal: "[t]he FIREBALL name is the generic term for a type of cinnamon flavored alcoholic beverage and thus is not protectable as a trademark under Federal or State law." 63 TTABVUE 128 (emphasis added). This assertion directly and obviously supports Applicant's genericness counterclaim.

On the other hand, we recognize that Opposer asserted that FIREBALL is generic over 21 years ago, about a decade before FIREBALL cinnamon-flavored whisky's popularity started its meteoric rise. Today, the record shows that as a result of FIREBALL whisky's success over the past decade, the term "fireball" is used and understood differently by the relevant public than it was in 2001, and is now much more likely to be perceived as a source identifier for Opposer's cinnamon-flavored whisky.

[12] As explained throughout this opinion, Opposer has introduced a great deal of evidence that could support a claim that FIREBALL has acquired distinctiveness for Opposer's goods.

In fact, FIREBALL is now one of the country's most popular whiskies, and has been widely reported on in the media, especially during the early-mid 2010s, when its sales and public recognition started growing so significantly. As a result, the relevant public's encounters with the term "fireball" are much more likely now than they would have been in the early 2000s to be in connection with Opposer's cinnamon whisky product as opposed to, for example, a cocktail/shooter recipe or ATOMIC FIREBALL candy. Furthermore, five months before asserting its affirmative defense of genericness, Opposer issued a press release which made trademark use of FIREBALL, calling its specific product "FIREBALL" and the product's category "cinnamon whisky." 63 TTABVUE 92.

Finally, while Opposer's 2001 assertion that FIREBALL is generic is certainly "illuminative of shade and tone in the total picture confronting" us, at the same time, we recognize that "[u]nder no circumstances, may a party's opinion, earlier or current, relieve the decision maker of the burden of making his own ultimate conclusion on the entire record." *Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 198 USPQ 151, 153 (CCPA 1978); *cf. Quaker Oats Co. v. St. Joe Processing Co.*, 232 F.2d 653, 109 USPQ 390, 391 (CCPA 1956) (a witness's opinion "obviously is not binding upon either the tribunals of the Patent Office or the courts"); *Sunnen Prods. Co. v. Sunex Int'l Inc.*, 1 USPQ2d 1744, 1746 n.8 (TTAB 1987) (witness testimony "on questions pertaining to ultimate issues of trademark law" entitled to less weight). Thus, Opposer's affirmative defense of genericness in the Marie Brizard litigation is

not conclusive on the question, but it certainly weighs in favor of finding that "fireball" was generic for whisky and liqueurs, at least in 2001.

### 2. The Impact of Ferrara Pan's Use of FIRE BALL Marks for Candy, and Third-Party Use "Fireball" to Identify a Flavor

The record reveals that when "fireball" is used in connection with Opposer's cinnamon whisky, it has two meanings. First, as Ms. Henry explains, "fireball" means "a ball of fire." 60 TTABVUE 33 (Henry Dec. I ¶ 22). Indeed, a ball of fire has been depicted on the packaging for FIREBALL cinnamon whisky since before Opposer acquired the product from Seagram. *Id.*

Second, while Ms. Henry was less forthcoming about it, the term "fireball" is perceived by many as referring to the "cinnamon flavor" of Opposer's FIREBALL cinnamon whisky. Ms. Henry admits that FIREBALL cinnamon whisky has "the same flavoring" as Ferrara Pan's ATOMIC FIREBALL candy. 67 TTABVUE 293 (Henry Tr. 165); 63 TTABVUE 214, 216, 223, 225. Moreover, there are a number of media reports to the same effect, providing ample evidence that at least a portion of the relevant public perceives "fireball" as the flavor of Opposer's FIREBALL cinnamon whisky. *Id.* at 55 (Henry Dec. I ¶ 84); *id.* at 159, 165, 171, 174, 175, 178, 227; 63 TTABVUE 241, 244, 248, 252, 256, 260, 264, 267, 272, 280, 292, 298; 67 TTABVUE 155 (Henry Dec. II Ex. AN).

As we point out above, a term may be generic if it refers to a subpart or "key aspect" of the genus. *See Royal Crown*, 127 USPQ2d at 1041 (term is generic if it refers to a "key aspect" or part of a genus); *In re Cordua Rests.*, 118 USPQ2d at 1638 ("churrascos," a type of grilled meat, is generic for restaurant services). Obviously,

flavor is a "key aspect" of many foods and beverages, and thus a flavor name may be generic for food or beverage products. *In re Pepcom Indus., Inc.*, 192 USPQ 400 (TTAB 1976) (affirming refusal to register JIN.SENG on the Supplemental Register for soft drinks, because it is the phonetic equivalent of "ginseng," which "is the generic name of an herb that might be an ingredient in applicant's goods"); *In re Demos*, 172 USPQ 408, 409 (TTAB 1971) ("'CHAMPAGNE' is deemed unregistrable to applicant irrespective of the amount of purported secondary meaning evidence submitted" because it "merely names the principal ingredient of [applicant's] salad dressing). *See also A.J. Canfield Co. v. Honickman*, 808 F.2d 291, 1 USPQ2d 1364 (3d Cir. 1986) (CHOCOLATE FUDGE found generic for diet soda, because "the term 'chocolate fudge' denotes a particular full and rich chocolate flavor, that distinguishes Canfield's product from plain chocolate sodas" and "it appears difficult if not impossible for a competing producer to convey to the public that its product shares this functional flavor characteristic without using the words 'chocolate fudge'"); *Parasol Flavors, LLC v. SnoWizard, Inc.*, 94 USPQ2d 1635 (E.D. La. 2010) (shaved ice flavor names found generic).

However, in this case the record is not consistent as to whether "fireball" refers to the "sweet/spicy cinnamon" flavor of Opposer's FIREBALL whisky/liqueur. While there are many articles stating and other evidence that Opposer's whisky/liqueur has the same flavor as ATOMIC FIREBALL candy, this evidence is "mixed" with contrary evidence. Indeed, while "fireball" typically signifies spiciness, it only sometimes refers

to cinnamon flavoring, especially when used in connection with alcoholic beverages, as discussed immediately below.

