**Nos. 23-1682, 23-1900**

# United States Court of Appeals for the Federal Circuit

**BULLSHINE DISTILLERY LLC,**

***Appellant***

***v.***

**SAZERAC BRANDS, LLC,**

***Cross-Appellant***

APPEAL FROM THE UNITED STATES PATENT AND TRADEMARK OFFICE, TRADEMARK TRIAL AND APPEAL BOARD IN NO. 91227653

**CROSS-APPELLANT SAZERAC BRANDS, LLC's NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF**

Lauren A. Degnan
Jared Hartzman
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com
hartzman@fr.com

Cynthia Walden
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Tel: (617) 542-5070
walden@fr.com

Kristen McCallion
Vivian Cheng
FISH & RICHARDSON P.C.
7 Times Square, 20th Floor
New York, NY 10036
Tel: (212) 765-5070
McCallion@fr.com
cheng@fr.com

September 20, 2023

*Attorneys for Cross-Appellant Sazerac Brands LLC*

# CERTIFICATE OF INTEREST

Counsel for Cross-Appellant Sazerac Brands, LLC certifies the following:

1. Provide the full names of all entities represented by undersigned counsel in this case.

   **Sazerac Brands, LLC**

2. Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

   **Sazerac Company, Inc.**

3. Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

   **Sazerac Company, Inc.**

4. List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

   **Fish & Richardson P.C.: John McCormick, Nancy Ly, Robert O'Connell Jr., David Hosp, Elizabeth Brenckman, Michael Anderson**

   **Cooley LLP: Thomas M. Hadid, Peter J. Willsey, Vincent J. Badolato, Marcus D. Peterson**

5. Other than the originating case(s) for this case, are the related or prior cases that meet the criteria under Fed. Cir. R. 47.5(a)?

   **No**

6. Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

   **None/Not Applicable**

Dated: September 20, 2023

*<u>/s/ Lauren A. Degnan</u>*
Lauren A. Degnan

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ........ i

TABLE OF AUTHORITIES ........ vi

STATEMENT OF RELATED CASES ........ 1

JURISDICTIONAL STATEMENT ........ 2

COUNTERSTATEMENT OF THE ISSUES PERTINENT TO APPEAL NO. 2023-1682 ........ 3

STATEMENT OF THE ISSUES PERTINENT TO CROSS-APPEAL NO. 2023-1900 ........ 3

COUNTERSTATEMENT OF THE CASE AND FACTS ........ 4

A. Sazerac Begins Selling FIREBALL Whisky in 2001 ........ 4

B. The FIREBALL Brand Continues To Grow ........ 6

C. Bullshine's Plan To Trade off of the Goodwill of FIREBALL ........ 9

D. The Board's Findings ........ 9

1. The Board Rejected Bullshine's Argument That Sazerac's FIREBALL Mark Is Generic ........ 9

2. The Board Rejected Sazerac's Opposition to Bullshine's Registration ........ 13

SUMMARY OF THE ARGUMENT ........ 15

ARGUMENT ........ 17

I. STANDARD OF REVIEW ........ 17

II. THE COURT SHOULD AFFIRM THE BOARD'S FINDING THAT SAZERAC'S FIREBALL TRADEMARK IS NOT GENERIC ........ 17

A. The Court Should Reject Bullshine's Mischaracterizations of the Board's Findings....................................20

B. Substantial Evidence Supports the Board's Finding That FIREBALL Was Not Generic at the Times of Registration ..........................................................................26

1. Bullshine's Reliance on 2007 Is Misplaced............................ 28

2. Substantial Evidence Supports the Board's Rejection of Bullshine's Theories of Genericness.................. 31

3. Bullshine's Remaining Arguments Do Not Show That the Board's Findings Lack Substantial Evidence ........................................................................... 40

C. Because FIREBALL Was Not Generic at the Times of Registration, Bullshine's Three Arguments Must Be Rejected .............................................................................44

1. The Board Did Not Err in Allowing Sazerac "To Remove" FIREBALL from the Public Domain ...................... 45

2. The Board Did Not Err in Finding FIREBALL Not Generic at the Times of Registration in View of Its Factual Findings.................................................................. 46

3. Bullshine's "Heightened and Exacting Standard" Is Irrelevant and Inapplicable................................................ 47

D. The Court Should Affirm the Board's Finding That FIREBALL Was Not Generic at the Time of Trial ............................49

III. THE COURT SHOULD REVERSE THE BOARD'S FINDING THAT FIREBALL IS NOT FAMOUS AND REMAND SAZERAC'S LIKELIHOOD OF CONFUSION CLAIM.........................................................................................53

A. The Board Legally Erred in Analyzing the Fame of FIREBALL ..........................................................................55

1. This Court's Test for Fame Does Not Require Comparative Sales and Advertising Data ................................ 56

2. Sazerac's Sales and Advertising Figures Exceed Those Found Sufficient in *Bose* .............................................. 57

3. The Board Made Findings Showing That Sazerac Put the Sales and Advertising Data in Context Under the Proper Legal Standard ............................................ 59

4. Additional Record Evidence Shows FIREBALL's Fame ......................................................................... 63

B. The Board Erred in Determining the Conceptual Strength of FIREBALL.......................................................................66

1. The Board Legally Erred by Looking to Dissimilar Goods ......................................................................... 66

2. Substantial Evidence Does Not Support the Board's Finding that FIREBALL Is Conceptually Weak ......................................................................... 68

C. The Board Committed Legal Error by Failing To Consider Evidence That the Sixth *DuPont* Factor Weighs in Favor of Likelihood of Confusion ................................................71

D. This Court Should Vacate the Board's Finding of No Likelihood of Confusion Because It Was Infected by the Board's Other Errors ....................................................................72

IV. CONCLUSION.........................................................................75

CERTIFICATE OF SERVICE AND FILING ..................................................... 77

CERTIFICATE OF COMPLIANCE.................................................................. 78

CERTIFICATE OF CONFIDENTIAL INFORMATION .................................... 79

Pages 7, 9, 42, 55, 58, and 64 have been redacted in this non-confidential version of Sazerac's Principal and Response Brief. The material omitted on pages 7 and 58 describes Sazerac's marketing expenditures, revenue, and a number of units sold. The material omitted on page 42 was designated by NBCUniversal Media, LLC as confidential under the protective order and describes the total views

of a particular film, which is considered proprietary business information. The material on pages 9, 55, and 64 includes admissions from a Bullshine business plan that has been designated by Bullshine as confidential under the protective order.

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*BASF Corp. v. Ingevity S.C., LLC*,
No. 2022-1129, 2023 WL 4115908 (Fed. Cir. June 22, 2023)....................63

*In re Bayer Aktiengesellschaft*,
488 F.3d 960 (Fed. Cir. 2007)....................40

*BellSouth Corp. v. DataNational Corp.*,
60 F.3d 1565 (Fed. Cir. 1995)....................17

*Bose Corp. v. QSC Audio Prod., Inc.*,
293 F.3d 1367 (Fed. Cir. 2002)....................*passim*

*Bose Corp. v. QSC Audio Prods., Inc.*,
2000 WL 1759738 (T.T.A.B. Nov. 16, 2000)....................57, 58

*Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*,
955 F.3d 971 (Fed. Cir. 2020)....................27, 50, 51

*Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*,
110 USPQ2d 1458 (T.T.A.B. 2014)....................75

*Chatham Imports, Inc. v. Driftless Pure, LLC*,
2022 WL 3974325 (T.T.A.B. 2022)....................67

*In re Chippendales USA, Inc.*,
622 F.3d 1346 (Fed. Cir. 2010)....................30, 31, 69

*Coach Servs., Inc. v. Triumph Learning LLC*,
668 F.3d 1356 (Fed. Cir. 2012)....................66

*In re Cordua Rests., Inc.*,
823 F.3d 594 (Fed. Cir. 2016)....................45

*In re Dixie Rests., Inc.*,
105 F.3d 1405 (Fed. Cir. 1997)....................53

*Drackett Co. v. H. Kohnstamm & Co.*,
404 F.2d 1399 (C.C.P.A. 1969) .......................................................................71

*In re E. I. DuPont DeNemours & Co.*,
476 F.2d 1357 (C.C.P.A. 1973) ...................................................................*passim*

*Elliott v. Google, Inc.*,
860 F.3d 1151 (9th Cir. 2017) .........................................................................18

*Gillette Co. v. "42" Prods. Ltd.*,
396 F.2d 1001 (C.C.P.A. 1968) .......................................................................69

*Google Inc. v. SimpleAir, Inc.*,
682 F. App'x 900 (Fed. Cir. 2017) ..................................................................20

*In re Guild Mortg. Co.*,
912 F.3d 1376 (Fed. Cir. 2019) .............................................................53, 71, 72

*Hewlett-Packard Co. v. Packard Press, Inc.*,
281 F.3d 1261 (Fed. Cir. 2002) .......................................................................53

*Hoover Co. v. Royal Appliance Mfg. Co.*,
238 F.3d 1357 (Fed. Cir. 2001) .......................................................................40

*In re Hotels.com, L.P.*,
573 F.3d 1300 (Fed. Cir. 2009) .......................................................................27

*Hydro-Dynamics, Inc. v. George Putnam & Co.*,
811 F.2d 1470 (Fed. Cir. 1987) .......................................................................29

*InterDigital Commc'ns, Inc. v. ZTE Corp.*,
711 F. App'x 998 (Fed. Cir. 2017) ..................................................................43

*Interstate Brands Corp. v. Celestial Seasonings, Inc.*,
576 F.2d 926 (C.C.P.A. 1978) .........................................................................44

*Joseph Phelps Vineyards, LLC v. Fairmont Holdings, LLC*,
2019 WL 140540 (T.T.A.B. Jan. 3, 2019).........................................................64

*Joseph Phelps Vineyards, LLC v. Fairmont Holdings LLC*,
857 F.3d 1323 (Fed. Cir. 2017) .......................................................................64

*Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*,
963 F.2d 350 (Fed. Cir. 1992) ....................................................................54, 73

*Knight Textile Corp. v. Jones Inv. Co.*,
75 USPQ2d 1313 (T.T.A.B. 2005)...................................................................75

*In re La. Fish Fry Prods., Ltd.*,
797 F.3d 1332 (Fed. Cir. 2015) .......................................................................43

*Luxco, Inc. v. Everwild Spirits, LLC*,
2023 WL 2889715 (T.T.A.B. Mar. 24, 2023) ..................................................67

*In re MBNA Am. Bank, N.A.*,
340 F.3d 1328 (Fed. Cir. 2003) .......................................................................70

*Money Station, Inc. v. Cash Station, Inc.*,
70 F.3d 1290, 1995 WL 697313 (Fed. Cir. 1995) ...........................................73

*In re Morton-Norwich Prods., Inc.*,
671 F.2d 1332 (C.C.P.A. 1982).......................................................................30

*Nat'l Data Corp. v. Comput. Sys. Eng'g, Inc.*,
940 F.2d 676, 1991 WL 124920 (Fed. Cir. 1991) ...........................................71

*National Cable Television Association, Inc. v. American Cinema Editors, Inc.*,
937 F.2d 1572 (Fed. Cir. 1991) ..................................................................67, 68

*Natural Organics, Inc.*,
204 USPQ 773 (T.T.A.B. 1979).......................................................................75

*In re NTP, Inc.*,
654 F.3d 1279 (Fed. Cir. 2011) .......................................................................28

*Octocom Sys., Inc. v. Houston Comput. Servs., Inc.*,
918 F.2d 937 (Fed. Cir. 1990) ....................................................................19, 20

*Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*,
908 F.3d 1315 (Fed. Cir. 2018) .................................................................*passim*

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
469 U.S. 189 (1985)....................................................................................45, 48

*In re Pennington Seed, Inc.*,
466 F.3d 1053 (Fed. Cir. 2006) .......................................................... *passim*

*Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*,
786 F.3d 960 (Fed. Cir. 2015) .......................................................... 63

*R. J. Reynolds Tobacco Co. v. Am. Brands, Inc.*,
493 F.2d 1235 (C.C.P.A. 1974) .......................................................... 69

*Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*,
906 F.3d 965 (Fed. Cir. 2018) .......................................................... 18, 34

*Royal Crown Co., Inc. v. The Coca-Cola Co.*,
892 F.3d 1358 (Fed. Cir. 2018) .......................................................... 48

*Sec. & Exch. Comm'n v. Chenery Corp.*,
318 U.S. 80 (1943) .......................................................... 47, 49

*Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*,
962 F.3d 1362 (Fed. Cir. 2020) .......................................................... 39, 40

*Singh v. Brake*,
48 F. App'x 766 (Fed. Cir. 2002) .......................................................... 34, 36, 37

*Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*,
748 F.2d 669 (Fed. Cir. 1984) .......................................................... 44

*Sure-Fit Products v. Saltzon Drapery*,
254 F.2d 158 (C.C.P.A 1958) .......................................................... 74

*Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*,
35 F.4th 1352 (Fed. Cir. 2022) .......................................................... 39, 40

*Ultratec, Inc. v. CaptionCall, LLC*,
872 F.3d 1267 (Fed. Cir. 2017) .......................................................... 63

*United States Patent and Trademark Office v. Booking.com B.V.*,
140 S. Ct. 2298 (2020) .......................................................... 17

*United Trademark Holdings, Inc. v. Disney Enters., Inc.*,
No. 2021-1056, 2022 WL 558247 (Fed. Cir. Feb. 24, 2022) .......................... 71

*Velander v. Garner*,
348 F.3d 1359 (Fed. Cir. 2003) ....................................................................40

**Statutes**

15 U.S.C. § 1064....................................................................................*passim*

15 U.S.C. § 1071..........................................................................................2

**Other Authorities**

2 McCarthy on Trademarks and Unfair Competition § 11:64 (5th ed.)..................70

2 McCarthy on Trademarks and Unfair Competition § 12:47 (5th ed.)..................22

## STATEMENT OF RELATED CASES

In compliance with Rule 47.5 of the Federal Circuit Rules, Appellee/Cross-Appellant Sazerac Brands, LLC agrees with Appellant/Cross-Appellee Bullshine Distillery LLC's statement of related cases.

## JURISDICTIONAL STATEMENT

Sazerac agrees that this Court has jurisdiction over Bullshine's appeal. Moreover, this Court has jurisdiction to hear Sazerac's cross-appeal on the issues of fame and likelihood of confusion under 15 U.S.C. § 1071. Sazerac filed a timely notice of cross-appeal on May 8, 2023. *See* Appx6728-6797.

## COUNTERSTATEMENT OF THE ISSUES PERTINENT TO APPEAL NO. 2023-1682

1. Whether substantial evidence supports the Board's finding that the FIREBALL trademark was not generic at the times of registration?

## STATEMENT OF THE ISSUES PERTINENT TO CROSS-APPEAL NO. 2023-1900

1. Whether the Board legally erred in analyzing the fame of the FIREBALL mark?

2. Whether the Board legally erred in considering third-party uses with dissimilar goods in its analysis of the conceptual strength of the FIREBALL mark?

3. Whether substantial evidence supports the Board's finding on the conceptual strength of the FIREBALL mark?

4. Whether the Board legally erred by failing to consider evidence that the sixth *DuPont* factor weighs in favor of a likelihood of confusion?