### 3. Recipes for "Fireball" Cocktails and Shots/Shooters Are Inconsistent

Many of the "fireball" cocktail and shot/shooter recipes of record call for a whisky or whiskey-based product (often bourbon or Southern Comfort) or a cinnamon-flavored liqueur (or both) on the one hand, and Tabasco sauce on the other. 63 TTABVUE 235, 438, 441, 462, 471, 481, 492, 496, 498, 500, 517, 524, 528, 536, 538, 540, 550, 555, 557, 643, 667, 674, 680. But, even if we assume that all of these recipes create a whisky/liqueur beverage with a "sweet/spicy cinnamon" flavor,[13] we must balance them against the large number of "fireball" recipes that do not feature this type of flavor.

For example, neither the "Fireball Mead" recipe containing cinnamon oil nor "Chuck's Fireball Mead" "with cinnamon and cinnamon candy added" are part of the whisky/liqueur genus, and they would have a mead flavor rather than the "sweet/spicy cinnamon" whisky or liqueur flavor for which Applicant contends that FIREBALL is generic. 63 TTABVUE 189, 692, 711-14 (Sheets Dec. ¶ 17 and Ex. 5). The rum, tequila and vodka-based recipes, and those made with other liquors, would presumably not have the whisky/liqueur flavor of Opposer's FIREBALL cinnamon

---

[13] It is not at all clear that recipes featuring only a whisky or Southern Comfort and Tabasco sauce would result in a beverage with a cinnamon flavor such as that found in Opposer's FIREBALL cinnamon whisky. Thus, while "fireball" is recognized by some members of the relevant public as a flavor similar to the flavor of ATOMIC FIREBALL candy, it may very well be that precious few "fireball" cocktail/shot/shooter recipes come nearly as close to the ATOMIC FIREBALL flavor as does Opposer's FIREBALL cinnamon whisky.

whisky, or of other “fireball” cocktails/shots/shooters that are whisky-, Southern Comfort- or liqueur-based. And most of the recipes that include brandy, Kahlua, ouzo or Sambuca do not include cinnamon or other ingredients that would be expected to create a cinnamon flavor.

In other words, while some alcoholic beverages (including Opposer’s FIREBALL cinnamon whisky) feature the “sweet/spicy cinnamon” flavor of ATOMIC FIREBALL candy, the term “fireball” does not always or even consistently refer to whisky or liqueur-based beverages having that flavor. Applicant’s expert witness Ms. Kimmerle admits as much. 60 TTABVUE 606-11 (Kimmerle Tr. 124-28). In short, “fireball” alcoholic beverages do not all share the same flavors, as they are based on different liquors, liqueurs and even meads falling outside the genus, and different mixers as well. Some do not even include cinnamon or any other spicy ingredient.

**4. The Parties’ Expert Testimony and Reports**

Each party retained an expert witness. For the reasons set forth below, we do not find either expert’s testimony or report particularly probative.

**a. Opposer’s Expert Ms. Butler**

Ms. Butler is a Managing Director at NERA Economic Consulting where she is Chair of the Survey and Sampling Practice. *Id.* at 643 (Butler Report ¶ 1). She has experience with both trademark issues and “conducting and using surveys to measure consumer opinions.” *Id.* (Butler Report ¶¶ 2, 4). Opposer hired her “to evaluate the level of distinctiveness of the name FIREBALL and assess the name’s recognition by relevant consumers as an indicator of source for a single brand of alcohol.” *Id.* at 644 (Butler Report ¶¶ 6, 8).

Ms. Butler's report initially states that her evaluation was based on an online survey "of 301 consumers age 21 or older who purchase alcoholic beverages." The survey was intended "to determine whether FIREBALL is associated with one or more companies, and whether FIREBALL is viewed as a brand name associated with a single source or, rather, is seen as a common or descriptive name for a certain type of alcohol, i.e., cinnamon-flavored whiskey." *Id.* at 644-45 (Butler Report ¶¶ 8, 9). Survey respondents were divided into a Test Group that was asked questions about FIREBALL, and a Control Group that was asked questions about CINNAMON WHISKEY. *Id.* at 645 (Butler Report ¶ 9).

In the Test Group: 74.8% of respondents believed FIREBALL "is an alcoholic beverage made by one brand or company," with 59.3% of them identifying "FIREBALL" or "Sazerac" as that brand or company; 64.2% of the Test Group "indicated FIREBALL is a brand name;" and 61.6% believed "that FIREBALL is a product made by one company and is a brand name." *Id.* at 645-46 (Butler Report ¶ 9). In the Control Group, 37.3% "indicated that CINNAMON WHISKEY is a product made by one brand or company;" 16% "believed that CINNAMON WHISKEY is a brand name;" 12.7% "believed that CINNAMON WHISKEY is a product made by one company and is a brand name." *Id.* at 646 (Butler Report ¶ 9). Using "the rate in the Control Group to net out guessing or survey noise," Ms. Butler ultimately "estimated" that "a net total of 48.9 percent of consumers associate FIREBALL with products made by one company and think that FIREBALL is a brand name." *Id.*

There are a number of problems with this survey and its methodology. We focus on a few here.

First, the survey's universe of respondents is either too broad, or too narrow. It would be too broad because, as indicated above, Ms. Butler's report states initially that she surveyed "301 consumers age 21 or older who purchase alcoholic beverages." But the genus here is not "alcoholic beverages" generally; rather, it is "whisky" and "liqueurs" specifically. Thus, this universe would be overly broad.

It appears, however, that the initial statement in Ms. Butler's report about the chosen universe is inaccurate (calling the survey's credibility into question), and that the actual universe was too narrow. Specifically, later in her report, Ms. Butler indicates that "[t]he relevant population for this matter is comprised of individuals who, in the past six months, have purchased a shot of alcohol or report that in the next six months they are likely to purchase a shot of alcohol." *Id.* at 649, 651 (Butler Report ¶¶ 20, 28). This universe, like the initially (and apparently inaccurately) described universe, also ignores the genus, which is: (1) limited to "whisky" and "liqueurs" specifically rather than "alcohol" generally; and (2) unlimited as to serving size or method, rather than being limited to "shots" specifically. Because the survey's universe is limited to actual or prospective purchasers of "shots" when the genus is not, Ms. Butler focused on only a subset of relevant consumers.