## COUNTERSTATEMENT OF THE CASE AND FACTS

FIREBALL has been the brand name of a distilled spirit sold in the U.S. since the 1980s. Appx638. Having acquired rights in the FIREBALL trademark from two predecessors, Sazerac sold its first DR. MCGILLICUDDY'S FIREBALL whisky, a cinnamon infused "whisky shooter," twenty-two years ago. Appx22-23 (citing Appx3119-3120); Appx638-640; Appx678-681. Due to years of dedicated marketing and promotional efforts, FIREBALL whisky has become one of the bestselling and most famous alcohol products in the United States. *See* Appx24-25 (citing Appx646-647; Appx797-798); Appx661-662; Appx790-795; Appx4511.

Sazerac owns the following incontestable registrations of FIREBALL that are at issue on appeal:

| Reg. No. | Mark | Goods | First Use | Date Filed | Date Registered |
|---|---|---|---|---|---|
| Reg. No. 2,852,432 | FIREBALL | Liqueurs | September 1988 | November 14, 2001 | June 15, 2004 |
| Reg. No. 3,550,110 | FIREBALL | Whisky | April 2007 | May 11, 2008 | December 23, 2008 |

Appx643; Appx726-732.

### A. Sazerac Begins Selling FIREBALL Whisky in 2001

In 1999, Sazerac purchased the worldwide rights of Joseph E. Seagram & Sons, Inc. to the DR. MCGILLICUDDY'S brand, including the trademarks, artwork/label designs, and formula for DR. MCGILLICUDDY'S FIREBALL

whisky. Appx639; Appx668-677; Appx2319-2361; Appx4503-4504; Appx4511-4512; Appx4533-4543; Appx4581-4592. While the brand name of Sazerac's "cinnamon flavored whisky" was "DR. MCGILLICUDDY'S FIREBALL," Appx4502-4503; Appx4519-4532, the earliest U.S. bottle label featured the FIREBALL trademark (with the "TM" symbol) prominently on both the front and back of the label. Appx4502-4503; Appx4519-4532; Appx639-640; Appx668-681. Sazerac also emphasized the FIREBALL trademark in advertising sell sheets, press releases, and marketing materials as early as 2001. Appx22-23 (citing Appx3119-3120); Appx4504-4509; Appx4533-4574.

Due to its early success in the U.S., DR. MCGILLICUDDY'S FIREBALL caught the eye of another company, Mohawk Distilled Products, L.P. (d/b/a Marie Brizard Wines & Spirits) ("Mohawk"), which claimed rights in FIREBALL with liqueur since 1988 and demanded that Sazerac cease its use of the FIREBALL mark. Appx21-22; Appx3139-3140; Appx3165; Appx3170; Appx4511-4512; Appx4575-4577; Appx4786; Appx4892-4910; Appx4512; Appx4578-4580. A lawsuit ensued and the case settled in 2002 when Sazerac purchased Mohawk's rights in the FIREBALL trademark, including a then-pending application for FIREBALL, Appx21-22; Appx4510; Appx4512-4513; Appx2415-2436, which later issued to Sazerac as Registration No. 2,852,432. Appx2445. Since this time, Sazerac's use of FIREBALL as a brand name for whisky/liqueur has been

exclusive. Appx663; Appx1211-1212; Appx1226; Appx1293-1294; Appx1370; Appx1433; Appx50-51.

### B. The FIREBALL Brand Continues To Grow

Around 2005, Sazerac began exploring the possibility of taking FIREBALL whisky out of its DR. MCGILLICUDDY'S line of spirits and selling it as a standalone product. Appx24; Appx641-642. In and around 2007-2009, Sazerac worked on updating the product label by removing DR. MCGILLICUDDY'S and revising some of the imagery. Appx640-643. The prominence of the FIREBALL brand name remained, and Sazerac carried the flame imagery—playing off of the literal meaning of the word "fireball," i.e., a ball of fire—from the prior label. Appx24; Appx642; Appx712-725.

With the updated label, Sazerac launched a reinvigorated promotional campaign that catapulted FIREBALL whisky to become the #1 selling whisky in the U.S. Appx646-647; Appx785-787. Sazerac adopted a unique "grassroots" approach that focused on live promotional events and customer interaction, which quickly built a legion of loyal fans. Appx646; Appx655-658, Appx895-896; Appx998-1029. Sazerac has devoted a substantial amount of time, effort, and resources into promoting its FIREBALL brand and spirit across the U.S. (and globally) by:

> (1) promoting FIREBALL whisky at thousands of events around the country and giving away FIREBALL memorabilia and "swag" to

legal drinkers, Appx648-650; Appx707; Appx925-926; Appx939-940; Appx943; Appx945-946; Appx958; Appx1007; Appx1109-1118;

(2) selling FIREBALL branded promotional items and merchandise via its website, Appx649; Appx974-977;

(3) running a nationwide brand ambassador program of over forty FIREBALL brand representatives and an “Official Bartender Loyalty Program,” Appx26; Appx649; Appx651; Appx927-928; Appx953-954;

(4) creating promotional FIREBALL whisky campaigns in bars, restaurants, and retailers, Appx654; Appx917-919; Appx936-952;

(5) facilitating relationships with celebrities who are fans of FIREBALL whisky, Appx27; Appx651-652; Appx923; Appx978-997;

(6) maintaining a dedicated FIREBALL brand website and active FIREBALL social media profiles, Appx653; Appx1067-1080; and

(7) partnering with other alcohol brands/companies and restaurants on co-promotional and co-branding campaigns featuring FIREBALL whisky, Appx658-659; Appx1157-1162.

Between 2001 and 2019, Sazerac spent nearly [redacted] dollars on marketing FIREBALL whisky in the U.S. Appx25, Appx654-655; Appx4511. Moreover, between 2011 and 2019, Sazerac’s sales of FIREBALL whisky in the U.S. exceeded [redacted], which amounts to ***over*** [redacted] individual bottles of FIREBALL whisky sold. Appx25; Appx661; Appx4511.

Over the last 20 years, FIREBALL whisky has amassed an overwhelming level of customer recognition and a devoted nationwide fan base of millions of people. *See, e.g.*, Appx655-658; Appx1088-1092; Appx1054; Appx4514-4515; Appx4609-4612; *see also* Appx655; Appx1081-1129. As of early 2020, the

"Fireball Whisky" Facebook page had almost 1 million followers. Appx27; Appx652; Appx998-1060. Fans share their enthusiasm for FIREBALL whisky by using the hashtags "#FIREBALL" and "#FIREBALLwhisky" in their social media posts, which Sazerac often re-posts on its social media accounts. Appx655-656; Appx1779; Appx1781-1782; Appx1806; Appx1826.

The success of the FIREBALL brand and popularity of the whisky have been featured in thousands of news articles. Appx25; Appx4785; 4789-4824; Appx659-661; Appx804-908; Appx3783-3784; Appx3815-3885. The brand is so well-known that "FIREBALL" was the answer to a *Jeopardy!* question about a "cinnamon whisky" in 2017. Appx27; Appx4510; Appx1783. FIREBALL whisky also has won multiple industry awards—including for its product packaging—at competitions such as the San Francisco World Spirits Competition, International Spirits Challenge, and Los Angeles International Wine & Spirits Competition. Appx4808; Appx4513-4514; Appx4593-4603.

With fame comes copying, causing Sazerac to enforce its rights in the FIREBALL mark. Appx27-28; Appx3782-3783; Appx3800-3814; Appx4515-4516; Appx4619-4622; Appx4658-4665. Sazerac's settlement agreements regularly include an acknowledgment by the other party of Sazerac's rights in the FIREBALL trademark. Appx663; Appx4515-4516; Appx4623-4657.

### C. Bullshine's Plan To Trade off of the Goodwill of FIREBALL

Bullshine plans to trade off of FIREBALL's goodwill. Appx1484. In fact, it prepared a "Fireball Whiskey Business Plan" that reveals Bullshine's plan to [redacted] the FIREBALL brand name, thereby [redacted] FIREBALL whisky's market share, which Bullshine estimated to be [redacted] of the market. Appx1482; Appx1488; Appx1478-1484; Appx1485-1491; Appx1207-1209. One aspect of the plan was that Bullshine would seek to invalidate Sazerac's FIREBALL mark by arguing it was "generic." Appx1480-1484. In another aspect, Bullshine assumed its pending application for BULLSHINE FIREBULL would register and it would then sell BULLSHINE FIREBULL whisky in and to the same trade channels and consumers as Sazerac's FIREBALL whisky. *Id.*; *see also* Appx1419-1420; Appx1422.

### D. The Board's Findings

#### 1. The Board Rejected Bullshine's Argument That Sazerac's FIREBALL Mark Is Generic

Before the Board, Bullshine sought to cancel Sazerac's '432 and '110 Registrations, both for FIREBALL, pursuant to 15 U.S.C. § 1064(3). *See* Appx561 ("such registrations are subject to cancellation under Section 14 of the Lanham Act, 15 U.S.C. § 1064"); Appx6171-6172. Specifically, Bullshine argued that FIREBALL was generic before the times of registration (i.e., generic *ab initio*). *See* Appx6292 (arguing that "before 2001 . . . the relevant public primarily

used and understood the 'Fireball' designation to be a generic term"). Bullshine did not argue that the already-existing registrations for FIREBALL had become generic via genericide. *See* Appx6179 (arguing this is a "non-genericide case").

Bullshine advanced two theories of genericness: (1) "FIREBALL is generic for a 'subcategory' or 'part' of the genus (alcoholic drinks containing whiskey and liqueurs that attempt 'to replicate the taste of Fireball candy')," and (2) "FIREBALL is generic for a 'key aspect' of the genus (the 'fireball' flavor)." Appx36. The Board examined whether FIREBALL had "become the generic name" of a subcategory, part, or key aspect (e.g., the flavor) of the genus between the times of registration and the time of trial, Appx33; *see also* Appx33-51—an appropriate inquiry given that section 1064(3) permits cancellation of a registered mark for genericness only if it "becomes . . . generic[,]" 15 U.S.C. § 1064(3). Doing so involved determining whether FIREBALL was generic at the times of registration, Appx34, Appx49-51, and, if not, determining whether FIREBALL had become generic by the time of trial, Appx51. After evaluating all of the record evidence, the Board found that FIREBALL was not generic at any point in time. Appx51.

Specifically, the Board found that FIREBALL reflects neither a subcategory nor a flavor of the whisky/liqueur genus. *See, e.g.*, Appx43 ("[T]he term 'fireball' does not always or even consistently refer to whisky or liqueur-based beverages

having that flavor." (citing Appx1336-1340)). To the contrary, the Board found that "'fireball' alcoholic beverages do not all share the same flavors," and "they are based on different liquors, liqueurs and even meads falling outside the genus[.]" Appx43; *see also* Appx49 ("[M]any of the recipes do not contain whiskey, or liqueur, and would not replicate the ATOMIC FIREBALL . . . flavor.").

***With respect to the times of registration***, the Board considered, *inter alia*, "recipes," "bartending or alcoholic beverage publications," "specialized websites," expert testimony, and party testimony. *See* Appx49-51. Based on its review of evidence—from both before 2001 and 2008—the Board found that "'Fireball' recipes are not always consistent," as "[s]ome do not include whiskey, and others may not even have a spicy/sweet cinnamon flavor." Appx17-19 (citing Appx3470; Appx3505; Appx3590; Appx3613; Appx4052-4057; Appx4060; Appx4065-4066)). Moreover, it found that most of the mixed drinks would "not have the whisky/liqueur flavor of [Sazerac's] FIREBALL cinnamon whisky," Appx42-43, and that "fireball" is not a subcategory of the whisky/liqueur genus, Appx42 (noting that certain third-party "fireball" recipes are not "part of the whisky/liqueur genus"); *see also* Appx16-17; Appx49.

With respect to the materials Bullshine identified below, including the Harvard textbooks it cites on appeal, BB 3-4, 6, 28-30, the Board found that:

> (1) "the vast majority of the recipes [Bullshine] relies upon were published in bartending or alcoholic beverage publications, or specialized websites," Appx49;
>
> (2) Bullshine failed to present "evidence that a large number of relevant consumers were exposed to these recipes," Appx49; and
>
> (3) it is likely that "relatively few relevant consumers encountered these recipes directly," Appx49-50.

The Board also found that Bullshine's expert was unqualified to offer opinion "about the meaning of the term 'fireball' to consumers," and thus her "opinions about the term 'fireball,' legal aspects of this case and [Bullshine's] genericness counterclaim generally" should be discounted. Appx47.

***With respect to the time of trial***, the Board further considered "sales and advertising figures," "media attention," Sazerac's consistent treatment and use of FIREBALL as a trademark, and Sazerac's successful enforcement efforts. Appx51. Based on this evidence, the Board found:

> (1) "'As of October 2019, FIREBALL whisky was ranked the #1 selling whisky nationwide.'" Appx25 (quoting Appx646-647 and citing Appx797-798);
>
> (2) Sazerac's FIREBALL whisky "has received substantial unsolicited media attention" and has numerous "celebrity endorsers." Appx25 (citing Appx647-648; Appx804-908); Appx27 (citing Appx652; Appx804-857);
>
> (3) Sazerac's "gross sales from 2011-2019 are significant," and its "marketing expenses from 2011-2019 are as well." Appx25 (citing Appx654-655, Appx661); Appx26 (citing Appx1230-1231);
>
> (4) Sazerac has been using FIREBALL as a mark since 2001. *See* Appx22-23 (citing Appx3119-3120); Appx39 (citing same); and

> (5) Sazerac "successfully enforced its asserted rights in FIREBALL against many of the third-party users of the term." *See* Appx27-28 (citing Appx3782-3783; Appx3791-3795; Appx3798-3799; Appx3800-3808; Appx3809-3814; Appx4515-4516; Appx4619-4622; Appx4623-4657; Appx4658-4665).

Given these findings, the Board concluded that FIREBALL had not become generic between the times of registration and the time of trial. *See* Appx51.

### 2. The Board Rejected Sazerac's Opposition to Bullshine's Registration

Sazerac opposed registration of Bullshine's BULLSHINE FIREBULL mark based on a claim of likelihood of confusion. Appx2; Appx87-96. In its analysis of the likelihood of confusion between BULLSHINE FIREBULL and FIREBALL, the Board found that the "parties' goods are legally identical" because Bullshine's claimed goods, "alcoholic beverages except beers," "is broad enough to encompass Opposer's 'whisky' and 'liqueurs.'" Appx54. Because the goods are legally identical, the Board presumed "that the channels of trade and classes of purchasers for these goods also overlap." Appx54. The Board also determined that the goods are inexpensive and thus purchased without great care, which weighs in favor of finding a likelihood of confusion. Appx65. The Board found the factor focused on Bullshine's alleged bad faith intent in choosing its mark neutral. Appx66.

In its analysis of the strength of the FIREBALL mark, the Board determined that the mark "is commercially strong" (as Bullshine conceded), but that it could not find FIREBALL has achieved fame due to a lack of "context" for Sazerac's

advertising and sales figures, or other evidence of strength, such as how they compare with other brands of whisky and liqueurs. Appx56-57. As to conceptual strength, the Board found that FIREBALL is "highly suggestive of the taste and flavor of [Sazerac's] 'sweet/spicy cinnamon'-flavored whisky/liqueur" and that this "conceptual weakness essentially 'cancels out' the mark's commercial strength." Appx59-60. The Board therefore entitled the mark to "a normal scope of protection." Appx60.