Moreover, this subset of relevant consumers on which the survey actually focused is obviously more in tune with the types of alcohol sold, served, and consumed in "shots," such as Opposer's FIREBALL cinnamon whisky, one of, if not the, most

prominent alcoholic beverages typically sold in shots. This skews the survey's results, as consumers of shots (typically purchased in bars) would be more likely to be exposed to and familiar with alcoholic beverages sold in "shots" (typically in bars), and thus more likely to be familiar with Opposer's FIREBALL product than other consumers of "whisky" and "liqueurs" (the agreed-upon genus). Indeed, Opposer's marketing efforts are heavily bar- and bartender-focused. *Id.* at 40-41, 146-49, 159 (Henry Dec. I ¶¶ 45-47 and Exs. P and Q-1) (evidence of Opposer's marketing efforts involving bars, including its "Official Bartender Loyalty Program"). *See also id.* at 654 (Butler Report ¶ 38) ("I understand that **consumers who drink shots are typically under the age of 35 years old**. Thus, **the majority of my survey sample was comprised of respondents between 21 and 29 years of age (70.1 percent)**.") (emphasis added). The problem here is that many consumers of "whisky" and "liqueurs" (the agreed-upon genus) are over 35, even if they do not imbibe as often, as much, or as late at night as the under 35 (much less 21-29) set, and even if they do not "do shots," a sales/consumption method absent from the agreed-upon genus.

Finally, Opposer's survey was not even intended to establish whether or not FIREBALL is generic. Opposer admits that instead the survey "tested brand strength and was not a *Teflon* survey." 107 TTABVUE 28 n.100. *Cf. Sheetz of Del., Inc. v. Doctor's Associates Inc.*, 108 USPQ2d 1341, 1359-66 (TTAB 2013) (analyzing genericness surveys and their attributes and probative value); *In re Country Music Ass'n, Inc.*, 100 USPQ2d 1824, 1831-33 (TTAB 2011) (same).

But there is no question that FIREBALL cinnamon whisky enjoys significant "brand strength." Applicant concedes as much, testifying that FIREBALL is a strong brand because it "sold a lot." 60 TTABVUE 501-02 (Kramer Tr. 127-28). Thus, Opposer's survey does not have significant probative value, beyond being cumulative corroboration of the evidence that FIREBALL is commercially strong.[14]

**b. Applicant's Expert Ms. Kimmerle**

Ms. Kimmerle holds "a confectionery science certificate from University of Wisconsin and a Sensory Science certificate from International Food Technologists." 63 TTABVUE 37. She has "worked on innovation and sensory projects for both industrial and artisanal food clients for over two decades." *Id.* She has "served as a candy expert and historian and … served the confectionery industry as a writer and consultant." *Id.*

However, Ms. Kimmerle was not retained to provide her expert opinion on candy or other types of food. Rather, Applicant hired her to provide her "opinions on whether or not the term 'Fireball' has become synonymous with the sweet, spicy cinnamon flavor of the candy Atomic Fireball Candy before it was used by [Opposer]." *Id.*

There is an obvious mismatch between Ms. Kimmerle's confectionery and food-related qualifications and her opinions about the meaning of the term "fireball" to consumers. We therefore discount her opinions about the term "fireball," legal aspects of this case and Applicant's genericness counterclaim generally. *See e.g. Kohler Co. v.*

[14] A generic term that enjoys de facto secondary meaning is still unregistrable. *See Frito-Lay N. Am., Inc. v. Princeton Vanguard LLC*, 124 USPQ2d 1184, 1203 (TTAB 2017) (citing *Weiss Noodle Co. v. Golden Cracknel & Specialty Co.*, 290 F.2d 845, 129 USPQ 411, 414 (CCPA 1961)).

*Honda Giken Kogyo K.K.*, 125 USPQ2d 1468 at *13 (TTAB 2017) (holding testimony of engine expert about consumer perception inadmissible because that was not his area of expertise); *Alcatraz Media*, 107 USPQ2d at 1756-57 (travel writer and editor found to be qualified as an expert on travel writing and journalism, but unqualified to opine on consumer perception, "[n]or can Ms. Summers' opinion serve as a substitute for the Board's judgment on the legal claims before us").[15]

The rest of Ms. Kimmerle's testimony and report concerns ATOMIC FIREBALL candy, and the "fireball" flavor and its use in alcoholic beverages. For example, she opines that "Fireball denotes spicy, cinnamon and candy-like taste," 63 TTABVUE 53, a fact established elsewhere in the record that Opposer does not seriously dispute. Thus, the testimony Ms. Kimmerle is qualified to provide is for the most part merely cumulative, and not particularly helpful.

#### 5. Balancing the Evidence and Reaching a Conclusion on Genericness

When we consider the evidence from the time each registration was sought – 2001 for the '432 Registration and 2008 for the '110 Registration – Applicant's counterclaim presents a close question. When we consider the evidence from the time of trial – late 2021 through mid 2022 – Opposer's FIREBALL cinnamon whiskey had become so much more popular and well known by that time that whisky and liqueur consumers

[15] During her deposition, Ms. Kimmerle was asked whether she would "categorize yourself as an expert in customer perception?" She responded "I'm asked to give my opinion on the popularity of confectionary products and names pretty often. I do not have – I did not do a specific consumer poll about this. So that's not – that wasn't something that I performed." 60 TTABVUE 568-69 (Kimmerle Tr. 63-64).

did not **primarily** use or understand FIREBALL to refer to a subpart or "key aspect" of the genus, but instead to Opposer's FIREBALL cinnamon whisky.

**a. The Time of Registration**

In 2001-2004 and 2008, relatively little time had passed since Opposer argued in federal court that FIREBALL was generic. Moreover, recipes for "fireball" cocktails/shots/shooters including whisky or cinnamon liqueur and Tabasco sauce were fairly prevalent. And there is no evidence that at that time Opposer tried to enforce any rights it had in FIREBALL against third parties; to the contrary, Opposer took the position that "fireball" was available for all to use for whisky and liqueurs. Thus, there was significant evidence of genericness at the time of registration.

However, at the time of registration, much of the evidence pointed in the opposite direction. Indeed, many of the recipes of record that were in existence at the time of registration directly contradict Applicant's theories that FIREBALL: (1) "was the name of a subcategory of alcoholic drinks containing whiskey and liqueurs that sought to replicate the taste of Fireball candy;" and (2) refers "to a 'key aspect' of the goods at issue – namely the flavor." 101 TTABVUE 17. In fact, many of the recipes do not contain whiskey, or liqueur, and would not replicate the ATOMIC FIREBALL (or FIREBALL cinnamon whisky) flavor. 63 TTABVUE 189, 443, 478, 511, 563, 692, 711-14; 67 TTABVUE 299-304; 100 TTABVUE 47.