Despite holding that "[t]he legal identity of the goods and their overlapping channels of trade and classes of purchasers . . . weigh heavily in favor of finding a likelihood of confusion, [and] also reduce the degree of similarity between the marks necessary to find a likelihood of confusion[,]" Appx55, the Board concluded that the marks are dissimilar when considered in their entireties and that this factor "weighs heavily against a finding of likelihood of confusion." Appx65. This conclusion rests on the Board's findings on "the conceptual weakness of FIREBALL, and the differences between BULLSHINE FIREBULL and FIREBALL in appearance and sound, and especially in meaning and commercial impression." Appx64. The Board, therefore, dismissed Sazerac's opposition. Appx66.

This cross-appeal followed.

## SUMMARY OF THE ARGUMENT

This Court should affirm the Board's findings that FIREBALL was not generic at any point in time. Bullshine attempts to cancel Sazerac's registrations by incorrectly arguing that FIREBALL was generic before the times of registration (i.e., generic *ab initio*). *See* BB 25 (arguing FIREBALL "was generic . . . since at least the early 1990's"). In making this argument, Bullshine repeatedly mischaracterizes the Board's factual findings in a misguided attempt to create legal error and secure *de novo* review. The Board's conclusion that FIREBALL is not generic is a factual finding reviewable only for substantial evidence. Because substantial evidence supports the Board's finding that FIREBALL was not generic at the times of registration, the Court should reject Bullshine's arguments to the contrary. Furthermore, because Bullshine does not challenge the Board's finding that FIREBALL had not become generic at the time of trial—and this finding is supported by substantial evidence in any event—this Court should affirm the Board's decision not to cancel Sazerac's registrations.

In addition, the Court should reverse the Board's finding that FIREBALL is not famous and vacate the Board's decision dismissing Sazerac's opposition to Bullshine's registration because the Board's legal error in determining fame infected its entire analysis. The Board legally erred when it refused to find FIREBALL famous based on an alleged lack of "context" for Sazerac's evidence

of commercial strength because this Court does not require comparative sales figures or market share data. Under the proper legal test, the record evidence shows fame. The Board also erred in its analysis of the conceptual strength of FIREBALL because it considered third-party use of "fireball" with ***dissimilar*** goods, rather than the whisky/liqueur goods at issue, and the Board's finding that FIREBALL is "highly suggestive," based on two decades-old statements by Sazerac and inconsistent "fireball" recipes, is not supported by substantial evidence. Further, the Board failed to consider the sixth *DuPont* factor for which there was evidence and argument regarding the exclusivity of Sazerac's use of FIREBALL with whisky/liqueur. Accordingly, the Court should reverse the Board's finding that FIREBALL is not famous, and vacate and remand the Board's dismissal of Sazerac's opposition to Bullshine's registration.

# ARGUMENT

## I. STANDARD OF REVIEW

The Court applies "a limited standard of review to Board decisions, reviewing legal determinations *de novo* and factual findings for substantial evidence." *In re Pennington Seed, Inc.*, 466 F.3d 1053, 1056 (Fed. Cir. 2006). "Substantial evidence requires the reviewing court to ask whether a reasonable person might find that the evidentiary record supports the agency's conclusion." *Id.* (internal quotation omitted). "Whether a term is a generic, common descriptive name for a good is a question of fact." *Id.* "[W]hether a likelihood of confusion exists is, however, a question of law," though "[e]ach of the *DuPont* factors presents a question of fact." *Bose Corp. v. QSC Audio Prod., Inc.*, 293 F.3d 1367, 1370 (Fed. Cir. 2002).

## II. THE COURT SHOULD AFFIRM THE BOARD'S FINDING THAT SAZERAC'S FIREBALL TRADEMARK IS NOT GENERIC

"A generic name—the name for a class of products or services—is ineligible for federal trademark registration." *United States Patent and Trademark Office v. Booking.com B.V.*, 140 S. Ct. 2298, 2301 (2020). "A descriptive term may be generic for a designation *ab initio*, or it may become generic over time through common usage if the otherwise nondescriptive term is not policed as a trademark and it is commonly used to describe a type of product." *BellSouth Corp. v.*

*DataNational Corp.*, 60 F.3d 1565, 1569-70 (Fed. Cir. 1995) (internal citations omitted).

Bullshine bore the burden to prove, "by a preponderance of the evidence," that the term FIREBALL, registered in the '432 and '110 Registrations, was generic—whether at the times each of the registrations was sought (generic *ab initio*) or at the time of trial. *Real Foods Pty Ltd. v. Frito-Lay N. Am., Inc.*, 906 F.3d 965, 973 (Fed. Cir. 2018). Bullshine's opening brief does not challenge the Board's finding that FIREBALL was not generic at the time of trial (i.e., 2021-2022). *See generally* BB; *see also* Section II.D, *infra*. Rather, Bullshine argues that neither the Board nor this Court should "examine the evidence up through the time of trial," BB 21 n.2 (quoting Appx34), because—according to Bullshine—this case does not involve genericide.[1] *See* BB 1, 13, 15; *see also* BB 18 ("The correct legal analysis, thus, focuses on whether the term was generic for the goods at issue '***prior to*** the proprietor's trademark use and registration.'" (internal citation omitted) (emphasis added by Bullshine)).

Bullshine instead attempts to cancel Sazerac's registrations pursuant to 15 U.S.C. § 1064(3), *see* Appx561; Appx6171-6172, by incorrectly arguing that

---

[1] "Genericide" refers to the scenario where a trademark becomes generic over time and "occurs when the public appropriates a trademark and uses it as a generic name for particular types of goods or services irrespective of its source." *Elliott v. Google, Inc.*, 860 F.3d 1151, 1156 (9th Cir. 2017).

FIREBALL was generic before the times of registration (i.e., generic *ab initio*). *See* BB 25 (arguing FIREBALL "was generic . . . since at least the early 1990's"). However, when a party seeks to cancel a registration more than five years after the registration issued—as is the case here for the '432 and '110 Registrations—the statute limits the grounds for cancellation. 15 U.S.C. § 1064. Specifically, in relevant part, section 1064(3) allows cancellation "[a]t any time if the registered mark ***becomes*** the generic name for the goods or services, or a portion thereof, for which it is registered[.]" *Id.* § 1064. As a result, cancellation pursuant to section 1064(3) is not even an available remedy in cases, as here, that do not involve genericide. *See Pennington Seed*, 466 F.3d at 1060;[2] BB 1, 13, 15, 21.

Regardless, in making this argument, Bullshine's brief repeatedly mischaracterizes the Board's factual findings in a misguided attempt to create legal error and secure *de novo* review. The Board's conclusion that FIREBALL is not generic is a factual finding reviewable only for substantial evidence. *Pennington Seed*, 466 F.3d at 1056. Because Bullshine's brief ***never disputes*** whether the Board's finding is supported by substantial evidence under the correct standard of review, "no basis for reversal in law or fact can be or is even arguably shown." *Octocom Sys., Inc. v. Houston Comput. Servs., Inc.*, 918 F.2d 937, 943 (Fed. Cir.

[2] In *Pennington Seed*, this Court held that when a mark is alleged to have been "generic *ab initio*," "15 U.S.C. § 1064" is "not relevant to the disposition of th[e] case." 466 F.3d at 1060 (affirming PTO's refusal to register a mark).

1990). It is unsurprising that Bullshine avoids the proper standard of review—substantial evidence supports the Board's finding that FIREBALL was not generic at any point in time.

### A. The Court Should Reject Bullshine's Mischaracterizations of the Board's Findings

This Court should reject all three issues Bullshine raises on appeal because each one hinges on, and is replete with, gross mischaracterizations of the Board's factual findings. *See Google Inc. v. SimpleAir, Inc.*, 682 F. App'x 900, 905 (Fed. Cir. 2017) (rejecting argument that involved "mischaracterization of the PTAB's ruling, in attempt to create legal error"); *Octocom*, 918 F.2d at 941-44 (sanctioning party that argued that the TTAB legally erred based on "[a] deliberate mischaracterization of [the] appealed decision").

Bullshine mischaracterizes the time period the Board considered, the date the Board found that Sazerac was using the FIREBALL mark, the Board's non-genericness finding, the Board's subsidiary findings as to whether FIREBALL reflects a subcategory or flavor of the whisky/liqueur genus, and whether the Board relied on *de facto* secondary meaning.

First, Bullshine accuses the Board of failing to focus on whether FIREBALL was generic "in the first instance." *See, e.g.*, BB 18-19, 21 n.2. With respect to decisions the Board makes about registration, genericness in the first instance corresponds to genericness at the time of registration; accordingly, Bullshine's

argument challenges the registrability of FIREBALL when registration was sought (the "times of registration"). Bullshine's argument that the Board failed to focus on the appropriate time period ignores that the Board found that "FIREBALL ***was not generic at the time of registration***,"[3] Appx51, in a section of its Decision devoted to "the time of registration," Appx49-51.

Second, Bullshine argues that Sazerac did not use or attempt to monopolize the FIREBALL mark until 2007, *see, e.g.*, BB 8, 12, 23-27, 30-31, despite the fact that the Board found that Sazerac was using it by 2001. *See* Appx22 ("[Sazerac] was using FIREBALL as a mark for its cinnamon whisky product, and using 'cinnamon whisky' to identify the product's category, as shown in the following 2001 press release[.]"); Appx39 (citing Appx3119-3120); Appx51 n.16.

Third, despite requesting reversal of the Board's conclusion that FIREBALL ***was not generic***, *e.g.*, BB 21, Bullshine repeatedly alleges that the Board found that FIREBALL "***was generic***." BB 22; *see also e.g., id.* at 13 ("[T]he Board found that the 'fireball' designation ***was generic*** . . . <u>before</u> the time of Opposer's first trademark use." (underline in original)).

Fourth, Bullshine states that FIREBALL must be generic because the Board found that "'fireball' reflects a subcategory of the claimed goods," and that it "denotes a flavor of the claimed goods," BB 22; *see also id.* at 19, when the Board

[3] All emphasis is added unless noted otherwise.

found the exact opposite:

> ***'[F]ireball' alcoholic beverages do not all share the same flavors***, as they are based on different liquors, liqueurs and even meads ***falling outside the genus***, and different mixers as well. Some do not even include cinnamon or any other spicy ingredient.

Appx43. In fact, according to the Board, "many of the recipes of record . . . ***directly contradict Applicant's theories*** that FIREBALL: (1) 'was the name of a subcategory of alcoholic drinks containing whiskey and liqueurs that sought to replicate the taste of Fireball candy;' and (2) refers 'to a 'key aspect' of the goods at issue – namely the flavor.'" Appx 49.

Fifth, Bullshine accuses the Board of "crediting de facto secondary meaning," BB 21, by considering Sazerac's "advertising and commercial success," BB 20 (citing Appx38, Appx48-51 and referring to the Board's findings that the public perception of FIREBALL had evolved over time). However, because the Board found that FIREBALL was not generic at the times of registration, the concept of de facto secondary meaning does not apply.[4] Moreover, the Board did not rely on Sazerac's evidence of advertising or commercial success from the

[4] "[D]e facto secondary meaning denotes the view that once a designation has been determined to be a 'generic name,' then no amount of consumer recognition can ever thereafter transform the status of that designation into that of a protected trademark." 2 McCarthy on Trademarks and Unfair Competition § 12:47 (5th ed.); *accord Pennington Seed*, 466 F.3d at 1059 ("Even though they succeed in the creation of de facto secondary meaning, due to lack of competition or other happenstance, the law respecting registration will not give it any effect.").

period after the times of registration in finding that FIREBALL was not generic at the times of registration. *See* Appx49-51.[5] Nor did the Board expressly rely on Sazerac's commercial success at the times of registration; the Board mentioned Sazerac's success at those times only as added support for its finding that, due to Sazerac's use of the FIREBALL mark, "FIREBALL was known by many relevant consumers as a trademark[.]" Appx50.

As illustrated in the table below, Bullshine's deliberate mischaracterizations of the Board's findings—in an ill-advised attempt to portray legal error—do not stop there:

| Topic | What Bullshine Says | What the Board Said |
|---|---|---|
| **Whether FIREBALL is generic** | "The Board made factual findings that the 'fireball' designation was generic before the Opposer's attempted monopolization[.]" BB 22. | "We therefore find that FIREBALL was not generic at the time of registration." Appx51. |
| | "[T]he Board found that the 'fireball' designation was generic for whiskeys and liqueurs in two related ways <u>before</u> the time of Opposer's first trademark use." BB 13 (underline in original). | "Applicant has not met its burden of proving by a preponderance of the evidence that FIREBALL was generic for whisky or liqueurs, either at the time of registration or the time of trial." Appx51. |

[5] The Board correctly considered this evidence—which demonstrates widespread consumer recognition of "FIREBALL as a trademark"—when analyzing whether FIREBALL had become generic by the time of trial. Appx51 (finding that Sazerac's success is evidence that Sazerac's FIREBALL whisky "had become significantly more popular" with the relevant public over time); Section II.D, *infra*.

| Topic | What Bullshine Says | What the Board Said |
|---|---|---|
| | "[T]he Board correctly found, that the 'fireball' designation was generically used for whiskeys and liqueurs[.]" BB 26. | "Applicant's counterclaims are denied because it has failed to prove that Opposer's FIREBALL mark is generic[.]" Appx66. |
| | | |
| **Whether FIREBALL reflects a subcategory of the "genus"**[6] | "The Board made factual findings that . . . 'fireball'" reflects a subcategory of the claimed goods [i.e., the genus.]" BB 22 (internal citations omitted). | "'[F]ireball' alcoholic beverages . . . are based on different liquors, liqueurs and even meads falling outside the genus[.]" Appx43 (discussing third-party "fireball" recipes). |
| | "[T]he Board recognized that . . . the 'fireball' designation reflected a 'subcategory' or 'part of' the genus (*i.e.*, alcoholic drinks designed to taste like Fireball candy)." BB 26. | "[M]any of the recipes of record that were in existence at the time of registration directly contradict Applicant's theor[y] that FIREBALL . . . 'was the name of a subcategory of alcoholic drinks containing whiskey and liqueurs that sought to replicate the taste of Fireball candy[.]'" Appx49. |
| | | "[T]he term 'fireball' does not always or even consistently refer to whisky or liqueur-based beverages having that flavor." Appx43. |
| | "[T]he Board correctly found, that the 'fireball' designation was | "[M]any of the recipes do not contain whiskey, or liqueur[.]" Appx49. |

[6] The Board found that "the genus is 'whisky' (the goods identified in the '110 Registration) and 'liqueurs' (the goods identified in the '432 Registration)." Appx35.

| Topic | What Bullshine Says | What the Board Said |
|---|---|---|
| | generically used for whiskeys and liqueurs[.]" BB 26. | |
| | | |
| **Whether FIREBALL refers to a flavor** | "The Board made factual findings that . . . 'fireball' . . . denotes a flavor for the claimed goods." BB 22 (internal citations omitted). | "[A]t the time of registration, FIREBALL was known by many relevant consumers as a trademark, whether for candy or whisky/liqueurs, rather than as a nondistinctive term for a specific flavor." Appx50. |
| | "[T]he Board found 'fireball' denoted a 'spicy, cinnamon and candy-like taste.'" BB 22. | "'Fireball' recipes are not always consistent, however. Some . . . may not even have a spicy/sweet cinnamon flavor." Appx17 (discussing third-party "fireball" recipes); *see also* Appx18-19. |
| | | "'[F]ireball' alcoholic beverages do not all share the same flavors . . . Some do not even include cinnamon or any other spicy ingredient." Appx43 (discussing third-party "fireball" recipes). |
| | "[T]he Board recognized that . . . the term denoted a key aspect of the genus (i.e., the 'fireball' flavor)." BB 26. | "[M]any of the recipes of record that were in existence at the time of registration directly contradict Applicant's theor[y] that FIREBALL . . . refers 'to a 'key aspect' of the goods at issue – namely the flavor.' In fact, many of the recipes . . . would not replicate the ATOMIC FIREBALL (or |

| Topic | What Bullshine Says | What the Board Said |
|---|---|---|
| | | FIREBALL cinnamon whisky) flavor." Appx49 (internal citations omitted). |
| | | "[T]he term 'fireball' does not always or even consistently refer to whisky or liqueur-based beverages having that flavor." Appx43. |
| | | "[T]he record is not consistent as to whether 'fireball' refers to the 'sweet/spicy cinnamon' flavor of Opposer's FIREBALL whisky/liqueur." Appx41. |

Contrary to Bullshine's mischaracterizations, the Board found, after weighing all of the evidence, that FIREBALL does not reflect a subcategory of the whisky/liqueur genus or denote a specific flavor (i.e., the Atomic Fireball candy flavor specifically or a sweet/spicy cinnamon flavor more broadly), and, therefore, is not and was never generic. Appx33-51. As discussed below, substantial evidence supports the Board's findings that FIREBALL was not generic at any time.