Furthermore, the vast majority of the recipes Applicant relies upon were published in bartending or alcoholic beverage publications, or specialized websites. There is no evidence that a large number of relevant consumers were exposed to these recipes, and we would expect that relatively few relevant consumers encountered

these recipes directly (though it is unclear how many drank cocktails/shots/shooters that followed these recipes).

By contrast, the record makes clear that at the time of registration, ATOMIC FIREBALL was the trademark for a popular candy that publications assumed consumers would remember from their childhoods, and DR. MCGILLCUDDY'S FIREBALL was an at least modestly successful whisky/liqueur beverage. Thus, we can safely assume that even at the time of registration, FIREBALL was known by many relevant consumers as a trademark, whether for candy or whisky/liqueurs, rather than as a nondistinctive term for a specific flavor. In fact, the record shows more relevant consumer exposure at the time of registration to trademark use of FIREBALL than to non-trademark use of the term.

In this case, as in other cases in which the record is "mixed" or "ambiguous," we find that Applicant has not introduced sufficient evidence of genericness at the time of registration. *See e.g. Alcatraz Media*, 107 USPQ2d at 1763. In fact, here, as in *Alcatraz Media* and *In re Merrill Lynch, Pierce, Fenner and Smith, Inc.*, 828 F.2d 1567, 4 USPQ2d 1141, 1143 (Fed. Cir. 1987), much of the evidence of record shows trademark, rather than generic use of FIREBALL. *See also In re Country Music Ass'n*, 100 USPQ2d at 1829-32 (evidence, some of which was "obscure" and some of which showed potential trademark use, insufficient to show "that the relevant purchasers perceive the phrase as naming the genus of the services at issue"). There is no evidence that any of Applicant's competitors in the whisky or liqueur fields used the

term FIREBALL at the time of registration.[16] *See In re Trek 2000 Int'l Ltd.*, 97 USPQ2d 1106, 1113-14 (TTAB 2010) ("where the record demonstrates both trademark and generic uses, evidence of the lack of competitor use, at a minimum, may create doubt sufficient to tip the balance in favor of registration"). We therefore find that FIREBALL was not generic at the time of registration

**b. The Time of Trial**

The evidence is even more "mixed" and "ambiguous" when we consider whether FIREBALL was generic at the time of trial. By that time, Opposer's FIREBALL cinnamon whisky had become significantly more popular than it was at the time of registration, as reflected by sales and advertising figures and media attention. Furthermore, in the past 10-15 years, Opposer has consistently treated and used FIREBALL as a trademark, and it successfully enforced its asserted rights in FIREBALL against many of the third-party users of the term cited by Applicant in support of its counterclaims. Thus, the record does not support a finding that FIREBALL was generic for whisky or liqueurs at the time of trial.

**c. Conclusion on Genericness**

Applicant has not met its burden of proving by a preponderance of the evidence that FIREBALL was generic for whisky or liqueurs, either at the time of registration or the time of trial. Accordingly, its genericness counterclaims are denied.

---

[16] While Marie Brizard had been using FIREBALL for liqueurs around the time of registration, Opposer acquired Marie Brizard's FIREBALL mark in 2002 following litigation, and has used it since for whisky/liqueurs. 59 TTABVUE 32 (Henry Dec. I ¶ 19); 62 TTABVUE 187-90.

### B. Fraud Counterclaims

"Fraud in procuring a trademark registration occurs when an applicant knowingly makes false, material representations of fact in connection with its application **with intent to deceive the USPTO**." *Nationstar Mortgage LLC v. Ahmad*, 112 USPQ2d 1361, 1365 (TTAB 2014) (citing *In re Bose Corp.*, 580 F.3d 1240, 91 USPQ2d 1938 (Fed. Cir. 2009)) (emphasis added). Here, Applicant has not presented any evidence, direct, indirect or circumstantial, let alone the requisite "clear and convincing" evidence, *In re Bose*, 91 USPQ2d at 1939, that Opposer made false statements with the intent to deceive the USPTO, or that Opposer acted with reckless disregard as to the truth of its statements.

Indeed, Applicant's theory of fraud is that "Opposer knew 'Fireball' was generic for whiskeys and liqueurs." 101 TTABVUE 32. As explained above, however, the record does not support Applicant's contention that FIREBALL is generic. Applicant's fraud counterclaims fail for this reason alone.

Even if Applicant had established that FIREBALL is generic, it has presented no evidence that Opposer had the specific intent to deceive the USPTO, or to support its argument, 101 TTABVUE 31, that Opposer acted with reckless disregard as to the truth of its representations or omissions, while it was pursuing, or after it was issued, the '110 or '432 Registrations. *Chutter, Inc. v. Great Mgmt. Grp., LLC*, 2021 USPQ2d 1001 at *26 (TTAB 2021) (finding of reckless disregard "is the legal equivalent" of finding that defendant "had the specific intent to deceive the USPTO"); *DaimlerChrysler Corp. v. American Motors Corp.*, 94 USPQ2d 1086, 1090 (TTAB

2010) ("It is clear that under the holding of *Bose* that intent must be separately proved ….").

In fact, despite Opposer's second affirmative defense in the Marie Brizard litigation, the fact is that Opposer shortly thereafter acquired Marie Brizard's rights in the FIREBALL mark, including the '432 Registration, renewed that Registration and continued using the FIREBALL mark in the United States for the ensuing 20 years. Applicant's fraud counterclaims are also denied.

## V. Opposer's Likelihood of Confusion Claim

Having disposed of Applicant's counterclaims, we now consider Opposer's likelihood of confusion claim. Opposer's claim is based in large part on its pleaded registrations, which have survived Applicant's challenge.

### A. Priority

Because Opposer's pleaded registrations are of record, 60 TTABVUE 34, 96-102 (Henry Dec. I ¶ 24 and Ex. H), and Applicant's counterclaims to cancel them were unsuccessful, priority is not at issue with respect to the goods identified therein. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974).