### B. Substantial Evidence Supports the Board's Finding That FIREBALL Was Not Generic at the Times of Registration

Bullshine challenges "the Board's conclusion that the 'fireball' designation is not generic for whiskeys and liqueurs." BB 21; BB 32 ("[T]his Court should

conclude that the Board erred by failing to find the 'fireball' designation was generic for whiskeys and liqueurs."); BB 36 ("[T]his Court should reverse the Board and ***find*** that the 'fireball' designation is generic for whiskeys and liqueurs."). However, "[w]hether a term is a generic . . . name for a good is a question of fact," not law, and thus the only question on appeal is whether substantial evidence supports the Board's findings. *Pennington Seed*, 466 F.3d at 1056; *see also In re Hotels.com, L.P.*, 573 F.3d 1300, 1302 (Fed. Cir. 2009) ("On appellate review of the Board's factual finding of genericness, we determine whether, on the entirety of the record, there was substantial evidence to support the determination.").

The Board thoroughly considered Bullshine's arguments, including its argument that FIREBALL was generic "before 2001," Appx6292, and carefully weighed the evidence, ultimately finding that "FIREBALL was not generic at the time of registration." Appx51. On appeal, Bullshine ***never disputes*** whether substantial evidence supports that finding—indeed, it does not even seem to be aware of this standard. *See generally* BB (failing to apply the correct standard of review).[7] Instead, Bullshine attempts to reargue its case *de novo*, *e.g.*, BB 15, and

[7] Bullshine thus waived any argument that the Board's non-genericness finding lacks substantial evidence support. *Bozeman Fin. LLC v. Fed. Rsrv. Bank of Atlanta*, 955 F.3d 971, 974 (Fed. Cir. 2020) ("We similarly consider arguments not raised in an appellant's opening brief waived absent exceptional circumstances.").

would have this Court reweigh the evidence and reconsider the Board's fact-based findings concerning recipes, websites, a movie, expert and fact witness testimony, and alleged prior concessions. *See, e.g.*, BB 22-36. Although Bullshine may disagree with the Board's findings, this Court is not the venue for re-litigating these fact-specific issues. *See In re NTP, Inc.*, 654 F.3d 1279, 1292 (Fed. Cir. 2011) ("This court does not reweigh evidence on appeal, but rather determines whether substantial evidence supports the Board's fact findings."). Substantial evidence supports the Board's finding that FIREBALL was not generic at the times of registration, which is all this Court needs to affirm. *Id.*

### 1. Bullshine's Reliance on 2007 Is Misplaced

In its counterclaims, Bullshine sought to cancel the '432 Registration and the '110 Registration, both for FIREBALL, with the former being for liqueurs and the latter being for whisky. Appx3; Appx2 n.3 & n.5; Appx3 n.7. The '432 Registration issued on June 15, 2004, from an application filed on November 14, 2001. Appx2 n.5; Appx20; Appx3164-3168; Appx3175.[8] The '110 Registration issued on December 23, 2008, from an application filed on May 11, 2008. Appx2 n.3; Appx3184-3190. Accordingly, for purposes of determining whether the marks

[8] Sazerac purchased the application for the '432 Registration from Mohawk in 2002. Appx22 (citing Appx4916; Appx641; Appx2416-2419).

were generic *ab initio*,[9] the Board properly considered the evidence as of the times the registrations were sought (i.e., 2001 and 2008, respectively). Appx34.[10]

On appeal, however, Bullshine falsely asserts that Sazerac did not use the FIREBALL mark until 2007 and thus the Board should have considered only the April 2007 timeframe in evaluating whether FIREBALL is generic.[11] BB 23 ("Under the correct legal standard, genericness of the 'fireball' designation had to be tested in April 2007[.]"). Bullshine's argument is premised on its false assertion that Sazerac did not "attempt to monopolize" the FIREBALL mark until 2007.[12] BB 25. The Board expressly found, however, that Sazerac "was using FIREBALL

[9] Although section 1064(3) does not permit cancellation of the registrations at issue for being generic *ab initio, see* Section II, *supra*, the Board nevertheless made findings as to the time of the registrations, *see, e.g.*, Appx49-51.

[10] The Board also referenced the 2001-2004 time-period, Appx49, reflecting the time between when the '432 Registration's application was filed and when the registration issued. Appx643; Appx726-732.

[11] Bullshine notably never argued that April 2007 was the correct period for assessing genericness in its briefing before the Board. *See generally* Appx6152-6188; Appx6291-6462.

[12] Ignoring the evidence of Sazerac's use of FIREBALL as a trademark before 2007, Bullshine relies on Sazerac's "date of first use" statement from the application that led to the '110 Registration. BB 25. This statement says that Sazerac first used FIREBALL "***[a]t least as early*** as 04/00/2007." Appx3184. Sazerac's "first use" statement is not a concession that its first use was actually in 2007 because "[t]he PTO allows an applicant to state a date of first use ***not as a date certain but . . . 'at least as early as' a named date***. . . . [S]uch 'indefinite phraseology' . . . give[s] notice that, when called upon to do so, applicant may undertake to prove a date earlier than the one specifically set forth.'" *Hydro-Dynamics, Inc. v. George Putnam & Co.*, 811 F.2d 1470, 1473 (Fed. Cir. 1987) (internal citations omitted).

as a mark for its cinnamon whisky product" ***by "2001."*** Appx22. This factual finding is supported by substantial evidence in the form of press releases demonstrating the use of the mark at that time and the declaration of Sazerac's brand manager. *See* Appx22-23 (including screen shot of Appx3119-3120); *see also* Appx39 (referring to press release (citing Appx3119-3120)); Appx20 (citing Appx638 (including photo of DR. MCGILLICUDDY'S FIREBALL label showing TM designation next to FIREBALL term)).[13]

In addition, even if the Board had found that 2007 was the time of first use, Bullshine's argument fails to apply the proper legal standard. Where, as here, the only argument on appeal is whether a mark is generic *ab initio*, and thus not registrable, the Court focuses on "the factual situation ***as of the time when registration is being sought***," not the time of first use. *In re Chippendales USA, Inc.*, 622 F.3d 1346, 1354 (Fed. Cir. 2010) (quoting *In re Morton-Norwich Prods., Inc.*, 671 F.2d 1332, 1344 (C.C.P.A. 1982)).

Therefore, the Board did not err by failing to confine its inquiry to April 2007. *Contra* BB 23.

---

[13] Bullshine also admitted that "Sazerac first used the 'Dr. McGillicuddy's Fireball' designation in 2001." Appx6291.

### 2. Substantial Evidence Supports the Board's Rejection of Bullshine's Theories of Genericness

Bullshine proffered two theories of genericness before the Board: "the first theory is that FIREBALL is generic for a 'subcategory' or 'part' of the genus (alcoholic drinks containing whiskey and liqueurs that attempt 'to replicate the taste of Fireball candy'), and the second theory is that FIREBALL is generic for a 'key aspect' of the genus (the 'fireball' flavor)." Appx36. Due to their similarities, the Board addressed the two theories together—focusing on "whether consumers use or understand FIREBALL to refer to a 'subcategory,' 'part' or 'key aspect' of the genus, specifically whisky or liqueur with a spicy/sweet cinnamon or ATOMIC FIREBALL-type flavor." *Id.* In so doing, the Board found that, even though "the evidence of genericness . . . is significant," "[t]he contrary evidence that FIREBALL is perceived as a mark for [Sazerac's] cinnamon-flavored whisky is also significant." Appx37.

Specifically, the Board found that FIREBALL was not generic at the times of registration because it reflects neither a subcategory nor a flavor of the whisky/liqueur genus. *See, e.g.*, Appx43 ("[T]he term 'fireball' does not always or even consistently refer to whisky or liqueur-based beverages having that flavor." (citing Appx1336-1340 (Bullshine's expert))). Rather, it found that "'fireball' alcoholic beverages ***do not all share the same flavors***," and "they are ***based on different liquors, liqueurs and even meads falling outside the genus***[.]" Appx43;

*see also* Appx49 ("[M]any of the recipes do not contain whiskey, or liqueur, and would not replicate the ATOMIC FIREBALL . . . flavor."). Substantial evidence supports these findings.

***Recipes.*** The Board found—based on its review of dozens of third-party recipes from both before the registration sought in 2001 and before the registration sought in 2008 (including those cited by Bullshine on appeal, BB 27)—that "'Fireball' recipes are not always consistent," as "[s]ome do not include whiskey, and others may not even have a spicy/sweet cinnamon flavor." Appx17-19 (citing Appx3470; Appx3505; Appx3590; Appx3613; Appx4052-4057; Appx4060; Appx4065-4066).

For example, the Board considered recipes from before the time of the registration sought in 2001 (and issued in 2004), *see, e.g.*, Appx16 (citing Appx3465 (1995); Appx3468 (1997); Appx3489 (2001)); Appx19 (citing Appx3470 (1997); Appx17 (citing Appx3505 (2003)), which fail to include any whiskey. The Board further considered recipes from before the time of the 2008 registration, *see, e.g.*, Appx17-19 (citing Appx3505 (2003); Appx4056 (2007); Appx4066 (2006); Appx4057 (2008)); Appx42 (discussing Appx3742 (2008)),[14] which either fail to include whiskey or include rum, Kahlua, vodka, tequila, or

---

[14] This pre-2008 evidence also supports the Board's finding that FIREBALL was not generic prior to the 2007 date upon which Bullshine relies on appeal.

mead. The Board found—based on its review of the recipes—that these drinks would "not have the whisky/liqueur flavor of [Sazerac's] FIREBALL cinnamon whisky."[15] Appx42-43.[16] Rather, as the Board correctly found, recipes comprising, e.g., (1) "Sambuca," "Tequila," and "Tabasco Sauce," Appx4060, (2) "Kahlua" and "Ouzo," Appx4053, and (3) "cinnamon schnapps" and "Bacardi 151-proof rum," Appx3505, produce different flavors. *See* Appx17-19 (citing same); *see also* Appx43 ("[T]he recipes that include brandy, Kahlua, ouzo or Sambuca do not include cinnamon or other ingredients that would be expected to create a cinnamon flavor."); Appx1336 (Bullshine expert discussing flavor of Kahlua, Ouzo).

Moreover, as the Board found, certain "Fireball Mead" recipes existing at the time of the 2008 registration demonstrate both that "fireball" is not a subcategory of the whiskey/liqueur genus (because mead is not a whiskey or

---

[15] Broad classes of non-whiskey liq**uo**rs such as rum, tequila, and vodka also fall outside of the claimed genus, as they are neither a whiskey nor a liq**ueu**r. *See* Appx1607-1622 (Chapter 4 from The Alcohol and Tobacco Trade Bureau's The Beverage Alcohol Manual defining class and type designations for alcohols).

[16] The Board further found that "[i]t is not at all clear that recipes featuring only a whisky or Southern Comfort and Tabasco sauce would result in a beverage with a cinnamon flavor such as that found in [Sazerac's] FIREBALL cinnamon whisky," and thus it may be "that precious few 'fireball' cocktail/shot/shooter recipes" result in a drink that tastes like the "ATOMIC FIREBALL" candy. Appx42 n.13 (referring to sentence citing Appx3259; Appx3465; Appx3468; Appx3489; Appx3498; Appx3508; Appx3519; Appx3523; Appx3525; Appx3527; Appx3544; Appx3551; Appx3563; Appx3565; Appx3567; Appx3577; Appx3582; Appx3584; Appx3670; Appx3694; Appx3701; Appx3707).

liqueur) and "fireball" is not a particular flavor (as the fireball mead recipes would produce a "mead flavor"):

> Neither the "Fireball Mead" recipe containing cinnamon oil [Appx3742, Appx3744] nor "Chuck's Fireball Mead" "with cinnamon and cinnamon candy added" [Appx3739] are part of the whisky/liqueur genus, and they would have a mead flavor rather than the "sweet/spicy cinnamon" whisky or liqueur flavor for which [Bullshine] contends that FIREBALL is generic.

Appx42 (citing Appx3719 at ¶17; Appx3216); *see also* Appx16-17; Appx49. Substantial evidence, including the recipes themselves, supports this finding. *See, e.g.*, Appx3505; Appx3470; Appx3590; Appx3613; Appx4052-4057; Appx4060; Appx4065-4066.

Furthermore, as the Board correctly noted, Appx34, Bullshine bore "the burden of proving that the term is generic . . . by a preponderance of the evidence." *Real Foods*, 906 F.3d at 128. Thus, the fact that Bullshine failed to present evidence to the Board that these recipes would result in drinks having a flavor "such as that found in [Sazerac's] FIREBALL cinnamon whisky," Appx42 n.13, is itself substantial evidence supporting the Board's finding that FIREBALL does not denote such a flavor. *See Singh v. Brake*, 48 F. App'x 766, 773-74 (Fed. Cir. 2002) (holding "substantial evidence supports the Board's key finding" on conception when "[t]he burden was on [the inventor] to prove that he as the inventor had a definite and permanent idea of how to make the construct" and did not do so).

***Bartending Books/Entries.*** Before the Board, Bullshine focused on recipes in "bartending books" and specialized "internet bartending guides." BB 28-31. The Board considered this evidence and found:

> (1) "the vast majority of the recipes [Bullshine] relies upon were published in bartending or alcoholic beverage publications, or specialized websites," Appx49;
>
> (2) Bullshine failed to present "evidence that a large number of relevant consumers were exposed to these recipes," Appx49;[17] and
>
> (3) it is likely that "relatively few relevant consumers encountered these recipes directly," Appx49-50.

Substantial evidence—namely the ratings/votes/comments for the websites and the sales data of the books—supports the Board's findings about those publications.