### B. Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative evidence of record bearing on the likelihood of confusion. *In re E.I. du Pont de Nemours & Co.*, 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973) (setting forth factors to be considered); *see also In re Majestic Distilling Co.*, 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key

considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.*, 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by § 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks.").

Opposer bears the burden of establishing that there is a likelihood of confusion by a preponderance of the evidence. *Cunningham*, 55 USPQ2d at 1848. We consider the likelihood of confusion factors about which there is evidence and argument. *See In re Guild Mortg. Co.*, 912 F.3d 1376, 129 USPQ2d 1160, 1162-63 (Fed. Cir. 2019).

**1. The Goods, and Their Channels of Trade and Classes of Consumers**

The parties' goods are legally identical because the involved application identifies "alcoholic beverages except beers," which is broad enough to encompass Opposer's "whisky" and "liqueurs." *See In re Hughes Furniture Indus., Inc.*, 114 USPQ2d 1134, 1137 (TTAB 2015) ("Applicant's broadly worded identification of 'furniture' necessarily encompasses Registrant's narrowly identified 'residential and commercial furniture.'").

Moreover, because the goods are legally identical, we presume that the channels of trade and classes of purchasers for these goods also overlap. *In re Viterra Inc.,* 671 F.3d 1358, 101 USPQ2d 1905, 1908 (Fed. Cir. 2012) (even though there was no evidence regarding channels of trade and classes of consumers, the Board was entitled to rely on this legal presumption in determining likelihood of confusion); *Am.*

*Lebanese Syrian Associated Charities Inc. v. Child Health Research Inst.,* 101 USPQ2d 1022, 1028 (TTAB 2011).[17]

The legal identity of the goods and their overlapping channels of trade and classes of purchasers not only weigh heavily in favor of finding a likelihood of confusion, but also reduce the degree of similarity between the marks necessary to find a likelihood of confusion. *In re Viterra*, 101 USPQ2d at 1908; *In re Mighty Leaf Tea*, 601 F.3d 1342, 94 USPQ2d 1257, 1260 (Fed Cir. 2010); *In re Max Capital*, 93 USPQ2d at 1248.

**2. How Strong Is Opposer's FIREBALL Mark?**

Before addressing the marks themselves, we consider the strength of Opposer's mark, to ascertain the scope of protection to which it is entitled. There are two types of strength: conceptual and commercial. *In re Chippendales USA, Inc.*, 622 F.3d 1346, 96 USPQ2d 1681, 1686 (Fed. Cir. 2010) ("A mark's strength is measured both by its conceptual strength … and its marketplace strength ….").

**a. Commercial Strength**

Turning first to commercial strength, we must determine where to place FIREBALL on the "spectrum" of marks, which ranges from "very strong to very weak." *Palm Bay Imps. Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005) (quoting *In re Coors Brewing Co.*, 343 F.3d 1340, 68 USPQ2d 1059, 1063 (Fed. Cir. 2003)). *See also*, *Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*, 857 F.3d 1323, 122 USPQ2d 1733, 1734-

[17] In any event, there is ample "real world" evidence that the channels of trade and classes of consumers overlap. *See e.g.* 60 TTABVUE 541, 552 (Kramer Tr. 206, 292, ); *id.* at 665-667, 670, 683, 687-88, (Applicant's responses to RFA Nos. 8, 9, 19, 59, 60 and Interrogatory Nos. 3, 4); 67 TTABVUE 264-67 (Sheets Tr. 37-40).

35 (Fed. Cir. 2017). The stronger the mark, the greater the scope of protection to which it is entitled. *Tao Licensing, LLC v. Bender Consulting Ltd.*, 125 USPQ2d 1043, 1056 (TTAB 2017) ("A very strong mark receives a wider latitude of legal protection in the likelihood of confusion analysis."); *Nike, Inc. v. WNBA Enters., LLC*, 85 USPQ2d 1187, 1198 (TTAB 2007). Moreover, when fame exists, it plays a dominant role in the likelihood of confusion analysis. *Bose Corp. v. QSC Audio Prods., Inc.*, 293 F.3d 1367, 63 USPQ2d 1303, 1305 (Fed. Cir. 2002) (quoting *Recot, Inc. v. Benton*, 214 F.3d 1322, 54 USPQ2d 1894, 1897 (Fed. Cir. 2000)); *Kenner Parker Toys, Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).

Fame or strength "of a mark may be measured indirectly, among other things, by the volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident." *Bose,* 63 USPQ2d at 1305. Other relevant factors include "length of use of the mark, market share, brand awareness, licensing activities, and variety of goods bearing the mark." *Coach Servs. Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 101 USPQ2d 1713, 1720 (Fed. Cir. 2012).

Here, Applicant concedes, 60 TTABVUE 501-02 (Kramer Tr. 127-28), and we agree, that Opposer's mark is commercially strong. In fact, while Opposer's cinnamon whisky enjoyed only modest success in the United States when it was sold as DR. MCGILLICUDDY'S FIREBALL, not long after Opposer rebranded the product "to just FIREBALL," 60 TTABVUE 32, it took off, becoming quite popular among at least shot/shooter drinkers. 60 TTABVUE 37-38 and 59 TTABVUE 52, 188-189 (Henry

Dec. I ¶¶ 38, 71 and Ex. O). This rapid success generated significant media attention at the time. 60 TTABVUE 38-39, 150-254 (Henry Dec. I ¶¶ 39-40 and Exs. Q-1 and Q-2); 67 TTABVUE 30-31, 63-152 (Henry Dec. II ¶¶ 12-14 and Exs. AL-1, AL-2 and AM). Opposer's aggressive and extensive marketing efforts appear to have contributed to this success and recognition. 59 TTABVUE 45-46 (Henry Dec. I ¶ 61). Opposer's survey tends to support this evidence of commercial strength to some extent.