For example, as Sazerac explained to the Board, *see* Appx3758, the recipes appearing on the specialized websites Bullshine cites had little to no ratings, votes, or comments between 1997 and the present, indicating that nearly no one had seen them. *See, e.g.*, Appx49 (citing Appx3470 ("9 votes"); Appx3638 ("0 comments")); Appx16 (citing Appx3468 ("23 votes"); Appx3523 ("No Votes"); Appx3525 ("No Votes"); Appx3567 ("No votes yet!"); Appx3582 ("Read: 160 times"); Appx3694 ("[ ] votes"); Appx3701 ("Rated 1 times")).[18] Bullshine

---

[17] The Board found, and Bullshine does not dispute, that "the 'relevant public' consists of consumers of whisky and liqueurs." Appx35.

[18] Though not expressly cited by the Board, the Board's findings are further supported by Bullshine's co-founder, Mr. Kramer, and its expert, Ms. Kimmerle, who testified to being unfamiliar with these websites and unknowledgeable as to

notably cites no evidence in the record identifying the number of relevant consumers who were exposed to the recipes it highlights on appeal by the time of Sazerac's registration. *See generally* BB 23-36.

Moreover, despite citing a host of bartending books, BB 28-30,[19] Bullshine provided sales data for only three Harvard University textbooks. *See* BB 28-29. There is no legitimate dispute that these books illustrate use by the trade, not the relevant public (consumers of whisky and liqueurs, Appx35). *See* Appx3760. Nevertheless, even if relevant, Bullshine's proffered sales data demonstrates that "the 1994 Harvard Book," BB 28, was sold only 25,670 times, Appx5707-5708; the "1999 Harvard Book," BB 28, was sold only 19,823 times, Appx5708; and the third Harvard book was sold only 24,700 times, *id.*[20] The meager yearly sales of these textbooks to students in "bartending course[s] at Harvard University," BB

---

whether they were popular or viewed by anyone. *See* Appx1314 (96:13-19); Appx1321 (103:6-22); Appx1323 (105:7-13); Appx1324-1325 (109:17-110:15); Appx1326-1329 (111:19-114:4); Appx1332-1334 (120:17-122:4); Appx1252-1253 (185:15-186:15); Appx1254-1255 (188:12-189:16); Appx1260-1268 (195:1-203:20).

[19] Many of Bullshine's cited "bartending books" post-date the times of registration (and the 2007 date on which Bullshine relies), *see, e.g.*, BB 30 (citing "bartending books" from 2010, 2015, 2019), and are thus irrelevant to the only argument Bullshine makes on appeal for this additional reason. *See, e.g.*, BB 18-19, 21 n.2 (arguing only that "the designation is generic in the first instance").

[20] Bullshine's sales data from ***after*** the dates the two registrations were sought (2001-2004 for the '432 Registration and 2008 for the '110 Registration) is irrelevant because Bullshine appeals only the Board's finding that FIREBALL was not generic *ab initio*. *See, e.g.*, BB 18-19, 21 n.2.

29—who are not a representative segment of the relevant public—does not demonstrate that the Board's findings lack substantial evidence. Indeed, the Board considered these Harvard textbooks, *see, e.g.*, Appx16 (citing Appx3465; Appx3551), and still found that it is likely that "relatively few relevant consumers encountered these recipes directly," Appx49-50.

***Consumer Exposure to Trademark Usage.*** The Board also found—and Bullshine fails to dispute—that "the record shows more relevant consumer exposure at the time of registration to trademark use of FIREBALL than to non-trademark use of the term." Appx50; *see also id.* ("[A]t the time of registration . . . FIREBALL was known by many relevant consumers as a trademark[.]"). For example, "the record makes clear that at the time of registration, ATOMIC FIREBALL was the trademark for a popular candy that publications assumed consumers would remember from their childhoods, and DR. MCGILLCUDDY'S FIREBALL was an at least modestly successful whisky/liqueur beverage." *Id.* Moreover, as the Board noted, after rebranding to only FIREBALL in 2007 (i.e., before the 2008 registration), "FIREBALL cinnamon whisky's popularity skyrocketed in the United States." Appx24 (citing Appx640; Appx646-647).

These findings are supported by substantial evidence in the form of declarations, sales figures, and awards. *E.g.*, Appx5 (citing Appx4500-4617); Appx4513-4514 ("FIREBALL liqueur/whisky earned a gold, silver, or bronze

medal in the tasting competition of the San Francisco World Spirits Competition in 2001, 2003, 2004, 2006, and 2007 . . . . Sazerac also earned bronze medals for the packaging design of its DR. MCGILLICUDDY'S FIREBALL whisky in the 2004 and 2006 design competition of the San Francisco World Spirits Competition[.]"); Appx4594-4603; Appx640; Appx646.

***Lack of Evidence That Competitors Used FIREBALL.*** Sazerac explained to the Board that its "competitors that sell spicy, sweet cinnamon-flavored alcohol do not use FIREBALL, but rather describe their products as having 'spicy' and/or 'sweet' cinnamon flavor profiles." Appx6232 (citing Appx662-663 (Henry Decl. ¶¶76-77); Appx1939-1957); *see also* Appx3765; Appx3768. Without evidence to the contrary from Bullshine, the Board found that "[t]here is no evidence that any of Applicant's competitor's in the whisky or liqueur fields used the term FIREBALL at the time of registration." Appx50-51; Appx51 n.16 (identifying only Marie Brizard who had used FIREBALL for liqueurs but explaining that Sazerac had acquired the mark (citing Appx641; Appx2416-2419)). On appeal, Bullshine likewise identifies no such competitor. Thus, substantial evidence supports this finding.

***Ms. Kimmerle's Testimony.*** Bullshine also relied—and continues to rely—on "testimony from Ms. Kimmerlee [sic]." BB 34-35. The Board considered Ms. Kimmerle's opinion and found, with substantial evidence support, that she was

unqualified to offer opinion "about the meaning of the term 'fireball' to consumers." Appx47 ("There is an obvious mismatch between Ms. Kimmerle's confectionery and food-related qualifications and her opinions about the meaning of the term 'fireball' to consumers." (citing Appx3064)). "Decisions about credibility of witnesses and weight of evidence are committed to the sound discretion of the Board[.]" *Tiger Lily Ventures Ltd. v. Barclays Cap. Inc.*, 35 F.4th 1352, 1366 (Fed. Cir. 2022); *see also Shoes by Firebug LLC v. Stride Rite Children's Grp., LLC*, 962 F.3d 1362, 1371 (Fed. Cir. 2020).

In sum, the Board found:

> (1) the recipes proffered by both parties weigh against finding FIREBALL to be generic at the times of registration, Appx17-19; Appx41-43;
>
> (2) the bartending books relied upon by Bullshine do not demonstrate that FIREBALL was generic to the relevant public at the times of registration, Appx49;
>
> (3) the relevant public was more likely to come into contact with trademark, rather than non-trademark, usage of FIREBALL at the times of registration, Appx50;
>
> (4) the parties' competitors that sell spicy, sweet cinnamon-flavored alcohol do not use the term FIREBALL to describe their products, Appx50-51; and
>
> (5) Bullshine's expert's opinions were not credible and should be discounted, Appx47-48.

Because substantial evidence supports each of these findings, the Board's ultimate finding that FIREBALL was not generic at the times of registration is also supported by substantial evidence. *See Pennington Seed*, 466 F.3d at 1058

(holding that the Board's genericness finding was supported by substantial evidence because substantial evidence supported its subsidiary finding that the term was a name for a "variety of grass seed").

### 3. Bullshine's Remaining Arguments Do Not Show That the Board's Findings Lack Substantial Evidence

None of Bullshine's remaining arguments concerning (1) "The Guest" movie, (2) Atomic Fireball candy, and (3) Sazerac's alleged prior "concessions," demonstrate that the Board's finding that FIREBALL was not generic at the times of registration lacks substantial evidence. Indeed, precisely because the Board found that the evidence of genericness was "mixed," it concluded that Bullshine failed to carry its burden of proving that FIREBALL was generic. Appx50. When evaluating competing evidence, the Board may credit one conclusion over the other, as it did here. *See In re Bayer Aktiengesellschaft*, 488 F.3d 960, 970 (Fed. Cir. 2007) ("[T]he Board's decision to favor one conclusion over the other is the type of decision that must be sustained by this court as supported by substantial evidence."); *Hoover Co. v. Royal Appliance Mfg. Co.*, 238 F.3d 1357, 1361 (Fed. Cir. 2001).

This Court should not "second-guess the Board's assessment of the evidence." *See Shoes by Firebug*, 962 F.3d at 1371 (quoting *Velander v. Garner*, 348 F.3d 1359, 1378 (Fed. Cir. 2003)); *Tiger Lily*, 35 F.4th at 1366 ("Decisions about . . . weight of evidence are committed to the sound discretion of the

Board[.]"). In any event, the Board considered the arguments Bullshine reiterates on appeal (BB 23-36) and properly rejected them.

***"The Guest" Movie.*** "The Guest" movie does not show that FIREBALL reflects a "subcategory" of the claimed genus. *Contra* BB 31-32. The Board considered this movie, *see* Appx28, and did not err by failing to find that it overrides the other evidence showing that FIREBALL was not a generic term at the times of registration. "The Guest" premiered in 2014—more than 6 years after the times of registration. *See* BB 31-32; *see also id.* at 5-6; Appx28. Thus, Bullshine's reliance on a 2014 movie and its viewership between then and now is irrelevant to whether FIREBALL was generic at the times of registration.[21]

Nevertheless, "The Guest" fails to demonstrate that FIREBALL reflects a "subcategory" of the claimed genus. First, Bullshine introduced no evidence that it had any impact on the relevant public. The film, which is based on a script written by a single person, opened in only nineteen U.S. theaters and was a flop. *See* Appx6024; *see also* Appx6224. Bullshine even acknowledges that it played in a paltry "53 theaters," BB 32, representing a fraction of a percent of U.S. movie theaters, at "its widest point of theatrical distribution," BB 5.[22] Moreover,

---

[21] It is also irrelevant in 2007—the date Bullshine incorrectly argues for on appeal.

[22] Although Bullshine asserts these theaters were in the U.S., BB 32, the evidence shows 53 theaters in the "U.S. ***and Canada***." Appx6024; *see also* Appx6224.

**CONFIDENTIAL INFORMATION HAS BEEN REMOVED FROM THIS PAGE**

Bullshine's evidence of home viewership is self-contradictory. *Compare* BB 5 ("THE GUEST was purchased (EST) or rented (VOD) for home viewing a total of [redacted] times"), *with* BB 32 ("The GUEST . . . has had ***664,106*** home views.").

Second, Bullshine introduced no evidence that the drink ordered in "The Guest" reflects the relevant public's view of the term. Indeed, the marketing team for "The Guest" actually attempted to partner with Sazerac to promote the film and use "Fireball Whisky . . . as the key liquor in the drink of the main character." Appx5396; Appx5364-5368. Sazerac declined the offer and "The Guest" relied on a recipe without FIREBALL whisky for its drink. Appx5395. Bullshine introduced no evidence, furthermore, that "The Guest" used the term "fireball" in connection with the drink in the movie because the term was a generic subcategory of a drink.

***Atomic Fireball Candy.*** Bullshine also relies on the fact that Sazerac's FIREBALL whisky tastes like the Atomic Fireball candy as alleged support for its argument that FIREBALL denotes flavor. *See* BB 33-34. However, this similarity in taste does not mean that the term FIREBALL denotes a specific flavor associated with the two. Indeed, the Board found that third-party recipes "directly contradict [Bullshine's] theor[y] that FIREBALL . . . refers 'to a 'key aspect' of the goods at issue – namely the flavor,'" Appx49 (internal citations omitted), because, among other reasons, "precious few 'fireball' cocktail/shot/shooter

recipes" result in a drink that tastes like the "ATOMIC FIREBALL" candy, Appx42 n.13. Substantial evidence—e.g., the recipes themselves—supports that finding. *See* Section II.B.2, *supra*. Moreover, Bullshine's argument that "'fireball' is necessary to describe" a whiskey and/or liqueur that tastes like the Atomic Fireball candy, BB 35, is incorrect, unsupported, and contradicted by the record below, which demonstrates that Sazerac's competitors that sell spicy, sweet cinnamon-flavored alcohol do not use the term "fireball." *See* Appx50-51; Appx3765; Appx3768; Appx662-663; Appx1939-1957.

***Sazerac's Prior "Concessions."*** Sazerac's disclaimer of FIREBALL in 2001 and prior allegation that FIREBALL was generic are irrelevant. *See* BB 23-25, 27. First, as the Board correctly noted, any "concession that FIREBALL is merely ***descriptive*** [i.e., the disclaimer] is not a concession that the term is generic[.]" Appx38 (citing *In re La. Fish Fry Prods., Ltd.*, 797 F.3d 1332, 1335 (Fed. Cir. 2015)). Second, even though Sazerac asserted that FIREBALL was generic as a defense in a prior litigation, the case settled and Sazerac purchased its adversary's rights in FIREBALL before the assertion was accepted. Appx22. Thus, Sazerac is not estopped from arguing that FIREBALL is not generic here. *See InterDigital Commc'ns, Inc. v. ZTE Corp.*, 711 F. App'x 998, 1005 (Fed. Cir. 2017) ("Judicial estoppel applies 'where a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position[.]'").

Although the Board was free to consider—and did consider—Sazerac's prior statements, *see* Appx37-40, it correctly noted that, "[u]nder no circumstances, may a party's opinion . . . relieve the decision maker of the burden of making his own ultimate conclusion on the entire record." Appx39 (quoting *Interstate Brands Corp. v. Celestial Seasonings, Inc.*, 576 F.2d 926, 929 (C.C.P.A. 1978)); *see also Specialty Brands, Inc. v. Coffee Bean Distribs., Inc.*, 748 F.2d 669, 673 (Fed. Cir. 1984) ("[T]hat a party earlier indicated a contrary opinion . . . in a similar proceeding involving similar marks and goods is a fact, and that fact may be received in evidence as merely illuminative of shade and tone in the total picture confronting the decision maker." (quoting *Interstate Brands*, 576 F.2d at 929)).

Considering the full evidentiary record, Sazerac's prior positions do not show that the Board's finding that FIREBALL was not generic at the times of registration lacks substantial evidence. Appx51; Appx66.

### C. Because FIREBALL Was Not Generic at the Times of Registration, Bullshine's Three Arguments Must Be Rejected

All three of Bullshine's arguments on appeal presuppose that FIREBALL was generic "in the first instance[.]" BB 21 n.2 (stating its challenge to Sazerac's registrations were not allegations of genericide). As explained above, Bullshine's argument challenges the mark at the times of registration. *See* Sections II.A, II.B.1, *supra*. However, because the Board found that FIREBALL was not generic

at the times of registration, and substantial evidence supports this finding, this Court should reject each of Bullshine's arguments.

### 1. The Board Did Not Err in Allowing Sazerac "To Remove" FIREBALL from the Public Domain

Bullshine's primary argument requesting reversal of "the Board's conclusion that the 'fireball' designation ***is not generic***," BB 21, rests on Bullshine's incorrect belief that FIREBALL ***was generic at the times of registration***. Bullshine argues that the Board failed to focus "on whether the term was generic for the goods at issue prior to the proprietor's trademark use and registration," BB 18-19, and thus erred in permitting Sazerac to remove a mark that was generic at the times of registration from the public domain, BB 15. It did not.