Nevertheless, we cannot find on this record that FIREBALL has achieved "fame," the highest level of strength, because "[w]e have no context for opposer's advertising and sales figures," or its other evidence of strength, "such as how the figures for [products bearing Opposer's pleaded marks] compare with that for other brands of" whisky and liqueurs. *Lebanon Seaboard Corp. v. R&R Turf Supply Inc.*, 101 USPQ2d 1826, 1831 (TTAB 2012); *see also Bose*, 63 USPQ2d at 1309 ("some context in which to place raw statistics is reasonable"). We acknowledge that Opposer provided "rankings" for certain alcoholic beverages, including its FIREBALL cinnamon whisky. 59 TTABVUE 188-89. But there is no testimony from the provider of these rankings, or any way for us to determine exactly what was ranked or how, or what the provided figures and statistics represent. Furthermore, while FIREBALL's "almost 1 million followers" on Facebook, 60 TTABVUE 43 (Henry Dec. I ¶ 54), is evidence of commercial strength, that number falls short of establishing fame given the lack of "context" and comparison to other whisky and liqueur brands; brands found famous in Board proceedings often have several million followers on Facebook

and other social media (or more, sometimes many more). Finally, much of the evidence of FIREBALL's commercial strength is attributable to FIREBALL cinnamon whisky's popularity among shot drinkers specifically. The evidence shows that FIREBALL is less strong for "whisky" or "liqueurs" defined broadly (the identified goods) than it is for shots/shooters specifically (a mere subset of the identified goods).

In any event, because we have found that Opposer's FIREBALL mark is commercially strong, it is entitled to a concomitantly broad scope of protection, all else being equal. *See Joseph Phelps Vineyards,* 122 USPQ2d at 1734-35. In other words, the mark's commercial strength standing alone weighs in favor of finding a likelihood of confusion, though we must also consider the mark's conceptual strength.

**b. Conceptual Strength**

Because we have denied Applicant's counterclaims and Opposer's mark remains registered, we must presume that FIREBALL is inherently distinctive, i.e. that it is at worst suggestive of Opposer's goods. 15 U.S.C. § 1057(b) (registration is "prima facie evidence of the validity of the registered mark"); *In re Fiesta Palms, LLC*, 85 USPQ2d 1360, 1363 (TTAB 2007) (when mark is registered on the Principal Register, "we must assume that it is at least suggestive"). While Opposer's mark is valid and inherently distinctive, the record reveals that it is not just suggestive, but highly suggestive.

In fact, Opposer twice admitted, once to the USPTO and once in federal court, that FIREBALL is **not** inherently distinctive, at all. While this was more than 20 years ago, the evidence of record postdating Opposer's admissions reveals FIREBALL to be minimally distinctive for any particular whisky and liqueur.

In fact, “fireball” is the name, or part of the name, of a number of cocktails, shots and shooters, most of which include whisky or liqueur(s) as ingredients. But “fireball” names the cocktail/shot/shooter, not a brand of whisky or liqueur. In other words, “fireball,” like “martini” and “margarita,” often directly suggests certain alcoholic mixed drinks, rather than the source of particular liquors or liqueurs with which the drinks are made. For example, in the movie “The Guest,” when asked if he knew what a “fireball” is, a waiter responded “cinnamon schnapps and Tabasco sauce.” 96 TTABVUE.

The term “fireball” has also been widely used by third parties to denote the flavor of ATOMIC FIREBALL candy in products such as popcorn, ice cream and beef jerky, as well as in liquid flavorings meant to be added to food or beverages. 63 TTABVUE 199, 207, 211, 339, 348, 354, 363, 366, 369, 372, 376, 379, 392, 395, 691-93, 696-700, 702-09, 722-27. Opposer admits that its FIREBALL cinnamon whisky and ATOMIC FIREBALL candy have “the same flavoring,” 67 TTABVUE 293 (Henry Tr. 165), and a number of media reports reveal that much of the relevant public perceives “fireball” as describing the flavor of ATOMIC FIREBALL candy, and thus Opposer’s cinnamon whisky as well.

Thus, “fireball” is highly suggestive of the taste and flavor of Opposer’s “sweet/spicy cinnamon”-flavored whisky/liqueur. This taste/flavor has long been known to many consumers who have tried ATOMIC FIREBALL candy, since before Opposer started selling DR. MCGILLICUDDY’S FIREBALL, and it is a desired cocktail/shot/shooter flavor as evidenced by the number of recipes that attempt to

mimic it. We find therefore that Opposer's pleaded FIREBALL mark's conceptual weakness essentially "cancels out" the mark's commercial strength, and that ultimately the mark is entitled to no more than a normal scope of protection.

### 3. Similarity of the Marks

We compare the marks "in their entireties as to appearance, sound, connotation and commercial impression." *Palm Bay*, 73 USPQ2d at 1691. When we do so we find that they are dissimilar overall.

The marks are partially similar, however, in that the term FIREBULL in Applicant's mark looks and sounds somewhat similar to Opposer's mark FIREBALL. These similarities are easily outweighed by the differences between the marks considered in their entireties, however.

In fact, the coined term BULLSHINE comes first in Applicant's mark, and therefore consumers are more likely to focus on it than the trailing term FIREBULL. *In re Detroit Athletic Co.*, 903 F.3d 1297, 128 USPQ2d 1047, 1049 (Fed. Cir. 2018) ("The identity of the marks' initial two words is particularly significant because consumers typically notice those words first."); *Presto Prods. Inc. v. Nice-Pak Prods., Inc.*, 9 USPQ2d 1895, 1897 (TTAB 1988) ("[I]t is often the first part of a mark which is most likely to be impressed upon the mind of a purchaser and remembered").[18]

---

[18] We do not find that either term in Applicant's mark is dominant. Rather, as explained below, and as Opposer argues, Applicant's mark is likely to be perceived as a combination of the house mark or trade name BULLSHINE with the product mark FIREBULL. There is no evidence that either term is anything but arbitrary for alcoholic beverages.

Obviously, BULLSHINE FIREBULL and FIREBALL look and sound different.[19] Furthermore, we must balance the marks' merely partial similarity in appearance and sound against the marks' completely distinct meanings.

Opposer's mark has two meanings. First, as the dictionary evidence reveals, and Ms. Henry testified, Opposer's mark FIREBALL "means, literally, a ball of fire." 60 TTABVUE 33, 83-95 (Henry Dec. I ¶ 22 and Ex. G). The record reveals that "fireball" also has a second meaning, conveying that Opposer's whisky/liqueur has a sweet/spicy cinnamon flavor that Ms. Henry testified is the "same" flavor as ATOMIC FIREBALL candy. 67 TTABVUE 293 (Henry Tr. 165). In fact, Opposer posted on Facebook that it had a "heavy heart" when the inventor of ATOMIC FIREBALL candy passed away, stating that its FIREBALL cinnamon whisky is "based on" the candy. 63 TTABVUE 214, 216, 223, 225. By contrast, Applicant's mark "calls forth images of bovine animals." 101 TTABVUE 34; 60 TTABVUE 463 (Sheets Tr. 62) ("we want to put our product brand around this bull type of theme"); 63 TTABVUE 401 (Kramer Tr. 64). And because Applicant's mark begins and ends with the term "bull" (**BULL**SHINE FIRE**BULL**), the "bull type of theme" conveyed by Applicant's mark is accentuated, but entirely absent from Opposer's mark.