Bullshine's five-page discussion of the regional circuits' genericness case law is inapposite. *See* BB 15-19. There is no dispute that "[g]eneric terms are not registrable." *In re Cordua Rests., Inc.*, 823 F.3d 594, 599 (Fed. Cir. 2016) (quoting *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 194 (1985)); BB 18. Accordingly, if section 1064(3) were to permit cancellation due to genericness *ab initio*, one aspect of the inquiry would be on whether FIREBALL was generic at the times of its registration. *See* BB 18.

Contrary to Bullshine's argument that the Board focused on the wrong time period, the Board clearly examined whether FIREBALL was generic at the times of registration, *see* Appx49-51 (section titled, "***The Time of Registration***") and

found that "FIREBALL was not generic ***at the time of registration***." Appx51.[23] The Board did not base this finding on Sazerac's "advertising and commercial success," *contra* BB 20, and did not credit "de facto secondary meaning" in order to reach it, *contra* BB 21. *See* Appx49-51; Section II.A, *supra*.

Because substantial evidence supports the Board's finding that FIREBALL ***was not generic*** at the times of registration, the Board—by definition—could not have legally erred in permitting Sazerac "to remove" FIREBALL from "the public domain" because it ***was generic*** at the times of registration. *Contra* BB 15; *see also Pennington Seed*, 466 F.3d at 1058 (affirming Board's refusal to register term only after finding that "substantial evidence in the record support[ed]" determination that the term was already generic at that time). Bullshine's argument is circular and nonsensical, and the Court should reject it.

#### 2. The Board Did Not Err in Finding FIREBALL Not Generic at the Times of Registration in View of Its Factual Findings

Bullshine's second argument—that the "Board erred, as a matter of law, by failing to conclude that the 'fireball' designation is generic . . . ***given its factual findings***," BB 22-36—is similarly predicated on Bullshine's mischaracterizations

[23] Bullshine incorrectly asserts that the Board is "confusing this genericness case with a genericide case" by separately considering "evidence up through the time of trial." BB 21 n.2 (quoting Appx34). The Board's analysis of whether FIREBALL had become generic by the time of trial (i.e., "genericide"), Appx51, does not take away from the Board's separate evaluation of whether FIREBALL was generic at the times of registration, Appx49-51.

of two of the Board's factual findings. Specifically, Bullshine alleges that the Board legally erred in failing to find FIREBALL generic in the first instance because the Board allegedly found (1) that "'fireball' reflects a subcategory of the claimed goods," and (2) that "it denotes a flavor for the claimed goods." BB 22. However, as previously discussed, the Board made no such findings. *See* Sections II.A and II.B.2, *supra*. Rather, the Board found that "'fireball' alcoholic beverages ***do not all share the same flavors***," and that "they are ***based on different liquors, liqueurs and even meads falling outside the genus***[.]" Appx43; *see also* Appx49. Those findings are supported by substantial evidence. *See* Section II.B.2, *supra*.

Thus, the Board did not—and could not—err "as a matter of law, by failing to conclude that the 'fireball' designation is generic for whiskeys and liqueurs given its factual findings," *contra* BB 22, and this Court cannot reverse based on findings the Board never made. *See Sec. & Exch. Comm'n v. Chenery Corp.*, 318 U.S. 80, 87-88 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based. . . . For purposes of . . . reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency.").

#### 3. Bullshine's "Heightened and Exacting Standard" Is Irrelevant and Inapplicable

Bullshine's brief concedes that its "heightened and exacting standard" argument is relevant only if the Court finds—contrary to the Board—that

FIREBALL was generic at the times of registration, and that a merchant is allowed "to remove a generic designation from the public domain" if "the merchant created de facto secondary meaning." BB 36-37. Because substantial evidence supports the Board's finding that "FIREBALL was not generic at the time of registration," Appx51; *see* Section II.B, *supra*, and because there is no dispute that "[g]eneric terms are not registrable," Sections II.B.3 and II.C.1, *supra*, Bullshine's argument is irrelevant.

Moreover, a "heightened and exacting standard" applies to descriptive terms, not generic ones. *See, e.g.*, *Royal Crown Co., Inc. v. The Coca-Cola Co.*, 892 F.3d 1358, 1365 (Fed. Cir. 2018) ("Where a mark sits on a sliding scale of descriptiveness impacts the burden a proposed registrant must bear with respect to its claim of acquired distinctiveness."). Any discussion of descriptiveness or acquired distinctiveness here is improper because Sazerac's registrations of FIREBALL are valid and "incontestable." *See* Appx1601-1604. The mark therefore cannot be challenged as being merely descriptive. *Park 'N Fly*, 469 U.S. at 196 ("Mere descriptiveness is not recognized . . . as a basis for challenging an incontestable mark.").

Finally, Bullshine fails to identify ***any*** instance in which the Board relied on *de facto* secondary meaning in rejecting its arguments that FIREBALL was generic at the times of registration (or any other time period). *See* BB 36-38 (citing no

examples of the Board's purported reliance on secondary meaning).[24] Indeed, Bullshine concedes that the Board faithfully noted that "'[a] generic term that enjoys de facto secondary meaning is still unregistrable[.]'" BB 20 n.1 (quoting Appx47 n.14). To the extent that Bullshine is referring to Sazerac's evidence of "sales and advertising figures," BB 37, the Board did not rely on that evidence to find that FIREBALL was not generic at the times of registration. Appx49-51. Thus, when the Board separately considered such evidence in determining that FIREBALL had not become generic by the time of trial, Appx51—a finding Bullshine does not challenge on appeal—it was not using de facto secondary meaning to remove a generic mark from the public domain. *Contra* BB 36-38.

Thus, the Court should reject Bullshine's heightened standard argument.

### D. The Court Should Affirm the Board's Finding That FIREBALL Was Not Generic at the Time of Trial

Despite challenging only the Board's finding that FIREBALL was not generic at the times of registration, BB 21 n.2, Bullshine litters its brief with cites to post-registration materials. *See, e.g.,* BB 5-6 (discussing "The Guest" movie which came out in 2014), 31-32 (same), 29 (citing sales of Harvard book from 2005-present), 30 (citing bartending books from 2010, 2015, and 2019).

[24] Bullshine's discussion of Ms. Butler's survey, BB 37-38, is irrelevant, as the Board did not rely on it in finding that "FIREBALL" was not generic at the times of registration or at the time of trial. Appx43-47; Appx49-51; *Chenery*, 318 U.S. at 87.

Bullshine's opening brief does not challenge the Board's finding that FIREBALL was not generic at the time of trial (i.e., 2021-2022) or argue that the Board's finding on this issue lacks substantial evidentiary support. *See generally* BB. Rather, Bullshine argues that neither the Board nor the Court should even "examine the evidence up through the time of trial," BB 21 n.2 (quoting Appx34), because—according to Bullshine—this case does not involve genericide. *See* BB 1, 13, 15; *see also* BB 18 ("The correct legal analysis, thus, focuses on whether the term was generic for the goods at issue '***prior to*** the proprietor's trademark use and registration.'" (internal citation omitted, emphasis added by Bullshine)). Bullshine thus waived any argument that the Board's findings at the time of trial lack substantial evidentiary support. *Bozeman*, 955 F.3d at 974.

Nevertheless, substantial evidence supports the Board's finding that FIREBALL was not generic at the time of trial. Appx51. First, substantial evidence supports the Board's finding that Sazerac has been using FIREBALL as a mark since 2001. *See* Appx22-23 ("[Sazerac] was using FIREBALL as a mark for its cinnamon whisky product, and using 'cinnamon whisky' to identify the product's category, as shown in the following 2001 press release[.]" (citing Appx3119-3120); Appx39 (citing same). Specifically, the cited press release supports the Board's finding. Appx3119-3120.

Second, substantial evidence supports the Board's finding that Sazerac "successfully enforced its asserted rights in FIREBALL against many of the third-party users of the term." *See* Appx27-28. This evidence includes the cited testimony and related documentation, which provide examples of enforcement efforts. *See id.* (citing Appx3782-3783 (Henry Dec. II ¶¶ 7, 8, 10); Appx3791-3795 (arbitration decision); Appx3800-3814 (enforcement letters); Appx4515-4516 (Henry Dec. III ¶¶ 29-31); Appx4619-4665 (enforcement agreements)).

Third, the Board found that because Sazerac both used and enforced its rights in the FIREBALL trademark since 2001, Sazerac's "FIREBALL cinnamon whisky had become significantly more popular than it was at the time of registration, as reflected by sales and advertising figures and media attention." Appx51. For example, the Board found that "in 2012," "FIREBALL whisky was rated the '#1 shooter in growth,'" and in "'2014, FIREBALL whisky became the #1 shot by volume in the U.S.'" Appx24-25 (quoting Appx646-647). Moreover, "'[a]s of October 2019, FIREBALL whisky was ranked the #1 selling whisky nationwide, as it had also been in 2017 and 2018, after holding the #2 position in 2015 and 2016.'" Appx25 (quoting Appx646-647, citing Appx797-798). The testimony and related documentation that the Board cited are substantial evidence support for these findings.

The Board also found that Sazerac's FIREBALL whisky "has received substantial unsolicited media attention," citing over 100 pages of material as support. *See* Appx25 (quoting Appx647, citing Appx804-908). Such media attention includes, "[f]or example, a 2016 BUSINESS INSIDER article about FIREBALL whisky" that discusses how Sazerac grew its FIREBALL "sales from $1.9 million to $160 million in under 5 years[.]" Appx25 (citing Appx647-648; Appx858-908). Moreover, Sazerac's FIREBALL whiskey has "celebrity endorsers" including "Chris Pratt, Ed Sheeran, Miranda Lambert, and the bands Florida Georgia Line . . . and Kings of Leon." Appx27 (citing Appx652; Appx804-857).

Finally, the Board found that Sazerac's "gross sales from 2011-2019 are significant," and that its "marketing expenses from 2011-2019 are as well[,]" relying on Sazerac testimony. Appx25 (citing Appx654-655; Appx661); Appx631. Further supporting this finding, Bullshine's own co-founder, Mr. Kramer, agreed that Sazerac's FIREBALL whiskey is a "successful brand of whiskey" and is "[s]old a lot." *See* Appx26 (citing Appx1230-1231).

Accordingly, the Court should affirm the Board's finding that FIREBALL was not generic at the time of trial. *See* Appx51.

## III. THE COURT SHOULD REVERSE THE BOARD'S FINDING THAT FIREBALL IS NOT FAMOUS AND REMAND SAZERAC'S LIKELIHOOD OF CONFUSION CLAIM

"Where a likelihood of confusion exists as to the origin of goods traveling under a particular mark, that mark cannot be registered." *Bose*, 293 F.3d at 1369. This Court "review[s] the Board's overall determination of likelihood of confusion without deference." *Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, 908 F.3d 1315, 1319 (Fed. Cir. 2018). However, a determination into "[w]hether a likelihood of confusion exists" is "aided by application of the thirteen *DuPont* factors," *id.* (citing *In re E. I. DuPont DeNemours & Co.*, 476 F.2d 1357, 1361 (C.C.P.A. 1973)), each of which "presents a question of fact" reviewable "for substantial evidence . . . on appeal," *Bose*, 292 F.3d at 1371.

"In every case turning on likelihood of confusion, it is the duty of the examiner, the board and this court to find, upon consideration of ***all*** the evidence, whether or not confusion appears likely." *DuPont*, 476 F.2d at 1362 (emphasis in original). "In discharging this duty, the thirteen *DuPont* factors 'must be considered' 'when [they] are of record.'" *In re Guild Mortg. Co.*, 912 F.3d 1376, 1379 (Fed. Cir. 2019) (internal citations omitted). "This is true even though 'not all of the *DuPont* factors are relevant or of similar weight in every case.'" *Id.* (quoting *In re Dixie Rests., Inc.*, 105 F.3d 1405, 1406 (Fed. Cir. 1997)); *see also Hewlett-Packard Co. v. Packard Press, Inc.*, 281 F.3d 1261, 1265 (Fed. Cir. 2002).

"Fame of an opposer's mark or marks, if it exists, plays a 'dominant role in the process of balancing the *DuPont* factors,'" and "famous marks thus enjoy a wide latitude of legal protection." *Bose*, 293 F.3d at 1371 (internal citations omitted). "A famous mark is one 'with extensive public recognition and renown.'" *Id.* (quoting *Kenner Parker Toys Inc. v. Rose Art Indus., Inc.*, 963 F.2d 350, 353 (Fed. Cir. 1992)). "[W]hen a product reaches the marketplace under a famous mark, special care is necessary to appreciate that products not closely related may nonetheless be confused as to source by the consumer because of the fame of the mark." *Id.* at 1377.

Here, the Board erred in finding that FIREBALL had not achieved fame because of an alleged lack of "context" for Sazerac's "advertising and sales figures," or for "how such figures . . . compare with that for other brands' of whisky and liqueurs." Appx57 (internal citations omitted). Despite being factually incorrect, comparative sales and advertising evidence from "other brands" is not required for a finding of fame under this Court's precedent.

Given the Board's existing findings, when the proper standard for fame is applied, "only one conclusion can be reached regarding the fame of the [FIREBALL] mark"; it is famous and "thus entitled to broad protection." *Bose,* 293 F.3d at 1376. Thus, the Court should reverse the Board's finding of no fame. Moreover, because fame "plays a 'dominant role in the process of balancing the

*DuPont* factors,'" *id.* at 1371, the Board's error infected its analysis with respect to the remaining *DuPont* factors and its overall likelihood of confusion finding. Remand is thus appropriate for the Board to reassess those factors, taking into consideration FIREBALL's undeniable fame.

### A. The Board Legally Erred in Analyzing the Fame of FIREBALL

The Board correctly found that FIREBALL is "commercially strong," Appx56,[25] but erred in holding that it could not find that FIREBALL has achieved "fame." Appx57. Specifically, the Board refused to find FIREBALL famous because it claimed there was "no context for [Sazerac's] advertising and sales figures, or its other evidence of strength, such as how the figures for [products bearing Sazerac's FIREBALL mark] compare with that for other brands of whisky and liqueurs." Appx57 (internal quotations omitted).[26]

In requiring comparative sales figures, the Board misconstrued *Bose* and ignored *Omaha Steaks*—both of which clearly hold that comparative sales figures

[25] Even Bullshine conceded commercial strength. Appx56 (citing Appx1230-1231).

[26] The Board's statement that the record lacks evidence of market share ignores Bullshine's business plan. Appx1480-1481. Although the Board acknowledged this "aggressive" plan, Appx66 n.20 (citing Appx4940), it did not mention Bullshine's admissions describing (1) FIREBALL whisky as "the [redacted] Appx1480; (2) the [redacted] with an estimated [redacted] of the market, Appx1487-1488; and (3) "the [redacted] selling flavored whiskey in the U.S." Appx1490.

or market share data is not required. *Omaha Steaks*, 908 F.3d at 1320; *Bose*, 293 F.3d at 1375.

### 1. This Court's Test for Fame Does Not Require Comparative Sales and Advertising Data

One may establish fame with "direct evidence," such as "widespread consumer polls," or "indirect evidence" such as "volume of sales and advertising expenditures of the goods traveling under the mark, and by the length of time those indicia of commercial awareness have been evident." *Omaha Steaks*, 908 F.3d at 1319 (internal quotations omitted); *Bose*, 293 F.3d at 1371. Sales and advertising figures "display indirect customer awareness in two ways: first by the vast number of purchases that have been made of the marked products, and second by the extent to which the public has been bombarded with textually substantive advertising of the marked product." *Bose*, 293 F.3d at 1375.