Moreover, as Opposer argues, the first term in Applicant's mark – BULLSHINE – will likely be perceived as "a trade name or house mark." 83 TTABVUE 26-27. Oftentimes, as Opposer also points out, the addition of a house mark to a registered

[19] While the term FIREBULL in isolation looks and sounds somewhat similar to FIREBALL, Applicant has not applied for registration of FIREBULL by itself.

mark is found insufficient to avoid confusion, and is sometimes even found to be an "aggravation, and not a justification…." *Menendez v. Holt*, 128 U.S. 514, 521 (1888). *See also In re Fiesta Palms LLC*, 85 USPQ2d 1360, 1367 (TTAB 2007) (affirming refusal to register CLUB PALMS MVP based on prior registration of MVP, finding consumers "likely to believe that the CLUB PALMS MVP casino services is simply the now identified source of the previously anonymous MVP casino services").

There are other times, however, where adding a house mark to a registered mark is sufficient to avoid confusion. These cases typically involve "highly suggestive" shared terms. For example, in *Knight Textile Corp. v. Jones Inv. Co.,* 75 USPQ2d 1313 (TTAB 2005), we found no likelihood of confusion between NORTON MCNAUGHTON ESSENTIALS and ESSENTIALS, both for women's clothing, because evidence established that the shared, registered term ESSENTIALS is "highly suggestive." *See also* TMEP §1207.01(b)(iii) (July 2021) ("Additions or deletions to marks may be sufficient to avoid a likelihood of confusion if … the matter common to the marks is not likely to be perceived by purchasers as distinguishing source because it is merely descriptive or diluted.").

Here, we find that the primary difference between the parties' marks – the term BULLSHINE at the beginning of Applicant's mark – is sufficient to avoid consumer confusion, for two main reasons. First, this case is unlike the typical situation where two marks share an identical term and one of the two marks is prefaced by a house mark. Rather, in this case there is no shared term, because FIREBALL and FIREBULL are merely similar, rather than identical, in sight and sound. Moreover,

they convey entirely distinct meanings and commercial impressions in the context of alcoholic beverages. That distinguishes this case from the house mark cases upon which Opposer relies. 83 TTABVUE 26-27.

Second, the evidence of record shows that Opposer's mark FIREBALL is analogous to ESSENTIALS, the mark in *Knight Textile*, because it is "highly suggestive" of alcoholic beverages containing whisky or liqueur on the one hand and having a spicy taste on the other. In fact, most of the "fireball" cocktail/shot/shooter recipes introduced into evidence include Tabasco sauce as an ingredient. Many of them also have a cinnamon flavor, and some mimic the flavor of ATOMIC FIREBALL candy. Many media reports equate FIREBALL cinnamon whisky's flavor to the ATOMIC FIREBALL flavor. 60 TTABVUE 159, 165, 171, 174, 175, 178; 63 TTABVUE 241, 244, 248, 252, 256, 260, 264, 267, 272, 280, 292, 298; 67 TTABVUE 155. Wikipedia does the same. 60 TTABVUE 227. For a time, Opposer took the position that "fireball" is not at all distinctive for whisky or liqueurs.

Thus, to the extent the term FIREBULL in Applicant's mark may call to mind Opposer's mark FIREBALL, the term FIREBALL is not distinctive enough for there to be a likelihood of confusion between the marks when Applicant's mark includes and begins with the distinctive term BULLSHINE. *See also Sure-Fit Prods. Co. v. Saltzson Drapery Co.*, 254 F.2d 158, 117 USPQ 295, 297 (CCPA 1958) (finding no likelihood of confusion between SURE-FIT and RITE-FIT, both for slip covers, because the term "fit" is "eminently suitable for use in connection with goods such as ready-made slip covers … [u]nder these circumstances, we do not feel that appellant

is entitled to the broad protection which it seeks"); *Couch/Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458, 1476-78 (TTAB 2014) (finding "that the mark PERKSPOT is sufficiently different from the marks PERKS and PERKSCARD to avoid a likelihood of confusion" even though the marks were used for legally identical services); *Plus Prods. v. Natural Organics, Inc.*, 204 USPQ 773, 779-80 (TTAB 1979) (allowing registration of NATURE'S PLUS for vitamins despite prior registration of PLUS for vitamins).

It is also significant here that Applicant's mark is comprised of two terms that each include "bull." Indeed, because the terms in Applicant's mark each contain "bull," the terms mutually reinforce each other, drawing further attention to the repeated term "bull" in Applicant's mark and highlighting the distinctions between the term FIREBULL in Applicant's mark and the term FIREBALL in Opposer's mark.

In short, given the conceptual weakness of FIREBALL, and the differences between BULLSHINE FIREBULL and FIREBALL in appearance and sound, and especially in meaning and commercial impression, the marks are dissimilar when considered in their entireties. This is so even though the marks are used for identical goods, and despite the commercial strength of FIREBALL. As the Federal Circuit's predecessor court stated in *Sure-Fit*:

> It seems both logical and obvious to us that where a party chooses a trademark which is inherently weak, he will not enjoy the wide latitude of protection afforded the owners of strong trademarks. Where a party uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights. The

> essence of all we have said is that in the former case there is not the possibility of confusion that exists in the latter case.

*Sure-Fit Prods.*, 117 USPQ at 297. This factor weighs heavily against a finding of likelihood of confusion.