However, because "raw numbers of product sales and advertising expenditures . . . may be misleading[,]" one must contextualize the raw statistics. *Id.* Context may include sales or advertising data for comparable products (e.g., market share data), and "the critical assessment or the general reputation of the marketed product" reflected by, for example, frequent and national exposure to the consuming public. *Id.* Although comparable or market share data is one way to contextualize sales and advertising figures, such evidence is not required. *Omaha Steaks*, 908 F.3d at 1320 (rejecting the Board's interpretation of *Bose*).

For example, in vacating and remanding to allow the Board to conduct a proper analysis of the strength factor in *Omaha Steaks*, this Court noted that "Omaha Steaks provided considerable contextual evidence of the type of advertisements and promotions it uses to gain sales," including evidence of the relevant public's exposure to the mark through direct mail, radio and television campaigns, mentions in newspapers and magazine, and on television shows. 908 F.3d at 1320-21. Similarly, in *Bose*, this Court reversed the Board's finding that the marks at issue were not famous because Bose had submitted evidence that put the sales and advertising data in context:

> [T]he sales and advertising numbers for ACOUSTIC WAVE and WAVE have to be seen both in the context of how the products are presented in the sales materials . . . and in the context of the continuous and extensive critical consideration the marked products have enjoyed. The record . . . gives evidence that ***the consuming public has been exposed frequently and nationwide to extensive descriptions of the two products***. In these contexts, the sales and advertising numbers, our historic indicia of fame, are bolstered by overwhelming evidence of ***confirmatory context***, and thus were incorrectly rejected by the Board.

293 F.3d at 1375-76.

### 2. Sazerac's Sales and Advertising Figures Exceed Those Found Sufficient in *Bose*

As an initial matter, Sazerac's sales and advertising expenditures well exceed the figures held to show fame in *Bose*. Bose had annual sales of $100 million, with total sales of $250 million of the WAVE product between 1993 and 2000—a seven-year period. *Bose*, 293 F.3d at 1373; *Bose Corp. v. QSC Audio*

**CONFIDENTIAL INFORMATION HAS BEEN REMOVED FROM THIS PAGE**

*Prods., Inc.*, Opp. No. 109,664, 2000 WL 1759738, at *3 (T.T.A.B. Nov. 16, 2000). Sazerac's sales were several times that over an eight-year period, and the Board agreed that its "gross sales from 2011-2019 are significant." Appx25; Appx661 (evidence of sales); Appx26 (citing Appx1230-1231). Similarly, on a unit basis over that same seven-year period, Bose sold 200,000 units of the WAVE product annually, with 500,000 units sold total. *Bose*, 293 F.3d at 1373; *Bose*, 2000 WL 1759738 at *3. In contrast, Sazerac sold up to FINANCIAL INFORMATION units of FIREBALL annually, with over FINANCIAL INFORMATION total bottles sold from 2011-2019. Appx25.[27]

Sazerac's advertising expenditures also dwarf those in *Bose*. Bose spent over $60 million between 1993 and 2000. *Bose*, 293 F.3d at 1373. Sazerac spent several times that over a comparable period. Appx654-655. The Board even acknowledged that Sazerac's "marketing expenses from 2011-2019 are [significant] as well." Appx25. Moreover, relying on this evidence, the Board found that FIREBALL whisky experienced "rapid success" due to Sazerac's "aggressive and extensive marketing efforts." Appx56-57 (citing Appx646-648;

[27] Every bottle sold prominently displays the FIREBALL mark. *See* Appx24 (depicting labels). The record contains other evidence that Sazerac has always emphasized the FIREBALL trademark, which the Board failed to consider. *See, e.g.*, Appx5402-5403; Appx4519-4532.

Appx661; Appx654-655; Appx796-798; Appx804-908; Appx3783-3784; Appx3815-3905).

### 3. The Board Made Findings Showing That Sazerac Put the Sales and Advertising Data in Context Under the Proper Legal Standard

Like the products in *Bose*, FIREBALL whisky has received widespread critical attention through product reviews in popular media directed to the target audience (consumers of whisky and liqueurs, Appx35). Appx25 (noting press coverage from a variety of national publications such as *Business Insider*, *Huffington Post*, *Fox News*, *Wall Street Journal*, *Entertainment Weekly*, *Bloomberg*, as well as magazines targeting beverage enthusiasts such as *Southern Beverage Journal*, *Kentucky Beverage Journal*, and *Eater*, and local press such as the *Philadelphia Inquirer*, *Nashville Business Journal*, and *Portland Press Herald* (citing Appx647; Appx804-908)); *see also Bose*, 293 F.3d at 1372 (noting product reviews and press in, e.g., the *Boston Herald*, *Chicago Tribune*, *Metrowest Business Review*, *Consumer Electronics Show Daily*, and *Popular Science*). The Board found that Sazerac's "product has received substantial unsolicited media attention," and provided as an example a 2016 *Business Insider* article about FIREBALL whisky titled "This liquor brand grew sales from $1.9 million to $160 million in under 5 years – and it's now more popular than Grey Goose or Jim Beam." Appx25 (citing Appx647-648; Appx858-908).

Indeed, FIREBALL whisky has received not only widespread critical attention, but also widespread critical acclaim. The Board acknowledged, for example, that FIREBALL won a 'Most Recommended Brand Award' in the 'Overall Spirit' and 'Shot/Shooter' categories" in 2015 and 2016. Appx27 (citing Appx799-803; Appx651). This critical acclaim is akin to the awards the radio products received in *Bose*. *Bose*, 293 F.3d at 1373 (referencing "Best of What's New Award" by *Popular Science* and "Best New Product of 1994" by *Business Week*).

This attention extends beyond traditional press to popular cultural references, including a Florida Georgia Line song that mentions FIREBALL, and the FIREBALL brand's feature as a *Jeopardy!* answer. *See* Appx26-27; Appx4510; Appx4514; Appx4606-4607. Moreover, "many shot and cocktail recipes" call for FIREBALL whisky by name, Appx19 (citing Appx3784; Appx3815-3852; Appx3906-3972), thus further showing attention, if not acclaim, by the consuming public. And, as the Board found, celebrity endorsers of FIREBALL whisky include Chris Pratt, Ed Sheeran, and Miranda Lambert. Appx27; Appx651-652; Appx923; Appx4514; Appx4605.

Like the registrant in *Omaha Steaks*, Sazerac provided evidence showing the types of advertisements and promotions it used to increase sales. 908 F.3d at 1320-21 (identifying as contextual evidence direct mail, radio and television

campaigns, and mentions in newspapers, magazine, and on television shows). For example, as the Board found, Sazerac runs a "brand ambassador program" through which ambassadors visit places where FIREBALL whisky is sold and engage with consumers. Appx26 (citing Appx649-650; Appx813). Sazerac also participates in "events at which FIREBALL whisky is highlighted," and provides "'branded novelty items,' signs and other promotional materials to bars." *Id*. (showing example of FIREBALL-branded items).[28] Such novelty items are "probative of consumer recognition of a mark." *See Bose*, 293 F.3d at 1375 ("[H]andbills passed at little cost to millions of consumers (for example, to New Yorkers exiting subway stations) may amount to the kind of advertising that is probative of consumer recognition of a mark.").

Given this widespread attention and acclaim, along with the varied and extensive types of advertising and promotions, the FIREBALL brand enjoys a renowned reputation as one of the most popular whiskies and shooters in the U.S. *See Bose* 293 F.3d at 1375 (examining the "critical assessment or the general reputation of the marked product"). Indeed, as the Board found, after rebranding to FIREBALL (without DR. MCGILLICUDDY'S), "FIREBALL cinnamon

---

[28] Other examples of FIREBALL promotional materials and branded items are shown in Appx4505, Appx925, Appx939-940, and Appx4546-4550, which the Board may have reviewed but did not specifically acknowledge.

whisky's popularity skyrocketed in the United States." Appx24 (citing Appx646-647).

This popularity is further reflected by "FIREBALL's 'almost 1 million followers' on Facebook[,]" which the Board found is "evidence of commercial strength[.]" Appx57. In discounting this evidence due to "the lack of 'context' and comparison to other whisky and liqueur brands," Appx 57, the Board made its own comparison to famous products other than whisky and liqueur brands, which it said "often have several million followers on Facebook and other social media[.]" Appx57-58. Assuming *arguendo* that such an apples-to-oranges comparison was appropriate, the Board overlooked that this Court, in *Omaha Steaks*, identified evidence of just "over 300,000 followers" on Facebook as part of the contextual evidence that supported vacating the Board's decision. 908 F.3d at 1320. When the Board in *Omaha Steaks* evaluated all of Omaha Steaks's contextual evidence on remand, it found that the mark had achieved a "significant level of fame." *See Omaha Steaks Int'l, Inc. v. Greater Omaha Packing Co.*, Opp. No. 91213527, 71 TTABVUE 34 (T.T.A.B. Sept. 30, 2020).

Given the Board's foregoing findings, which are supported by substantial evidence, when the proper standard for "fame" is applied, "only one conclusion can be reached regarding the fame of the [FIREBALL] mark"; it is famous and "thus entitled to broad protection." *Bose*, 293 F.3d at 1376. Therefore, this Court

should reverse the Board's finding to the contrary. *See id.* At a minimum, the Court should vacate the Board's decision and remand for the Board to consider the evidence under the proper legal standard. *Omaha Steaks*, 908 F.3d at 1322 (vacating and remanding).

#### 4. Additional Record Evidence Shows FIREBALL's Fame

Although the evidence the Board considered in determining the commercial strength of FIREBALL was sufficient to find fame under this Court's precedent, the record contains additional evidence of fame that the Board—without any elaboration—failed to consider, thus committing additional error. *See BASF Corp. v. Ingevity S.C., LLC,* No. 2022-1129, 2023 WL 4115908, at *4 (Fed. Cir. June 22, 2023) ("Though the Board is not required to discuss every piece of evidence, it cannot . . . disregard . . . evidence without explanation." (quoting *Princeton Vanguard, LLC v. Frito-Lay N. Am., Inc.*, 786 F.3d 960, 970 (Fed. Cir. 2015)); *see also Ultratec, Inc. v. CaptionCall, LLC,* 872 F.3d 1267, 1269 (Fed. Cir. 2017) (remanding "[b]ecause the Board failed to consider material evidence" or "explain its decisions to exclude the evidence"). Should the Court remand, it should instruct the Board to reassess the strength factor, taking the below evidence into account in accordance with the Board's obligations under the Administrative Procedure Act.

***Bullshine's Admissions Regarding Market Share.*** The Board acknowledged the existence of Bullshine's business plan that outlines Bullshine's

**CONFIDENTIAL INFORMATION HAS BEEN REMOVED FROM THIS PAGE**

plan to use Sazerac's FIREBALL brand. Appx66 n.20 (citing Appx4940). However, the Board did not address Bullshine's admissions describing (1) FIREBALL whisky as "the [redacted] Appx1480; (2) [redacted] with an estimated [redacted] of the market, Appx1487-1488; and (3) "the [redacted] selling flavored whiskey in the U.S.," Appx1490.

***Awards for FIREBALL Whisky***. FIREBALL whisky won gold, silver, and bronze medals from tasting competitions and bronze metals for packaging design competitions by the San Francisco World Spirits Competition for multiple years between 2001 and 2007; silver, gold, and double gold awards for graphics and overall package by Los Angeles International Wine & Spirits Competition; a silver medal for Best in Class by The International Wine and Spirits Competition; and a silver medal by the 2006 BTI Best Buy Bar Competition. Appx4593-4603. This type of evidence supports a finding of fame. *Bose*, 293 F.3d at 1373 (discussing two magazine awards). Similarly, in *Joseph Phelps Vineyards, LLC v. Fairmont Holdings LLC*, this Court remanded for the Board to consider the various accolades the opposer's product had received to reassess the strength of the mark. 857 F.3d 1323, 1326 (Fed. Cir. 2017). On remand, the Board found that the mark had "achieved a high level of fame" based on (1) sales of the opposer's wine products—sales that are a fraction of the sales of FIREBALL whisky; (2) five wine awards won over twelve years; and (3) eleven news articles. *Joseph Phelps*

*Vineyards, LLC v. Fairmont Holdings, LLC*, Cancellation No. 92057240, 2019 WL 140540, at *5 (T.T.A.B. Jan. 3, 2019).

***Publications Commenting on Spirit Industry Rankings of FIREBALL Whisky***. The Board did not adequately consider evidence of major publications describing FIREBALL as a top selling or popular spirit brand, including: (1) a *Wall Street Journal* article identifying FIREBALL as one of the top ten selling whiskey brands in the U.S. and how brands such as Jim Beam and Wild Turkey were trying to compete, Appx3827; (2) an article in the *Lexington Herald Leader* about FIREBALL being the eighth most popular spirits brand, Appx3816; (3) an article from *Playboy* that FIREBALL is the most popular whiskey brand in fourteen states, Appx3820-3821; and (4) others, Appx3836; Appx3864-3866; Appx3881-3882. At a minimum, these publications show that consumers have been exposed to information about FIREBALL as an extremely strong brand.

***Co-promotion/Co-branding Deals.*** Sazerac partnered with alcohol brands such as PBR/PABST for co-promotional campaigns featuring FIREBALL whisky and with national restaurants such as Applebee's and Red Robin to promote menu items and drinks incorporating FIREBALL whisky. Appx659; Appx1159-1161; Appx4515; Appx4613-4618. The Board did not address this evidence despite acknowledging that "licensing activities" are relevant for determining the fame or

strength of a mark. Appx56 (citing *Coach Servs., Inc. v. Triumph Learning LLC*, 668 F.3d 1356, 1367 (Fed. Cir. 2012)).

***Additional Types of Advertising and Marketing Materials.*** The Board did not consider additional types of advertising and marketing efforts, including a sell sheet from 2007 promoting a "Fireball chiller machine," which was used in bars nationwide, Appx4508-4509, and various other point-of-sale items, Appx648-650; Appx707; Appx925-926; Appx939-940; Appx943; Appx945-946; Appx958; Appx1007; Appx1109-1118; Appx4506-4509; Appx4558-4561; Appx4564-4574.

***Engagement from Devoted FIREBALL Fans.*** Another example of fame is the FIREBALL fanbase. Sazerac has received thousands of emails and social media posts from the consuming public discussing their love of FIREBALL whisky, including fans who have tattooed the FIREBALL trademark on their bodies, had FIREBALL themed weddings, asked to name their local sports teams FIREBALL, and a fan whose now-late husband requested to be, and was, buried with a bottle of FIREBALL whisky. Appx656-657; Appx1054; Appx1081-1129.

### B. The Board Erred in Determining the Conceptual Strength of FIREBALL

#### 1. The Board Legally Erred by Looking to Dissimilar Goods

When evaluating the strength of a mark, "the controlling inquiry is the extent of third-party marks in use on 'similar' goods or services." *Omaha Steaks*, 908 F.3d at 1324. Yet the Board found that FIREBALL is conceptually weak by

considering its use on wildly ***dissimilar*** goods: "The term "fireball" has also been widely used by third parties to denote the flavor of ATOMIC FIREBALL ***candy*** in products such as ***popcorn, ice cream and beef jerky*** as well as liquid flavorings to be added to food/beverages." Appx59. The Board cited and the record contains no evidence showing that candy, popcorn, ice cream, beef jerky, or liquid flavorings are "similar to" whisky/liqueur.