**4. Purchaser Care and Sophistication**

We accept Opposer's argument that the goods are inexpensive and purchased without great care. 83 TTABVUE 30-31. The parties' alcoholic beverages may be sold in shots, which are not only small serving sizes and thus inexpensive, 60 TTABVUE 52 (Henry Dec. I ¶ 73), but the more shots a consumer can afford, the less care he or she may exercise as an evening progresses. Moreover, Applicant sells its BULLSHINE FIREBULL products in "airplane bottles," which are "probably" offered at the front counter of stores as "an impulse thing." 60 TTABVUE 549-50 (Kramer Tr. 284-85). This factor weighs in favor of finding a likelihood of confusion.

**5. Alleged Bad Faith**

Finally, we consider Applicant's intent in choosing its mark, and whether it reflects a bad faith attempt to trade on Opposer's goodwill. *See Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.*, 835 F.2d 888, 7 USPQ2d 1628, 1630 (Fed. Cir. 1988) ("proof of intent to trade on another's goodwill" can provide "persuasive evidence of likelihood of confusion").

Here, we disagree with Opposer's argument that Applicant acted in bad faith. 83 TTABVUE 30-31. While Applicant was aware of Opposer's mark before choosing its own, that does not establish bad faith or an intent to deceive. *Action Temporary Services, Inc. v. Labor Force, Inc.*, 870 F.2d 1563, 10 USPQ2d 1307, 1310 (Fed. Cir.

1989) ("*mere knowledge of the existence of the prior user* should not, by itself, constitute bad faith"). A finding of bad faith must be supported by evidence of an intent to confuse, rather than mere knowledge of another's mark or even an intent to copy. *See Quicktrip W., Inc. v. Weigel Stores, Inc.*, 984 F.3d 1031, 2021 USPQ2d 35, at *4 (Fed. Cir. 2021) (internal citations omitted). This factor is neutral.[20]

**VI. Conclusion**

Applicant's counterclaims are denied because it has failed to prove that Opposer's FIREBALL mark is generic, or that Opposer committed fraud in connection with any of its pleaded registrations.

As for Opposer's likelihood of confusion claim, even though the goods are identical and subject to impulse purchase, and travel in overlapping channels of trade to the same consumers, and Opposer's FIREBALL mark is commercially strong, confusion is unlikely. Because Opposer's FIREBALL mark is so conceptually weak, the marks FIREBALL and BULLSHINE FIREBULL are too different in appearance and sound, and especially meaning and commercial impression, for confusion to occur. *See Kellogg Co. v. Pack'em Enters. Inc.*, 951 F.2d 330, 21 USPQ2d 1142, 1145 (Fed. Cir. 1991) ("We know of no reason why, in a particular case, a single *duPont* factor may not be dispositive.").

**Decision:** Applicant's counterclaims are denied and the opposition is dismissed.

---

[20] Opposer argues that additional evidence concerning Applicant's future plans, designated as "Confidential," further supports a finding of bad faith. 82 TTABVUE 31. We disagree. Applicant's future contingent plans, while aggressive, would only be pursued if permitted under the Trademark Act.

FORM 30. Certificate of Service

Form 30
July 2020

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2023-1682; 2023-1900

**Short Case Caption** Bullshine Distillery LLC v. Sazerac Brands, LLC

**NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system. See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e). Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 07/07/2023

by ☐ U.S. Mail ☐ Hand Delivery ☑ Email ☐ Facsimile
☑ Other: Court's CM/ECF System

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Lauren A. Degnan | Fish & Richardson P.C., 1000 Maine Avenue, S.W., Suite 1000, Washington, DC 20024 Email: degnan@fr.com |
| Cynthia Walden | Fish & Richardson P.C., One Marina Park Drive Boston, MA 02210 Email: walden@fr.com |
| Jared Hartzman | Fish & Richardson P.C., 1000 Maine Avenue, S.W., Suite 1000 Washington, DC 20024 Email: hartzman@fr.com |
| Vivian Cheng | Fish & Richardson P.C., 7 Times Square, 20th Floor New York, NY 10036 Email: cheng@fr.com |
| Kristin McCallion | Fish & Richardson P.C., 7 Times Square, 20th Floor New York, NY 10036 Email: mccallion@fr.com |

☐ Additional pages attached.

Date: 07/07/2023

Signature: /s/ John R. Horvack, Jr.

Name: John R. Horvack, Jr.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS

**Case Number:** 2023-1682; 2023-1900

**Short Case Caption:** Bullshine Distillery LLC v. Sazerac Brands, LLC

**Instructions:** When computing a word, line, or page count, you may exclude any items listed as exempted under Fed. R. App. P. 5(c), Fed. R. App. P. 21(d), Fed. R. App. P. 27(d)(2), Fed. R. App. P. 32(f), or Fed. Cir. R. 32(b)(2).

The foregoing filing complies with the relevant type-volume limitation of the Federal Rules of Appellate Procedure and Federal Circuit Rules because it meets one of the following:

- [x] the filing has been prepared using a proportionally-spaced typeface and includes 8,592 words.

- [ ] the filing has been prepared using a monospaced typeface and includes ________ lines of text.

- [ ] the filing contains ________ pages / ________ words / ________ lines of text, which does not exceed the maximum authorized by this court's order (ECF No. ________).

Date: 07/07/2023

Signature: /s/ John R. Horvack, Jr.

Name: John R. Horvack, Jr.

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF CONFIDENTIAL MATERIAL

**Case Number:** 2023-1682; 2023-1900

**Short Case Caption:** Bullshine Distillery LLC v. Sazerac Brands, LLC

**Instructions:** When computing a confidential word count, Fed. Cir. R. 25.1(d)(1)(C) applies the following exclusions:

- Only count each unique word or number once (repeated uses of the same word do not count more than once).
- For a responsive filing, do not count words marked confidential for the first time in the preceding filing.

The limitations of Fed. Cir. R. 25.1(d)(1) do not apply to appendices; attachments; exhibits; and addenda. *See* Fed. Cir. R. 25.1(d)(1)(D).

The foregoing document contains 13 number of unique words (including numbers) marked confidential.

- [x] This number does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).
- [ ] This number does not exceed the maximum of 50 words permitted by Fed. Cir. R. 25.1(d)(1)(B) for cases under 19 U.S.C. § 1516a or 28 U.S.C. § 1491(b).
- [ ] This number exceeds the maximum permitted by Federal Circuit Rule 25.1(d)(1), and the filing is accompanied by a motion to waive the confidentiality requirements.

Date: 07/07/2023

Signature: /s/ John R. Horvack, Jr.

Name: John R. Horvack, Jr.