Here too, *Omaha Steaks* is instructive. In *Omaha Steaks*, the Board found that OMAHA was weak as a designation of source for meat because it was used in connection with popcorn, wine, oriental foods, and alcoholic beverages. In vacating this finding, the Court determined that any argument that those goods were "similar" to steak lacked record support and the Board's analysis of third-party usage was "flawed" because it "failed to focus on goods shown to be similar to meat." 908 F.3d at 1325-26.[29] Similarly, in *National Cable Television Association, Inc. v. American Cinema Editors, Inc.*, third-party uses of the mark, ACE, were "not only unpersuasive but essentially meaningless" to show that ACE is weak where "[n]one of the third party marks and uses of ACE made of record

---

[29] The Board's Decision also contradicts the Board's recent holdings in *Chatham Imports, Inc. v. Driftless Pure, LLC*, Opp. No. 91243988, 2022 WL 3974325 (T.T.A.B. 2022) (evidence of third party use on beer, wine, and hard cider not evidence of weakness of mark used in connection with distilled spirits), and *Luxco, Inc. v. Everwild Spirits, LLC*, Opp. No. 91268045, 2023 WL 2889715 (T.T.A.B. Mar. 24, 2023) (third party uses with beer of little probative value to strength of a mark used in connection with distilled spirits and wine).

are nearly as closely related to the activities of the parties as the virtually identical uses of the parties are to each other." 937 F.2d 1572, 1580 (Fed. Cir. 1991).[30] Therefore, the Board legally erred in relying on third-party uses on dissimilar goods to find that FIREBALL is conceptually weak. The undisputed fact remains that Sazerac is the ***only*** user of FIREBALL as a brand name for whisky or liqueurs. Appx50-51; Appx663; Appx1211-1212; Appx1226; Appx1293-1294; Appx1370; Appx1433.

Because the Board based its finding that FIREBALL is "highly suggestive of the taste and flavor of Opposer's 'sweet/spicy cinnamon'-flavored whisky/liqueur" in part on third-party uses on dissimilar goods, Appx58-59, the Board's legal error requires this Court to vacate this finding. *See Omaha Steaks*, 908 F.3d at 1326.

#### 2. Substantial Evidence Does Not Support the Board's Finding that FIREBALL Is Conceptually Weak

The Board also based its finding that FIREBALL is "highly suggestive" on decades-old statements by Sazerac in a USPTO filing and federal court proceeding and cocktail/shot/shooter recipes that have inconsistent ingredients and flavors. Appx58-59. Substantial evidence does not support the Board's finding that FIREBALL is "highly suggestive" due to these statements and recipes.

***With respect to the alleged admissions***, the Board improperly relied on two

---

[30] Here, the parties' goods are identical. Appx54.

legal filings from "more than 20 years ago[.]" Appx58. First, such filings are irrelevant because the Board recognized that Sazerac's concessions were made "over 21 years ago," Appx38, and at a time when Sazerac "was using FIREBALL as a mark for its cinnamon whisky product," Appx22.[31] Second, the Board is assessing likelihood of confusion now, when Bullshine's registration is under consideration; it is not assessing whether there was a likelihood of confusion, and thus whether FIREBALL was conceptually strong, at the time of these two-decade old filings. *See R. J. Reynolds Tobacco Co. v. Am. Brands, Inc.*, 493 F.2d 1235, 1237 (C.C.P.A. 1974) (noting that it would "frustrate the purpose of the [Lanham Act] to permit registration when, during the time registration is under consideration, there is a likelihood of confusion—although in the past there existed no likelihood of confusion"); *see also Gillette Co. v. "42" Prods. Ltd.*, 396 F.2d 1001, 1005 (C.C.P.A. 1968) (Almond, J., concurring) ("[R]egistration is prohibited if there is today a likelihood of confusion, and the question of whether confusion was likely ten or twenty years ago is irrelevant."). "Trademark rights are not static," *Chippendales*, 622 F.3d at 1354, and as the Board correctly found, FIREBALL "is used and understood differently by the relevant public" now than it was in 2001. Appx38-39.

---

[31] Sazerac's registrations are substantial evidence of the inherent distinctiveness of FIREBALL. Appx58.

***With respect to the cocktail recipes***, the Board erred in two respects. First, the Board found, based on the recipes, that FIREBALL "suggests certain alcoholic mixed drinks." Appx59. However, to be "suggestive," the mark must be suggestive of "the qualities or characteristics of the goods" in question—here, Sazerac's FIREBALL whisky. *See In re MBNA Am. Bank, N.A.*, 340 F.3d 1328, 1332 (Fed. Cir. 2003) ("[I]f a mark requires imagination, thought, and perception to arrive at the qualities or characteristics of the goods [or services], then the mark is suggestive." (internal citations omitted)); 2 McCarthy on Trademarks and Unfair Competition § 11:64 (5th ed.) (noting that a "suggestive" term must hint at the "ingredients, qualities or characteristics of the product"). Sazerac's FIREBALL ***whisky*** is not an "alcoholic ***mixed drink***." Thus, to the extent that FIREBALL suggests such a drink, Appx59, it is not suggestive, let alone highly suggestive, of a particular quality or characteristic of Sazerac's FIREBALL brand ***whisky***.

Second, based on third-party cocktail recipes (including the one recited in "The Guest"), the Board also found that FIREBALL "is ***highly*** suggestive of the taste and flavor of [Sazerac's] 'sweet/spicy cinnamon'-flavored whisky/liqueur." Appx59-60. However, the Board correctly noted earlier in its Decision that "precious few" of the "recipes come nearly as close to the ATOMIC FIREBALL flavor as does Opposer's FIREBALL cinnamon whisky." Appx42 n.13; *see also* Appx41-43; Appx49 ("[M]any of the recipes . . . would not replicate the . . .

FIREBALL cinnamon whisky[] flavor.”). Given its findings, FIREBALL is nowhere near as suggestive as the marks this Court previously determined rose to the level of “***highly*** suggestive.” *See United Trademark Holdings, Inc. v. Disney Enters., Inc.*, No. 2021-1056, 2022 WL 558247, at *3 (Fed. Cir. Feb. 24, 2022) (affirming finding that TINKER BELL was highly suggestive of ***Tinker Bell*** doll); *Nat’l Data Corp. v. Comput. Sys. Eng’g, Inc.*, 940 F.2d 676, 1991 WL 124920, at *2 (Fed. Cir. 1991) (affirming Board’s dismissal of opposition based on no likelihood of confusion where “DATA” was “highly suggestive” for “electronic ***data*** processing services”); *Drackett Co. v. H. Kohnstamm & Co.*, 404 F.2d 1399, 1400 (C.C.P.A. 1969) (affirming finding that “‘ENDUST’ and ‘DUSTOP’ are highly suggestive terms” which were “adopted to indicate that the products sold thereunder are intended to ***end or stop dust***”).

The Board’s finding that FIREBALL is “***highly*** suggestive of the taste and flavor of [Sazerac’s] ‘sweet/spicy cinnamon’-flavored whisky/liqueur,” Appx58-59, should be set aside as lacking substantial evidence, especially in light of its other findings.

### C. The Board Committed Legal Error by Failing To Consider Evidence That the Sixth *DuPont* Factor Weighs in Favor of Likelihood of Confusion

The Board must address all *DuPont* factors on which evidence and argument are presented. *Guild Mortgage*, 912 F.3d at 1379. Sazerac presented evidence

under the sixth *DuPont* factor—"the number and nature of similar marks in use on similar goods"—showing that Sazerac's use of FIREBALL as a trademark in connection with whisky or liqueur is exclusive. Appx663. Bullshine has repeatedly admitted this fact. Appx1433 (RFA 49); Appx1211 (149:19-22); Appx1226 (89:5-14); Appx1293-1294 (59:20-60:10); Appx1370 (268:5-14). Not surprisingly, therefore, the Board found that "[t]here is no evidence that any of [Sazerac's] competitors in the whisky or liqueur fields used the term FIREBALL at the time of registration," Appx50-51, and that Sazerac has "successfully enforced its asserted rights in FIREBALL against many of the third-party users of the term[,]" Appx51.

Yet, despite Sazerac's evidence and the Board's finding, the Board did not address the sixth *DuPont* factor in its likelihood of confusion decision at all. As a result of this failure alone, this Court should vacate the Board's decision and remand for the Board to consider this evidence. *See Guild Mortgage*, 912 F.3d at 1379 (vacating and remanding where "Board failed to consider relevant argument and evidence directed to *DuPont* factor 8").

### D. This Court Should Vacate the Board's Finding of No Likelihood of Confusion Because It Was Infected by the Board's Other Errors

The Board's failure to find fame—despite overwhelming evidence of commercial renown—influenced its weighing of the fifth *DuPont* factor (strength

of the mark), the first *DuPont* factor (similarity of the marks), and its ultimate conclusion of no likelihood of confusion. When a mark is famous it plays a dominant role in the likelihood of confusion analysis, as a very strong mark receives a wider scope of protection. *Kenner Parker*, 963 F.2d at 352, 354. Here, the Board considered the likelihood of confusion issue against the erroneous backdrop that FIREBALL was not famous. Appx58-66.

First, the Board's conclusion, in analyzing *DuPont* factor 5, that "conceptual weakness essentially 'cancels out' the FIREBALL mark's commercial strength, and that ultimately the mark is entitled to no more than a normal scope of protection," Appx60, put too much weight on conceptual weakness. When compared with the overwhelming evidence of commercial strength in the record here, FIREBALL should be afforded ***at least*** a somewhat broader scope of protection than average. *See, e.g.*, *Money Station, Inc. v. Cash Station, Inc*., 70 F.3d 1290, 1995 WL 697313, at *3 (Fed. Cir. 1995) (although CASH STATION was "highly suggestive," it had gained a "substantial measure of goodwill" in the Chicago area, weighing in favor of opposer, and therefore a finding of likelihood of confusion with regard to MONEY STATION was warranted).

Second, when addressing *DuPont* factor 1, the Board discounted similarities between Bullshine's and Sazerac's marks based in part on third-party marks for dissimilar goods that were not directed to the relevant public, i.e., "consumers of

whisky and liqueurs," Appx35. *See* Appx 61-63 (finding that in addition to meaning "literally, a ball of fire," "'fireball' also has a second meaning, conveying that [Sazerac's] whisky/liqueur has a sweet/spicy cinnamon flavor" similar to the flavor of ATOMIC FIREBALL candy). Thus, despite Bullshine's choosing a mark that includes a word that is one letter off of Sazerac's multi-billion dollar brand, Appx661,[32] the Board held that, even if "FIREBULL in [Bullshine's] mark may call to mind [Sazerac's] mark," FIREBALL is "not distinctive enough for there to be a likelihood of confusion between the marks[.]" Appx63.

In support of its conclusion, the Board primarily relied on *Sure-Fit Products v. Saltzon Drapery*, 254 F.2d 158 (C.C.P.A 1958). However, while *Sure-Fit* involved a descriptive mark that was registered only upon a showing of secondary meaning, here, FIREBALL is inherently distinctive. Appx58. Moreover, while there was "nothing in the [*Sure-Fit*] record to indicate that th[e] mark [was] not still in the category of a weak mark" at the time of the likelihood of confusion analysis, *Sure-Fit*, 254 F.2d at 160, here, there is overwhelming evidence of commercial strength. *See* Section III.A. The descriptive nature of FIT in connection with slip covers in *Sure-Fit*, 254 F.2d at 159, is very different from FIREBALL in connection with whisky, especially given the overwhelming

[32] FIREBULL is also phonetically virtually identical to FIREBALL, as evidenced by Bullshine's principal thinking—twice—that Sazerac's counsel said "firebull" when she had said "fireball." Appx1191-1192; Appx1198.

commercial renown of the FIREBALL brand.[33]

In light of the Board's errors, remand is necessary for the Board to reweigh the *DuPont* factors, including: (1) giving FIREBALL the weight due to a famous mark when evaluating the first factor (similarity of the marks) and balancing all of the *DuPont* factors; (2) evaluating the conceptual strength of FIREBALL without referencing dissimilar goods; and (3) considering the previously ignored sixth factor (the number and nature of similar marks in use on similar goods).

## IV. CONCLUSION

This Court should affirm the Board's judgment refusing to cancel Sazerac's registrations, reverse the Board's finding that FIREBALL is not famous, and vacate and remand the Board's dismissal of Sazerac's opposition to Bullshine's registration.

[33] The other non-binding cases the Board cites are equally distinguishable. The common elements of the marks in those cases were: PERKS for volume discount buying services, ESSENTIALS for sportswear, and PLUS for vitamins. Appx63-65. *Couch / Braunsdorf Affinity, Inc. v. 12 Interactive, LLC*, 110 USPQ2d 1458 (T.T.A.B. 2014); *Knight Textile Corp. v. Jones Inv. Co.*, 75 USPQ2d 1313 (T.T.A.B. 2005); *Plus Prods. vs. Natural Organics, Inc.*, 204 USPQ 773 (T.T.A.B. 1979). Unlike FIREBALL for whisky/liqueur, these terms are borderline descriptive and laudatory in their relevant context.

Dated: September 20, 2023

Respectfully submitted,

*/s/ Lauren A. Degnan*

Lauren A. Degnan
Jared Hartzman
FISH & RICHARDSON P.C.
1000 Maine Avenue, S.W.
Suite 1000
Washington, DC 20024
Tel: (202) 783-5070
degnan@fr.com
hartzman@fr.com

Cynthia Walden
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02210
Tel: (617) 542-5070
walden@fr.com

Kristen McCallion
Vivian Cheng
FISH & RICHARDSON P.C.
7 Times Square, 20th Floor
New York, NY 10036
Tel: (212) 765-5070
McCallion@fr.com
cheng@fr.com

***Attorneys for Cross-Appellant Sazerac Brands, LLC***

## CERTIFICATE OF SERVICE AND FILING

I certify that on September 20, 2023, I electronically filed the foregoing **NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF** of Cross-Appellant Sazerac Brands, LLC using the Court's CM/ECF filing system. Counsel for appellees were electronically served by and through the Court's CM/ECF filing system per Fed. R. App. P. 25 and Fed. Cir. R. 25(e) on September 20, 2023.

*/s/ Lauren A. Degnan*
Lauren A. Degnan

## CERTIFICATE OF COMPLIANCE

The **NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF** of Cross-Appellant is submitted in accordance with the type-volume limitation of Fed. Cir. R. 28.1(b)(2) and contains 16,493 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f) and Fed. Cir. R. 32(b)(2). This brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 Point.

Dated: September 20, 2023

*<u>/s/ Lauren A. Degnan</u>*
Lauren A. Degnan

## CERTIFICATE OF CONFIDENTIAL INFORMATION

Cross-Appellant Sazerac Brands, LLC's **NON-CONFIDENTIAL PRINCIPAL AND RESPONSE BRIEF** complies with Federal Circuit Rule 25.1(d)'s limitations on the amount of material that can be marked confidential in motions, responses, replies, or briefs. This brief contains 15 unique words (including numbers) marked confidential, which does not exceed the maximum of 15 words permitted by Fed. Cir. R. 25.1(d)(1)(A).

*/s/ Lauren A. Degnan*
Lauren A. Degnan